## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Francisca Sandoval, Ines Hernandez, Miriam Pachecho, Eva Reyes, Arminda Gomez, Nidia Guerrero, Lucila Marquez, and Maria Perez, | Court File No.: _Obcv 1772_ _RHK JSM_ |
| Plaintiffs, | **CLASS-ACTION COMPLAINT** **JURY TRIAL DEMANDED** |
| v. | |
| American Building Maintenance Industries, Inc., a/k/a ABM Industries Incorporated, d/b/a ABM Janitorial Services, | |
| Defendant. | |

### NATURE OF THE ACTION

1.      Plaintiff Class files this lawsuit on behalf of women previously and/or currently employed in Minnesota by Defendant as janitors and women who will be employed by, or seek employment with, Defendant as janitors in Minnesota during the pendency of the case.

2.      Pursuant to Title VII and the Minnesota Human Rights Act, Plaintiff Class brings its civil rights claims to address severe sex harassment of female janitors by their direct supervisors.  The egregious sex harassment has taken many forms, including coerced sex and additional assaults in the workplace.  Plaintiff Class also files this action to address other pervasive sex discrimination and retaliation against women at work.

1

SCANNED

MAY 15 2006

U.S. DISTRICT COURT MPLS

## JURISDICTION

3.      This Court has jurisdiction over the federal employment claims herein and

Plaintiff Class commences this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343, 42

U.S.C. § 1981a, and 42 U.S.C. § 2000e-5.  This Court's supplemental jurisdiction extends,

under 28 U.S.C. § 1367, to the state employment claims herein.

4.      The federal and state employment claims herein arise in the State of

Minnesota, so venue is proper in the Minnesota District of the United States District

Court, pursuant to 28 U.S.C. § 1391.

## PARTIES

5.      Plaintiff Class representative Francisca Sandoval resides in Minnesota and

has been employed by Defendant to clean facilities beginning in approximately March

1997.

6.      During her employment with Defendant, Ms. Sandoval has performed her

job duties satisfactorily.

7.      Ms. Sandoval is an employee within the meaning of the statutes that form

the basis of this action.

8.      Ms. Sandoval is a native Spanish speaker who speaks little English.

9.      Ms. Sandoval timely filed her employment-related claims against Defendant

with the Equal Employment Opportunity Commission ("EEOC") and the Minnesota

Department of Human Rights ("MDHR").

2

10.     On May 11, 2006, the EEOC issued Ms. Sandoval a "right-to-sue" notice at her request.

11.     Accordingly, Ms. Sandoval has exhausted all administrative prerequisites for the maintenance of this litigation.

12.     Plaintiff Class representative Ines Hernandez resides in Minnesota and has been employed by Defendant to clean facilities beginning in approximately March 2003.

13.     During her employment with Defendant, Ms. Hernandez has performed her job duties satisfactorily.

14.     Ms. Hernandez is an employee within the meaning of the statutes that form the basis of this action.

15.     Ms. Hernandez is a native Spanish speaker who speaks little English.

16.     Ms. Hernandez timely filed her employment-related claims against Defendant with the EEOC and the MDHR.

17.     On May 11, 2006, the EEOC issued Ms. Hernandez a "right-to-sue" notice at her request.

18.     Accordingly, Ms. Hernandez has exhausted all administrative prerequisites for the maintenance of this litigation.

19.     Plaintiff Class representative Miriam Pachecho resides in Minnesota and has been employed by Defendant to clean facilities beginning in approximately December 2000.

20.     During her employment with Defendant, Ms. Pachecho has performed her job duties satisfactorily.

21.     Ms. Pachecho is an employee within the meaning of the statutes that form the basis of this action.

22.     Ms. Pachecho is a native Spanish speaker who speaks little English.

23.     Ms. Pachecho timely filed her employment-related claims against Defendant with the EEOC and the MDHR.

24.     On May 3, 2006, the EEOC issued Ms. Pachecho a "right-to-sue" notice at her request.

25.     Accordingly, Ms. Pachecho has exhausted all administrative prerequisites for the maintenance of this litigation.

26.     Plaintiff Class representative Eva Reyes resides in Minnesota and has been employed by Defendant to clean facilities beginning in approximately March 2001.

27.     During her employment with Defendant, Ms. Reyes has performed her job duties satisfactorily.

28.     Ms. Reyes is an employee within the meaning of the statutes that form the basis of this action.

29.     Ms. Reyes is a native Spanish speaker who speaks little English.

30.     Ms. Reyes timely filed her employment-related claims against Defendant with the EEOC and the MDHR.

31.     On May 11, 2006, the EEOC issued Ms. Reyes a "right-to-sue" notice at her request.

32.     Accordingly, Ms. Reyes has exhausted all administrative prerequisites for the maintenance of this litigation.

33.     Plaintiff Class representative Arminda Gomez resides in Minnesota and has been employed by Defendant to clean facilities beginning in approximately April 2002.

34.     During her employment with Defendant, Ms. Gomez has performed her job duties satisfactorily.

35.     Ms. Gomez is an employee within the meaning of the statutes that form the basis of this action.

36.     Ms. Gomez is a native Spanish speaker who speaks little English.

37.     Ms. Gomez timely filed her employment-related claims against Defendant with the EEOC and the MDHR.

38.     On May 11, 2006, the EEOC issued Ms. Gomez a "right-to-sue" notice at her request.

39.     Accordingly, Ms. Gomez has exhausted all administrative prerequisites for the maintenance of this litigation.

40.     Plaintiff Class representative Nidia Guerrero resides in Minnesota and was employed by Defendant to clean facilities beginning in approximately March 2003.

41.     During her employment with Defendant, Ms. Guerrero performed her job

5

duties satisfactorily.

42.     Ms. Guerrero is an employee within the meaning of the statutes that form the basis of this action.

43.     Ms. Guerrero is a native Spanish speaker who speaks little English.

44.     Ms. Guerrero timely filed her employment-related claims against Defendant with the EEOC and the MDHR.

45.     On May 3, 2006, the EEOC issued Ms. Guerrero a "right-to-sue" notice at her request.

46.     Accordingly, Ms. Guerrero has exhausted all administrative prerequisites for the maintenance of this litigation.

47.     Plaintiff Class representative Lucila Marquez resides in Minnesota and has been employed by Defendant to clean facilities beginning in approximately February 1997.

48.     During her employment with Defendant, Ms. Marquez has performed her job duties satisfactorily.

49.     Ms. Marquez is an employee within the meaning of the statutes that form the basis of this action.

50.     Ms. Marquez is a native Spanish speaker who speaks little English.

51.     Ms. Marquez timely filed her employment-related claims against Defendant with the EEOC and the MDHR.

52.     On May 2, 2006, the EEOC issued Ms. Marquez a "right-to-sue" notice at her request.

53.     Accordingly, Ms. Marquez has exhausted all administrative prerequisites for the maintenance of this litigation.

54.     Plaintiff Class representative Maria Perez resides in Minnesota and has been employed by Defendant to clean facilities beginning in approximately April 2001.

55.     During her employment with Defendant, Ms. Perez has performed her job duties satisfactorily.

56.     Ms. Perez is an employee within the meaning of the statutes that form the basis of this action.

57.     Ms. Perez is a native Spanish speaker who speaks little English.

58.     Ms. Perez timely filed her employment-related claims against Defendant with the EEOC and the MDHR.

59.     On May 4, 2006, the EEOC issued Ms. Perez a "right-to-sue" notice at her request.

60.     Accordingly, Ms. Perez has exhausted all administrative prerequisites for the maintenance of this litigation.

61.     Defendant American Building Maintenance Industries, Inc., also known as ABM Industries Incorporated, doing business as ABM Janitorial Services, provides janitorial and other facility services at numerous locations in Minnesota, such as at the

7

Minneapolis-St. Paul International Airport and downtown office buildings.

62.  Incorporated in Delaware as a for-profit corporation, Defendant has generated annual revenues of over $2 billion since at least 2003.

63.  Defendant is one of the largest facility-services contractors listed on the New York Stock Exchange, employing nearly 75,000 workers in North America.

64.  Defendant is an employer within the meaning of the statutes that form the basis of this action.

## PATTERN AND PRACTICE OF SEX HARASSMENT, DISCRIMINATION, AND RETALIATION DIRECTED AT PLAINTIFF CLASS

65.  Defendant has assigned Plaintiff Class to work at various Minnesota facilities for Defendant.

66.  Defendant has adopted and maintained a system-wide pattern and practice of subjecting female janitors to sex harassment, discrimination, and retaliation that has denied Plaintiff Class equal employment opportunities.

67.  Defendant's pattern and practice of sex harassment, discrimination, and retaliation has created a highly offensive and hostile work environment for Plaintiff Class, and such conduct is based on the sex of Plaintiff Class members.

68.  As a matter of policy and practice, Defendant has conferred comprehensive powers and broad discretion on supervisors at the building level to alter the terms and conditions of employment for Plaintiff Class, including the authority to hire and fire employees; all equal employment violations alleged in this Complaint do not arise out of

8

contractual or collective bargaining terms and conditions of employment.

69.     Also as a matter of policy and practice, Defendant has not provided direct supervisors with adequate training on equal employment rights and responsibilities as well as on how to make employment decisions at Minnesota facilities in conformity with applicable employment statutes.

70.     As another matter of policy and practice, Defendant has provided virtually no monitoring of direct supervisors' treatment of Plaintiff Class in the workplace.

71.     As an additional matter of policy and practice, Defendant has not provided Plaintiff Class with adequate training on equal employment rights and responsibilities.

72.     As a further matter of policy and practice, Defendant has not established or maintained company procedures at Minnesota facilities that adequately guard against sex harassment, discrimination, and retaliation concerning Plaintiff Class.

73.     In addition, Defendant has failed to adopt investigation and corrective-action policies and practices at Minnesota facilities that adequately address sex harassment, discrimination, and retaliation regarding Plaintiff Class.

74.     At Minnesota facilities, Plaintiff Class has experienced sex harassment, discrimination, and retaliation in the form of unwelcome, frequent, and highly offensive sexual comments and touching as well as other adverse actions by direct supervisors.

75.     Defendant's pattern and practice of sex harassment, discrimination, and retaliation has had a material impact on the terms and conditions of employment for

9

Plaintiff Class.

76.     Plaintiffs and their representatives have complained multiple times to Defendant about the sex harassment, discrimination, and retaliation to which Plaintiffs and other members of Plaintiff Class have been subjected.

77.     Defendant has had actual and constructive knowledge of the sex harassment, discrimination, and retaliation experienced by Plaintiff Class, but Defendant has allowed this adverse treatment of Plaintiff class to continue.

78.     Defendant has classified job opportunities based on sex by, for example, indicating that "porter" positions are open to men and "matron" positions are open to women.

79.     As a matter of policy and practice, Defendant also has prevented women from learning of, and applying for, promotions to first-line supervisory positions by, for example, not regularly posting those job openings.

80.     While many of Defendant's non-supervisory employees are women, most of Defendant's direct supervisors are men.

81.     The sex harassment, discrimination, and retaliation have continued because Defendant has failed to take timely and adequate corrective action as a matter of policy and practice.

82.     Defendant's senior management has independently adopted, ratified, condoned, and approved the harassing, discriminatory, and retaliatory conduct identified

herein.

83.     Defendant has carried out its harassing, discriminatory, and retaliatory

conduct toward Plaintiff Class intentionally, deliberately, willfully, maliciously,

wantonly, and with reckless and callous disregard for the rights of Plaintiff Class.

84.     The sex of Plaintiff Class as well as their exercise of rights under anti-

discrimination employment statutes is a motivating factor in Defendant's decisions to take

adverse action against Plaintiff Class.

## CLASS-ACTION ALLEGATIONS

85.     Pursuant to Fed.R.Civ.P. 23, Plaintiff Class representatives Francisca Sandoval,

Ines Hernandez, Miriam Pachecho, Eva Reyes, Arminda Gomez, Nidia Guerrero, Lucila

Marquez, and Maria Perez seek to represent a class consisting of all women employed in non-

supervisory janitor positions in Minnesota by Defendant and all women seeking employment

from Defendant in non-supervisory janitor positions in Minnesota at any time between 2001 and

the present.

86.     Plaintiff Class satisfies the numerosity requirement of Fed.R.Civ.P. 23(a)(1)

because Plaintiff Class appears to exceed 100 women.  It would be impracticable to bring

all, or even a substantial percentage of, such persons before the Court as individual

plaintiffs.

87.     Common questions of law and fact exist for Plaintiff Class, as required by

Fed.R.Civ.P. 23(a)(2), and their resolution will advance the claims of Plaintiff Class as a

whole because those questions are the focus of this litigation.  The overarching question

11

of law and fact common to all members of Plaintiff Class is as follows: whether

Defendant, through its management and supervisory workforce, has adopted and

maintained policies and practices of sex harassment, discrimination, and retaliation that

are generally applicable to Plaintiff Class and deprive Plaintiff Class of equal

employment opportunities. The overarching common issue of law and fact includes

numerous sub-issues of law and fact that also are common to Plaintiff Class. These sub-

issues include, but are not limited to, the following:

a.   Whether Defendant adopted and adequately publicized procedures that
provide female janitors with the means to address adequately sex
harassment, discrimination, and retaliation;

b.   Whether Defendant tolerated sex harassment, discrimination, and retaliation
when it had actual or constructive knowledge of that conduct;

c.   Whether Defendant had a legitimate, non-discriminatory reason for
classifying, via policies and practices, certain job positions as open to men
and other job positions as open to women;

d.   Whether Defendant had a legitimate, non-discriminatory reason for
preventing female janitors from learning of, and applying for, promotions to
direct supervisor positions;

e.   Whether Defendant had a legitimate, non-retaliatory reason for taking
adverse action against female janitors when they reported sex harassment,
discrimination, and/or retaliation;

f.   Whether Defendant treated female janitors less favorably than male
employees because it adopted and maintained invidious stereotyping;

g.   Whether Defendant's employment policies and practices that adversely
affected women violate federal and state law under either a disparate
treatment or a disparate impact theory; and

h.    Whether Defendant's harassing, discriminatory, and retaliatory policies and practices warrant the provision of comprehensive injunctive relief that includes ongoing monitoring by the Court.

88.    In accordance with Fed.R.Civ.P. 23(a)(3), the claims of the above-identified Plaintiff Class representatives typify the claims of Plaintiff Class in the following respects: (i) they have been subjected to the same policies and practices of sex harassment, discrimination, and retaliation in employment; (ii) their claims turn on allegations that they have been adversely affected in a similar manner in that they have received less favorable treatment than their male counterparts concerning material aspects of employment; and (iii) their claims are based on the same legal theories and statutes, and they seek the same declaratory, injunctive, and other relief.

89.    The above-identified Plaintiff Class representatives adequately represent Plaintiff Class under Fed.R.Civ.P. 23(a)(4) for the following reasons: (i) they are ready, willing, and able to represent Plaintiff Class and have every reason to pursue this action to a successful conclusion; (ii) their claims are so interrelated with those of other members of Plaintiff Class; (iii) their interests do not conflict with the interests of other members of Plaintiff Class; and (iv) they have retained counsel experienced in litigating major class actions in the field of employment and civil rights law.

90.    Class-action status is warranted under Fed.R.Civ.P. 23(b)(2) because Defendant has acted on grounds generally applicable to Plaintiff Class, making declaratory and injunctive relief necessary with respect to Plaintiff Class as a whole.

91.     Such generally applicable grounds include, but are not limited to, Defendant's adoption and maintenance of policies and practices of sex harassment, discrimination, and retaliation to which Plaintiff Class has been subjected.

92.     The financial burden of proving that Defendant engaged in a pattern and practice of sex harassment, discrimination, and retaliation would make the prosecution of individual actions virtually impossible for most, if not all, members of Plaintiff Class.

93.     Plaintiff Class members fear they would face retaliation if they were to pursue individual actions against Defendant.

94.     Class-action status is appropriate under Fed.R.Civ.P. 23(b)(3) because the common questions of law and fact identified herein predominate over questions affecting only individual members of Plaintiff Class.

95.     A class action is superior to other available methods for the fair and efficient adjudication of this litigation.

96.     Requiring each member of Plaintiff Class to pursue her claim individually would entail needless and costly duplication and unreasonably tax the federal judiciary's increasingly scarce resources because, among other things, Plaintiff Class members allege that Defendant subjected them to the same policies and practices of sex harassment, discrimination, and retaliation.

97.     The financial burden and fear of retaliation outlined in paragraphs 92-93 also warrant class-action status here under Fed.R.Civ.P. 23(b)(3).

14

## PARTICULAR FACTS AS TO FRANCISCA SANDOVAL

98.     Since approximately November 2004, Ms. Sandoval's direct supervisor, D.G., has subjected her to unwelcome and offensive comments about his sexual desire for her.

99.     On multiple occasions, Ms. Sandoval's direct supervisor tried to kiss her and fondle her breasts against Ms. Sandoval's will.

100.    Ms. Sandoval has resisted these and other sexual advances, telling her direct supervisor that she is married and wants to do her job without being sexually harassed.

101.    Ms. Sandoval's direct supervisor has offered to pay her money to spend time with him alone outside of the workplace.

102.    Ms. Sandoval's direct supervisor has threatened Ms. Sandoval and increased her workload because she has continued to refuse to accept these and other sexual advances and because she has complained about the sex harassment.

103.    On several occasions, Ms. Sandoval indicated to her direct supervisor that she intended to report the ongoing sex harassment by him to Defendant's upper management.

104.    Ms. Sandoval's direct supervisor asserted that only he could translate for Ms. Sandoval and that Defendant's upper management would believe him rather than her.

105.    Ms. Sandoval's direct supervisor also warned that Ms. Sandoval would jeopardize her job by reporting his behavior to Defendant's upper management.

106.    On or about May 9, 2005, Ms. Sandoval's direct supervisor paged Ms.

15

Sandoval to change her work location to a secluded location in a building complex served by Defendant.

107.   When Ms. Sandoval entered a room to turn on the light, her direct supervisor appeared, pushed her onto a bed in that room, and continued to assault her by running his hands over her body and trying to kiss her.

108.   Ms. Sandoval's direct supervisor then said, in sum or substance, "what are you going to do if I rape you? No one can hear you; we're all alone out here."

109.   Ms. Sandoval's direct supervisor tried to put his hands up her shirt against her will.

110.   Ms. Sandoval's direct supervisor then attempted to pull down Ms. Sandoval's pants.

111.   Ms. Sandoval physically resisted her direct supervisor's advances.

112.   After this incident, her direct supervisor accused Ms. Sandoval of doing a bad job even though she has been a good employee for nearly a decade.

113.   On or about July 11, 2005, Ms. Sandoval's direct supervisor grabbed her, took her to an office, closed the door, and again pressured her to have a sexual relationship with him.

114.   Ms. Sandoval repeated that she was not interested and wanted to be left in peace to do her job.

115.   On or about August 11, 2005, Ms. Sandoval scheduled a meeting with

Defendant's upper management in another attempt to address the ongoing sex harassment.

116.    The next day, on or about August 12, 2005, Ms. Sandoval spoke more about her complaints of sex harassment through a translator she had to hire.

117.    Given Defendant's failure to take sufficient corrective action, Ms. Sandoval obtained a harassment restraining order concerning her direct supervisor on August 19, 2005.

118.    On information and belief, Defendant continues to employ Ms. Sandoval's direct supervisor.

## PARTICULAR FACTS AS TO INES HERNANDEZ

119.    Beginning in approximately September 2004, Ms. Hernandez's direct supervisor, F.O, touched her in sexually offensive ways on several occasions.

120.    Ms. Hernandez told her direct supervisor to stop touching her and tried to avoid interacting with him as much as possible after that.

121.    In approximately October 2004, Ms. Hernandez encountered her direct supervisor while she was on a facility elevator.

122.    She began to exit the elevator as her direct supervisor entered it to avoid riding the elevator alone with him, but Ms. Hernandez's direct supervisor insisted that Ms. Hernandez ride with him.

123.    After the elevator door closed, Ms. Hernandez's direct supervisor began grabbing Ms. Hernandez's buttocks and trying to grope her between her legs against her

17

will.

124.  Ms. Hernandez resisted, but her direct supervisor laughed and made an approving exclamation.

125.  Soon after, Ms. Hernandez reported the sex harassment she was experiencing to Defendant's shift manager, O.A.

126.  Manager O.A. and Ms. Hernandez's direct supervisor, who are related, later approached Ms. Hernandez together, and manager O.A. insisted that Ms. Hernandez misinterpreted her direct supervisor's behavior.

127.  Ms. Hernandez said, in sum or substance, "no I didn't because this is the third time my direct supervisor has grabbed my buttocks."

128.  Approximately one week after Ms. Hernandez complained about the sex harassment, manager O.A. and Ms. Hernandez's direct supervisor increased her workload and treated her with greater hostility.

129.  In approximately February 2005, Ms. Hernandez told manager O.A. that she wanted to talk to Defendant's building manager about the ongoing sex harassment.

130.  Later that week, manager O.A. told Ms. Hernandez, in sum or substance, "tomorrow the building manager will be available for you to talk with, but I'm asking you not to tell her anything about your direct supervisor's behavior toward you."

131.  Defendant designated manager O.A. as the translator for Ms. Hernandez at the meeting.

132.    During the meeting, Defendant's representatives did not ask Ms. Hernandez about the basis of her sex harassment complaints against her direct supervisor.

133.    In approximately April 2005, Ms. Hernandez scheduled another meeting with Defendant's upper management.

134.    Through a translator brought by Ms. Hernandez, she repeated the complaints she had previously lodged with manager O.A. about her direct supervisor.

135.    After that meeting, Ms. Hernandez's direct supervisor still had access to her and treated her in an intimidating manner.

136.    In approximately May 2005, Ms. Hernandez complained again about the ongoing sex harassment.

137.    On information and belief, Defendant continues to employ manager O.A. and Ms. Hernandez's direct supervisor.

## PARTICULAR FACTS AS TO MIRIAM PACHECHO

138.    Since approximately the summer of 2002, Ms. Pachecho's direct supervisor, M.V., regularly made unwanted and highly offensive comments about her appearance and his sexual desire for her.

139.    Ms. Pachecho's direct supervisor also forcibly kissed and groped her, and he compelled Ms. Pachecho to have sex with him against her will in the workplace.

140.    Ms. Pachecho's direct supervisor threatened to fire her if she did not comply with his sexual demands.

19

141.    Ms. Pachecho subsequently took maternity leave and then worked in a location away from her direct supervisor.

142.    In approximately August 2005, when Ms. Pachecho was again working in close proximity to her direct supervisor, the sex harassment – including demands for sex – intensified.

143.    Ms. Pachecho reported her direct supervisor's behavior to Defendant.

144.    Because of Defendant's failure to take adequate corrective action, Ms. Pachecho obtained a harassment restraining order concerning her direct supervisor on October 4, 2005.

145.    After Ms. Pachecho complained about the sex harassment and obtained the court order, Defendant decided to discharge her.

146.    On information and belief, Defendant promoted and has continued to employ Ms. Pachecho's direct supervisor.

## PARTICULAR FACTS AS TO EVA REYES

147.    Since approximately 2003, direct supervisor J.L. and, later, direct supervisor J.F. subjected Ms. Reyes to unwelcome and highly offensive sexual comments about her and other female coworkers, including false accusations that Ms. Reyes solicited sex from direct supervisor J.L.

148.    Direct supervisor J.L. also demanded that Ms. Reyes invite him to her house, particularly when Ms. Reyes' husband was out of town.

20

149.    Ms. Reyes asked direct supervisor J.L. to stop making sexually offensive comments to her and to stop demanding that she spend time with him alone at her home.

150.    Nonetheless, direct supervisor J.L.'s statements and demands continued.

151.    In approximately the end of 2004, Ms. Reyes learned that direct supervisor J.L. was falsely telling Ms. Reyes' coworkers that she had invited him to spend time with her at her home.

152.    After Ms. Reyes complained to direct supervisor J.L. about his false and sexually charged statements, he assigned her to a less favorable work area.

153.    On several occasions, direct supervisor J.L. told Ms. Reyes that it would do no good to complain about his conduct to Defendant's upper management because they would always believe him rather than, in sum or substance, "Hispanic women."

154.    In being assigned to a less favorable work area, Ms. Reyes came into regular contact with direct supervisor J.F.

155.    He made unwelcome and highly offensive sexual comments similar to those made by direct supervisor J.L.

156.    As with direct supervisor J.L., Ms. Reyes told direct supervisor J.F. that his statements were not appropriate and should stop.

157.    Nonetheless, direct supervisor J.F. continued to make sexually charged comments to Ms. Reyes, including providing descriptions of his and direct supervisor J.L.'s respective experiences with Viagra.

21

158.    In approximately March 2005, Ms. Reyes requested a transfer to another shift to try to avoid the ongoing sex harassment.

159.    Shortly after changing shifts, Ms. Reyes was called into the office of Defendant's upper management and asked humiliating questions about her alleged sexual relationship with direct supervisor J.L.

160.    Ms. Reyes again repeated that she has not sought, nor has she had, a sexual relationship with direct supervisor J.L.

161.    On information and belief, Defendant continues to employ direct supervisor J.F.

## PARTICULAR FACTS AS TO ARMINDA GOMEZ

162.    Since approximately November 2004, Ms. Gomez's direct supervisor, J.L., subjected Ms. Gomez to frequent and unwelcome statements of a sexually offensive nature.

163.    In approximately May 2005, Ms. Gomez's direct supervisor declared that Ms. Gomez had promised to have sex with him when he was ready and that he was now ready.

164.    Ms. Gomez told her direct supervisor that she would not agree to have sex with him and asked him to stop harassing her.

165.    Ms. Gomez's direct supervisor increased Ms. Gomez's workload after she rejected his sexual advances.

22

166.    Ms. Gomez knew about her direct supervisor's retaliation against another female employee of Defendant who had complained about Ms. Gomez's direct supervisor.

167.    In the face of continuing sex harassment, Ms. Gomez complained again to her direct supervisor and indicated that she intended to report the harassment to Defendant's upper management.

168.    Ms. Gomez's direct supervisor became angry and falsely accused Ms. Gomez and her aunt, who also works for Defendant, of being lesbians.

169.    On several subsequent occasions, her direct supervisor called Ms. Gomez and Ms. Gomez's aunt lesbians in front of other employees of Defendant.

170.    In approximately June 2005, Ms. Gomez complained about her direct supervisor's ongoing harassing conduct to another supervisor, but the problems continued.

## PARTICULAR FACTS AS TO NIDIA GUERRERO

171.    In approximately October 2003, Ms. Guerrero requested permission to leave work early due to illness.

172.    Ms. Guerrero's direct supervisor, J.A., told her that she should sit down to see if that made her feel better.

173.    After Ms. Guerrero sat down, her direct supervisor sat next to her, caressed Ms. Guerero's shoulders and hands in an unwelcome and offensive fashion, and tried to

23

kiss her against her will.

174.   Ms. Guerrero promptly stood up and returned to her work in an effort to escape her direct supervisor's sexual advances.

175.   Since then, Ms. Guerrero's direct supervisor frequently entered her work area and caressed her shoulders and hands in a sexual manner against her will.

176.   This behavior made Ms. Guerrero highly uncomfortable, but she feared her direct supervisor would fire her if she complained about his conduct.

177.   On multiple occasions, Ms. Guerrero's direct supervisor also asked her to go to bars and other places with him.

178.   Ms. Guerrero rejected these sexual advances and indicated that she wanted the sex harassment to stop.

179.   Ms. Guerrero's direct supervisor then began to offer her more desirable work schedules if she went on dates with him.

180.   Ms. Guerrero continued to repeat that she did not want to be sexually involved with him.

181.   On or about October 10, 2005, Ms. Guerrero's direct supervisor approached her from behind and grabbed her in an offensive and unwelcome fashion.

182.   Approximately one week later, Defendant informed Ms. Guerrero that she had lost her job and could not return to work.

183.   At this time, Ms. Guerrero's direct supervisor insinuated that Defendant

24

would rehire her if she would go out with him.

184.   On information and belief, Defendant continues to employ Ms. Guerrero's direct supervisor.

## PARTICULAR FACTS AS TO LUCILA MARQUEZ

185.   Beginning in approximately September 2005, manager S.R. began to make highly offensive, sexual statements to Ms. Marquez.

186.   Manager S.R. has commented on Ms. Marquez's body, asked her to go out with him, requested that she perform sex acts on him, and made other sexually charged comments on various occasions.

187.   In addition, when Ms. Marquez has sought permission to leave work to pick up her young daughter from school or made other reasonable requests, manager S.R. often has stated, in sum or substance, "in exchange for what?"

188.   Manager S.R.'s brother, R.R., is a manager of another building for Defendant and has subjected Ms. Marquez to similar treatment.

189.   Shortly after manager S.R. propositioned Ms. Marquez for sex in October 2005, Ms. Marquez's husband – who works the same shift as Ms. Marquez – complained to Defendant about the ongoing sex harassment.

190.   After Ms. Marquez's husband lodged this report, Defendant did not allow Ms. Marquez to work with her husband even though that had been the custom.

191.   The sexual advances and offensive comments have typically been made by

Ms. Marquez's superiors when her husband is not working with her.

192.   One of Defendant's senior managers questioned Ms. Marquez at length about her legal claims approximately one week after Ms. Marquez's attorney filed a formal charge of sex harassment, discrimination, and retaliation against Defendant with the EEOC and the MDHR.

193.   Defendant conducted this in-depth examination of Ms. Marquez's legal claims without the knowledge of Ms. Marquez's attorney.

194.   On the heels of Defendant's interrogation of Ms. Marquez, one of Defendant's senior managers came to the worksite to reprimand Ms. Marquez for allegedly making a telephone call during work hours.

195.   At the time the senior manager disciplined Ms. Marquez for the alleged infraction, the direct supervisor had already reprimanded Ms. Marquez.

196.   On information and belief, Defendant continues to employ manager S.R. and manager R.R.

## PARTICULAR FACTS AS TO MARIA PEREZ

197.   In approximately April 2003, Ms. Perez's direct supervisor, S.P., rubbed against her, fondled her breasts, and groped her between her legs – all against Ms. Perez's will.

198.   Ms. Perez reported this behavior to Defendant, but Defendant evidently did not take corrective action until Ms. Perez's husband told Defendant that he would go to

the police if Defendant did not address the problem.

199.   In approximately January 2005, Ms. Perez's direct supervisor, S.R., entered the women's bathroom while Ms. Perez was using it.

200.   Ms. Perez told him to leave her alone, but direct supervisor S.R. responded by saying that Defendant's upper management would believe him rather than her if she complained.

201.   Ms. Perez promptly approached a member of upper management, D.H., to report the sex harassment.

202.   As she began to register her complaint to manager D.H., he shouted at her, in sum or substance, "you don't have the right to say anything" and that "supervisors have the right to go anywhere they want."

203.   Manager D.H. also gave Ms. Perez a verbal warning for allegedly insulting a superior.

204.   After this incident, manager D.H. and direct supervisor S.R. have increased Ms. Perez's workload.

205.   In approximately September 2005, someone in the workplace put a sexually explicit movie in Ms. Perez's purse.

206.   Ms. Perez's eleven-year-old daughter first discovered the movie at home when searching Ms. Perez's purse for family photographs.

207.   Ms. Perez complained about this additional sex harassment to manager D.H.

27

208.   He responded by saying that he and his girlfriend had watched the movie found in Ms. Perez's purse and that, in sum or substance, "it wasn't that pornographic."

209.   Manager D.H. said he would investigate who put the movie in her purse and directed Ms. Perez to return the movie to him.

210.   Approximately one week later and after hearing nothing further from manager D.H. about an investigation of her report, Ms. Perez repeated her complaint to manager D.H.'s superior.

211.   On information and belief, Defendant continues to employ manager D.H. and direct supervisor S.R.

## INJURY AND DAMAGE TO PLAINTIFF CLASS

212.   By reason of Defendant's unlawful conduct, described herein, Plaintiff Class has sustained loss and damage, including, but not limited to, the following:

a.   Deprivation of equal employment opportunities; and

b.   "Garden variety" emotional distress, mental anguish, personal embarrassment, and humiliation.

## FIRST CAUSE OF ACTION:
## SEX HARASSMENT

213.   Plaintiff Class restates and realleges the allegations contained herein above.

214.   Defendant's policies and practices constitute quid pro quo sex harassment, in violation of 42 U.S.C. § 2000e-2(a)(1) and Minn.Stat. § 363A.08, Subd. 2, by making submission to unwelcome sexual advances and other sexual conduct and statements

among the terms and conditions of employment and by using submission to, or rejection

of, such sexual conduct and statements as a factor in Defendant's decisions about

employment opportunities for Plaintiff Class.

215. Defendant's policies and practices create and maintain a hostile work

environment based on sex, in violation of 42 U.S.C. § 2000e-2(a)(1) and Minn.Stat. §

363A.08, Subd. 2, in that Plaintiff Class has been subjected to unwelcome conduct and

statements based on sex that are objectively and subjectively offensive and are so severe

and pervasive as to alter materially the terms and conditions of employment.

## SECOND CAUSE OF ACTION:
## SEX DISCRIMINATION

216. Plaintiff Class restates and realleges the allegations contained herein above.

217. Defendant's policies and practices violate 42 U.S.C. § 2000e-2(a)(1) and

Minn.Stat. § 363A.08, Subd. 2 in that Defendant has discharged and otherwise

discriminated against Plaintiff Class regarding terms, conditions, and privileges of

employment because of sex.

218. Defendant's policies and practices also limit, segregate, and classify

Plaintiff Class in ways that deprive Plaintiff Class of equal employment opportunities and

otherwise adversely affect employment status – including the denial of opportunities to be

promoted to supervisory positions – because of sex, in violation of 42 U.S.C. § 2000e-

2(a)(2) and Minn.Stat. § 363A.08, Subd. 2.

219. As a matter of policy and practice, Defendant has published notices and otherwise made statements about employment opportunities indicating a preference, limitation, specification, and discrimination based on sex, in violation of 42 U.S.C. § 2000e-3(b) and Minn.Stat. § 363A.08, Subd. 2.

## THIRD CAUSE OF ACTION:
## RETALIATION

220. Plaintiff Class restates and realleges the allegations contained herein above.

221. Defendant's policies and practices violate 42 U.S.C. § 2000e-2(a)(1), 3(a) and Minn.Stat. § 363A.15 in that Defendant has taken adverse action against Plaintiff Class for submitting charges of sex harassment, discrimination, and retaliation and for otherwise opposing sex harassment, discrimination, and retaliation in employment.

## JURY DEMAND

Plaintiff Class hereby demands trial by jury of all issues properly triable thereby.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Class respectfully requests that the Court provide the following relief:

A.  Declaring, adjudging, and decreeing that this case be maintained as a class action and that counsel for Plaintiff Class be designated as class counsel of record for Plaintiff Class;

B.  Declaring, adjudging, and decreeing that Defendant has engaged in the violations of law set forth herein;

C.    Granting Plaintiff Class temporary and permanent injunctive relief, enjoining Defendant from engaging in such unlawful conduct in the future;

D.    Granting Plaintiff Class temporary and permanent injunctive relief, requiring Defendant to adopt employment policies and practices in conformity with the federal and state laws it has been found to violate herein;

E.    Declaring, adjudging, and decreeing that the Court shall retain jurisdiction over Defendant until such time as the Court is satisfied Defendant has remedied its improper policies and practices and is otherwise complying fully with the law;

F.    Awarding to Plaintiff Class compensatory damages in excess of $75,000.00;

G.    Pursuant to Minn.Stat. § 363A.29, Subd. 4, awarding to Plaintiff Class three times the general and special damages proved at trial;

H.    Assessing punitive damages regarding all applicable claims;

I.    Awarding to Plaintiff Class the cost of its suit, including, but not limited to, expert fees and other expenses of this litigation;

J.    Awarding to Plaintiff Class its reasonable attorney's fees;

K.    Awarding to Plaintiff Class pre- and post-judgment interest on the foregoing amounts;

31

L.    Assessing civil penalties for the violations of law set forth herein; and

M.    Granting to Plaintiff Class such other and further relief as the Court may

deem just and appropriate.


Dated:  May 15, 2006.                    **MILLER·O'BRIEN, P.L.L.P.**



M. William O'Brien, # 130229
Justin D. Cummins, # 276248
Brendan D. Cummins, # 276236
Kelly A. Jeanetta, # 277204
One Financial Plaza
120 South Sixth Street, Suite 2400
Minneapolis, MN  55402
612-333-5831

**ATTORNEYS FOR PLAINTIFF CLASS**

## ACKNOWLEDGMENT

The undersigned hereby acknowledges that sanctions may be awarded, pursuant to Minn.Stat. § 549.211, to the parties against whom the allegations in the pleadings are asserted.

Dated: May 15, 2006.                                 **MILLER·O'BRIEN, P.L.L.P.**


Justin D. Cummins

# ·MILLER·O'BRIEN·

A Professional Limited Liability Partnership

**ATTORNEYS**
One Financial Plaza
120 South Sixth Street, Suite 2400
Minneapolis, MN 55402-1809
(612) 333-5831

Brendan D. Cummins
Justin D. Cummins
Kelly A. Jeanetta
Richard A. Miller
Margaret Luger-Nikolai
M. William O'Brien

Robert J. Alfton
of Counsel

FAX (612) 342-2613
E-mail: miller-obrien@miller-obrien.com
Web Address: www.miller-obrien.com

RECEIVED

06 MAY 15  AM 7: 56

CLERK, U.S. DIST. COURT
MINNEAPOLIS, MN

Samual I. Sigal
1905-1995

May 15, 2006

**VIA HAND DELIVERY**

United States District Court
District of Minnesota
U.S. Courthouse
300 South Fourth Street
Minneapolis, MN  55415

Re:    <u>Sandoval, et al. v. American Building Maintenance Industries, Inc.</u>
       Our File No.: 55-5969-01

Dear Clerk of Court:

Enclosed for processing and/or filing is the following:

1.    Civil Cover Sheet;
2.    Summons;
3.    Complaint; and
4.    A check in the amount of $350.00 for the filing fee.

Sincerely,

MILLER·O'BRIEN

Justin D. Cummins

JDC/rlj
Enclosures
cc:    Clients (w/encls.)