UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA


FRANCISCA SANDOVAL, INES                    CIVIL NO. 06-1772 (RHK/JSM)
HERNANDEZ, MIRIAM PACHECHO,
EVA REYES, ARMINDA GOMEZ,
NIDIA GUERRERO, LUCILA MARQUEZ,
MARIA PEREZ, AZUCENA GARCIA,
ESTELA LAUREANO and MARLENE GIRON,

       Plaintiffs,

v.                                           REPORT AND RECOMMENDATION

AMERICAN BUILDING MAINTENANCE
INDUSTRIES, INC., a/k/a ABM Industries,
Incorporated, d/b/a ABM Janitorial Services and
AMERICAN BUILDING MAINTENANCE
CO. OF KENTUCKY,

       Defendants.


       JANIE S. MAYERON, U.S. Magistrate Judge

       The above matter came on before the undersigned upon Defendants' Motion for

Summary Judgment [Docket No. 147].  M. William O'Brien, Esq. and Justin Cummins,

Esq. appeared on behalf of plaintiffs; Jacqueline Mrachek, Esq. and Nancy Brasel, Esq.

appeared on behalf of defendants.  This matter has been referred to the undersigned

Magistrate Judge for a Report and Recommendation by the District Court pursuant to

28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

## I.    INTRODUCTION

       Plaintiffs in this action, Francisca Sandoval, Ines Hernandez, Miriam Pachecho,

Eva Reyes, Arminda Gomez, Nidia Guerrero, Lucila Marquez, Maria Perez, Azucena

Garcia, Estela Laureano, and Marlene Giron, have sued defendant American Building

Maintenance  Industries,  Inc.  ("ABMI"),  alleging  sexual  harassment  and  other

employment-related claims under Title VII of the Civil Rights Act and the Minnesota Human Rights Act ("MHRA").  Plaintiffs Garcia, Laureano and Giron also have asserted these claims against defendant American Building Maintenance Co. of Kentucky ("ABM Kentucky" or "ABM").

ABMI now moves for summary judgment against all plaintiffs on the grounds that it has never been plaintiffs' employer, nor can it be liable for the actions of ABM Kentucky, one of its subsidiaries.  In addition, both defendants moved for summary judgment on grounds that none of the plaintiffs can make out claims of sexual harassment, retaliation and gender discrimination.

For the reasons set forth below, the Court recommends that Defendants' Motion for Summary Judgment be granted.

## II.    STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); see also Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219 (8th Cir. 1999).  "[S]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action."  Celotex, 477 U.S. at 327.  "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'"  DePugh v. Smith, 880 F. Supp. 651, 656 (N. D. Iowa 1995) (quoting Anderson, 477 U.S. at 248).

The party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed.  Celotex Corp., 477 U.S. at 322-23; see also Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000).   If the moving party has carried its burden, the non-moving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  Anderson, 477 U.S. at 256; Krenik v. County of LeSueur, 47 F.3d 953, 957 (8th Cir. 1995).  "The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial."   Minnesota Laborers Health & Welfare Fund v. Swenke, 2003 U.S. Dist. LEXIS 11439, *4-5 (D. Minn. 2003) (citations omitted).   The non-moving party "must substantiate his allegations with sufficient probative evidence that would permit a finding in [their] favor based on more than mere speculation, conjecture, or fantasy."   Wilson v. Int'l Bus. Mach. Corp., 62 F.3d 237, 241 (8th Cir. 1995).

When deciding a motion for summary judgment, a court can only consider admissible evidence.  See Henthorn v. Capitol Commc'ns, Inc., 359 F.3d 1021, 1026 (8th Cir. 2004); see also Stuart v. Gen'l Motors Corp., 217 F.3d 621, 636 n. 20 (8th Cir. 2000) ("To be considered on summary judgment, documents must be authenticated by and attached to an affidavit made on personal knowledge setting forth such facts as would be admissible in evidence or a deposition that meets the requirements of Fed. R. Civ. P. 56(e).").

## III.    ABMI'S LIABILITY

Defendant ABMI seeks summary judgment on plaintiffs' Title VII and MHRA claims on grounds that it is not plaintiffs' employer.[1]  See Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Defs.' Mem.") at pp. 17-23. Liability under Title VII and the MHRA only apply to a plaintiff's "employer."  See 42 U.S.C. § 2000e-2(a); Minn. Stat. § 363A.08, subd. 2.  In opposition, plaintiffs argued that ABMI was plaintiffs' sole employer, or in the alternative, ABMI is a joint employer or integrated enterprise with ABM Kentucky.  See Plaintiffs' Memorandum of Law in Support of Summary Judgment ("Pls.' Mem.") at pp. 98-101.

### A.    Factual Background

The undisputed facts bearing on ABMI's motion for summary judgment are as follows.

### 1.    General Background

In December 2004, American Building Maintenance Co. of Illinois ("ABM Illinois"), which had been operating in Minnesota since April 2001 under the assumed name of "ABM Janitorial Services," entered into an agreement to transfer all of its operations in Minnesota, and other Midwestern states to ABM Kentucky.  See Affidavit of Jacqueline Mrachek ("Mrachek Aff."), Ex. 13 (Certificate of Assumed Name), Ex. 15 (Written

---

[1]    Plaintiffs Marquez, Pacheco, Guerrero, Perez, Gomez, Hernandez, Reyes and Sandoval have only asserted claims under Title VII and the MHRA against ABMI because District Judge Richard H. Kyle concluded that the claims brought by these plaintiffs under Title VII and the MHRA against ABM Kentucky were time-barred.  See Sandoval v. American Bldg. Maintenance Industries, Inc., Civ. No. 06-1772 (RHK/JSM), 2007 WL 142174 at *3-5 (D. Minn. Jan. 17, 2007) ("because plaintiffs failed to add ABM Kentucky within ninety days of receiving the right-to-sue letters from the EEOC and notifying the Minnesota Department of Human Rights ('MDHR') of their intention of bringing a lawsuit.")  Further, this Court rejected an attempt by plaintiffs to amend the First Amended Complaint to add ABM Janitorial Services, Inc. as a defendant in this case.  See April 19, 2007 Order [Docket No. 80].

Consent of the Sole Shareholder of ABM Illinois).  At that point, both ABM Kentucky and ABM Illinois became wholly-owned subsidiaries of ABM Janitorial Services, Inc., which in turn, is a wholly-owned subsidiary of ABMI.  See Affidavit of Maria Natoli Miller[2] ("Miller Aff."), ¶ 4; see also Mrachek Aff., Ex. 40 (Southard Dep.), Deposition Exhibit ("Dep. Ex.") 1 (Southard's business card).  ABMI owns all of the shares of ABM Kentucky, which has a fixed value of $2,500.  See Affidavit of Justin D. Cummins ("Cummins Aff."), Ex. 246 at pp. ABM07222-ABM7223.

On December 12, 2004, the Minnesota Secretary of State issued a "Certificate of Authority to Transact Business" in Minnesota to "American Building Maintenance Co. of Kentucky."  Mrachek Aff., Ex. 12.  The state of incorporation for ABM Kentucky is California.  Id.  According to the Minnesota Department of Employment and Economic Development, ABM Kentucky, d/b/a ABM Janitorial Services, became the successor employer to ABM Illinois effective January 1, 2005.  Id., Ex. 18 (Unemployment Tax Liability Determination, ABM06661).  ABM Kentucky operates in Minnesota under the name of "ABM Janitorial Services" and occasionally under the name of "American Building Maintenance Co."  See Miller Aff., ¶ 2.

On January 31, 2006, the Minnesota Secretary of State issued a "Foreign Corporations Certificate of Revocation" for ABM Kentucky arising out its failure to file an annual report in violation of Minnesota Law.  See Cummins Aff., Ex. 256, PABM 002970.  The failure by ABM Kentucky to file an annual report stemmed from the illness of the individual who was in charge of filing the annual report with the Minnesota Secretary of State.  See Mrachek Aff., Ex. 19 (Request for Admission No. 32).  On July 11, 2006, the Minnesota Secretary of State issued a "Certificate of Reinstatement"

_____

[2]    Maria Natoli Miller is the Vice President and Deputy General Counsel for defendant ABMI.  See Miller Aff., ¶ 1.

allowing ABM Kentucky to conduct business in Minnesota.  <u>Id.</u>, ABM07908.  As of March, 2007, ABM Kentucky has gone by the name of ABM Janitorial Services-North Central.  <u>See</u> Miller Aff., ¶ 2.

As stated previously, the assumed name "ABM Janitorial Services" had been used by ABM Illinois since April 2001 and then by ABM Kentucky after the transfer of ABM Illinois' operations in Minnesota and other states to ABM Kentucky.  <u>See</u> Miller Aff., ¶ 2; Mrachek Aff., Ex. 13 (Certificate of Assumed Name); Cummins Aff., Ex. 258, PABM 002951 (Business Organizations Inquiry).  The Minnesota address for ABM Illinois was 760 Harding Street; the principal place of business for ABM Illinois is 160 Pacific Avenue San Francisco, California 94111.  <u>See</u> Mrachek Aff., Ex. 13 (Certificate of Assumed Name); Cummins Aff., Ex. 258, PABM 002951 (Business Organizations Inquiry).  A Dunn and Bradstreet Company snapshot for ABMI provides that it is incorporated at 160 Pacific Avenue, Ste. 222, San Francisco, California; it also provides that ABMI has a branch located at 3150 Ranchview Lane, Minneapolis, Minnesota.  <u>See</u> Cummins Aff., Ex. 103, PABM 3234, 3246.  However, ABMI has no employees in Minnesota.  <u>See</u> Miller Aff., ¶ 5.

## 2. **ABM Kentucky Management**

ABM Kentucky is comprised of five branches that are located in Des Moines, Iowa; Minneapolis, Minnesota; Kansas City and St. Louis, Missouri; and Omaha, Nebraska.  <u>See</u> Mrachek Aff., Ex. 1 (Summary of North Central Region).  ABM Kentucky's Regional Vice President is Jeffory Southard, whose office is located in the Minneapolis Branch.  <u>Id.</u>, Ex. 40 at p. 48, Ex. 1 (Southard Dep.).  Southard reported directly to Jan Kaupas, the Executive Vice President of ABM Janitorial Services, Inc., and Jim McClure, the President of ABM Janitorial Services, Inc.  <u>Id.</u> at pp. 11-13.  While

Southard was responsible for everything that occurred at ABM Kentucky, including the Minnesota Branch, McClure has the final authority on all matters of ABM Kentucky, which encompassed company policy, its implementation and enforcement. Id. at pp. 93-94. The Minneapolis Branch Manager for ABM Kentucky is Chuck Ketchem, who reported to Southard. Id., Ex. 38 at pp. 14, 29 (Ketchem Dep.).

Each of ABM Kentucky's branches has its own human resources director. See Affidavit of Jeffory Southard ("Southard Aff."), ¶ 4. ABM Kentucky's former Regional Human Resources Director, Julie Mork, the Assistant Regional Vice President, Blake Ahrens, and the Controller for ABM Kentucky, Troy Hanson, all reported to Southard. See Mrachek Aff., Ex. 40 at pp. 94-95 (Southard Dep.).

ABM Kentucky and ABMI share the same Chief Executive Officer, Chief Financial Officer, Treasurer, Secretary and Vice President of Finance. See Cummins Aff., Ex. 28 at pp. 132-33; 244-45 (Southard Dep.), 246 (ABM07214, ABM07211, ABM07227-ABM07228). Further, the Chief Executive Officer and Chief Financial Officer for ABMI signed off on the appointments of the Executive Vice President, the Vice President of Finance, Secretary and the Board of Directors for a number of ABMI subsidiaries, including ABM Kentucky. Id., Ex. 246, ABM07239, ABM07236, ABM07214, ABM07220, ABM07220-ABM07221, ABM07215, ABM07236.

### 3.    ABM Kentucky Operations

On January 1, 1999, ABMI and ABM Kentucky entered into a Service Agreement whereby ABMI agreed to provide certain services to ABM Kentucky, including accounting services, administrative services, electronic services, employee benefits, human resources, insurance, legal services, safety advice and treasury services. See Cummins Aff., Ex. 242, Article 1. The accounting services set forth in the Service

Agreement included providing financial policies and procedures, payroll tax, depositing, independent audits, and the preparing and filing of federal and state income tax reports. Id., ¶ 1.1.  The administrative services included the negotiation and management of national accounts, management of uniform company logos and signage, and the purchase of business cards and stationary.   Id., ¶ 1.2.  Electronic services related to computer telecommunications systems included the purchasing of equipment, development of software and technical support.  Id., ¶ 1.3.  Employment benefits services included the administration of employee benefits programs.  Id., ¶ 1.4.

As it pertained to human resources, ABMI, through its human resources department, agreed to provide to ABM Kentucky the following services:

a)  Assist in the development of human resource policies applicable to Subsidiary;

b)  Assist on the development and distribution of employee handbooks and employment-related forms for use by Subsidiary;

c)  Assist Subsidiary with employment-related workplace posting requirements;

d)  Provide employee relations personnel to assist Subsidiary with employment-related problems;

e)  Provide employment related legal advice and guidance;

f)  Manage all employment-related lawsuits, claims and liability;

g)  Preparation of Annual Affirmative Action Plan(s);

h)  Provide support for Subsidiary in cases of governmental audits;

i)  Manage human resources information services;

j)  Develop and present employment-related division training programs.

Id., ¶ 1.5.

The insurance services included negotiating insurance coverage for workers and managing worker compensation insurance and claims.  Id., ¶ 1.6.  As to legal services, ABMI's legal department agreed to provide to ABM Kentucky such services as the

negotiation and drafting of service and procurement agreements.  Id., ¶ 1.7.  As related

to safety, ABMI agreed to provide to ABM Kentucky advice necessary to enable ABM

Kentucky to comply with laws dealing with the safety of employees, to develop and

distribute safety-related training and education, and publish and distribute appropriate

safety manuals.  Id., ¶ 1.8.  Treasury services included establishing and maintaining

banking relationships.  Id., ¶ 1.9.

In exchange for these services, ABM Kentucky agreed to pay to ABMI 1% of its

gross operating revenue and agreed to "follow policies and guidelines developed

pursuant to the Service Agreement, as well as such corporate guidelines as may be

developed and promulgated from time to time."  Id., ¶¶ 2.1, 2.3.  ABM Kentucky budgets

for the 1% gross operating revenue for the services provided under the Service

Agreement.  See Cummins Aff., Ex. 28 at p. 257 (Southard Dep.).

On September 1, 2004, ABMI and ABM Kentucky executed the First Amendment

to Service Agreement, which added real estate and marketing to the services to be

provided to ABM Kentucky.  Id., Ex. 242, ABM04018-19 (First Amendment to Service

Agreement).  In addition, pursuant to the Amendment,  ABM Kentucky agreed to pay

ABMI separate amounts for electronic services, employee benefits services, insurance

services and safety services.  Id., ABM04019.

Vice President and Deputy General Counsel for ABMI, Miller, represented that

the specific services provided to ABM Kentucky under the Service Agreement were

"limited, ministerial, and based on economies of scale, rather than control."  See

Second Affidavit of Maria Natoli Miller ("Second Miller Aff."), ¶ 5.  Miller also stated that

ABMI purchased for ABM Kentucky workers' compensation insurance, obtained

licenses for sexual harassment videos, negotiated the contract for the Harassment

Hotline, submitted motor vehicle record checks to a single provider, and drafted certain

forms such as performance evaluations.  Id.

Southard stated that ABM Kentucky developed its own hiring policies and

practices, investigation policies and practices, safety policies and practices, work rules,

affirmative action plans, attendance policies and practices, and disciplinary policies and

practices.   Second Southard Aff., ¶ 5.   In addition, ABM Kentucky developed and

implemented its own human resources policies, and negotiated and maintained its own

health insurance for its employees.  Id., ¶ 3.[3]

---

[3]   Citing to the Second Affidavit of Jeffory Southard submitted with their Reply,
ABMI argued that the Service Agreement "merely lists services that ABMI *can* perform
for ABM, *if* ABM requests them."  Defs' Reply, p. 3 (emphasis in original).  Specifically,
Southard stated that the services listed by the Service Agreement were services that
could be performed by ABMI for ABM Kentucky, if ABM Kentucky so desired, and that
many of the services listed on the Service Agreement were not provided to ABM
Kentucky, including the development of human resources policies and assisting in the
purchase of health insurance for employees.  See Second Affidavit of Jeffory in Support
of Defendants' Motion for Summary Judgment ("Southard Second Aff."), ¶ 3.  However,
Southard stated during his deposition that he had no knowledge of the Service
Agreement between ABMI and ABM Kentucky.  See Plaintiffs' Demonstrative Exhibits
on Summary Judgment, Tab 17 (Southard Dep. at p. 247).  Consequently, at the
hearing, plaintiffs asked that this Court to strike that portion of paragraph 3 of the
Second Affidavit of Jeffory Southard that suggested the Service Agreement was "not a
big deal. It's discretionary. It's – it doesn't really mean anything", as it contradicted his
deposition testimony that he had no knowledge of the agreement.  See January 18,
2008 Hearing Transcript at 62.

To the extent that Southard stated in paragraph 3 of his Second Affidavit his
understanding of Article 1 of the Service Agreement (i.e. that pursuant to Article 1, ABMI
agreed to perform "certain back office" tasks for ABM" and that "these services are
services can perform for ABM if ABM so requests"), this Court finds that this testimony
contradicts Southard's previous deposition testimony that he had no knowledge of the
Service Agreement.  See Reetz v. Jackson, 176 F.R.D. 412, 414 (D.D.C. 1997) (quoting
Mack v. United States, 814 F.2d 120, 124 (2d Cir. 1987)) ("[A] party's affidavit which
contradicts [her] own prior deposition testimony should be disregarded on a motion for
summary judgment."); see generally, Camfield Tires, Inc. v. Michelin Tire Corp.,
719 F.2d 1361, 1366 (8th Cir. 1983) (striking a witness' affidavit filed in opposition to a
motion for summary judgment that contradicted his deposition testimony because it
created only a "sham" issue of fact, rather than a "genuine" issue of fact).  However, the
Court will not strike that portion of paragraph 3 of Southard's Second Affidavit where he

ABM Kentucky's Regional Human Resources Director and the Human Resource Director for the Minneapolis Branch, until September of 2007, was Julie Mork. See Mrachek Aff., Ex. 2 (Business Card), Ex. 39 at pp. 20-21 (Mork Dep.); see also Declaration of Julie Mork ("Mork Decl."), ¶ 1.   Mork's office was located in the Minneapolis Branch for ABM Kentucky at 760 Harding Street, Minneapolis, MN 55413. See Mrachek Aff., Ex. 2.   Four additional ABM Kentucky employees, Tammy Rogers, Amy Severson, Robert Janecek and Mary Hesler also had human resource responsibilities for ABM Kentucky.   Id., Ex. 39 at p. 133, Dep. Ex. 13 (Mork Dep--List of Human Resources Responsibility).     Mork's responsibilities dealt with workers' compensation, harassment and discrimination claims, safety, affirmative action, payroll, insurance, and employee legal issues.   Id.   Rogers' responsibilities included dealing with payroll questions and concerns; maintenance of hiring packages, W-4 changes, termination reports, and vacation; and handling levies and garnishments, union dues, stock and 401K and unemployment issues.   Id.   Severson was in charge of employee insurance, COBRA issues, assisting in hiring and recruiting, leave-of-absences, FMLA issues, short-term disability, and notifications of open positions.   Janecek was in charge of supervisor development training, new hire training, performance recognition and safety.   Id.   Hesler dealt with administrative issues in the human resources department. Id.

Mork testified that she handled employment legal issues and that whenever she received an employment-related administrative charge or lawsuit she would forward a copy of it to ABMI.   See Cummins Aff., Ex. 20 at p. 96 (Mork Dep.).   In addition, Mork

described ABM Kentucky's performance of certain services (i.e. development and implementation of its own human resources policies, and negotiation and maintenance of its own health insurance for its employees) as that testimony does not contradict his earlier deposition testimony.

dealt directly with union representatives in connection with handing grievances.  See Mrachek Aff., Ex. 39 at p. 126 (Mork Dep.).  Mork also developed, with the help of her assistant, a document called the "Field Guide" for employees' use.  Id. at pp. 130-31, 161-62.  According to Mork, any changes to the sexual harassment policy or procedure would be made by her, Ketchem and Janecek, all of whom were employees of ABM Kentucky.  Id. at pp. 279-80.  The training in Spanish was carried out by Janecek and an assistant by the name of Louis Camacho.  Id. at pp. 63-64.  Janecek also handled annual trainings for nonunion employees, and new hire orientation for union employees, which included a sexual harassment component.  Id. at pp. 60-63, 67-70, 76.  Further, ABM Kentucky staff provided annual training for union employees on sexual harassment.  Id. at p. 76.  In addition, Mork testified that she, Ketchem and Janecek put together a staffing office, the new hire orientation and training program for individuals in non-union positions.  Id. at pp. 28-30, 60-62.

ABM Kentucky employees have access to a Harassment Hotline, which provides a toll-free number for any employee to report "any allegation of sexual harassment, discrimination, retaliation, theft, or any safety concern that occurs in the workplace or any harassment by a third party."  See Mrachek Aff., Ex. 6 (Employee Information Regarding Harassment Hotline).  With regards to the Harassment Hotline, ABMI was the contracting entity because ABMI could obtain the services at a lower cost.  See Miller Aff., ¶ 14.  Mork testified that ABMI employee training specialist, Clay Adams, would forward to her any complaints made via the Harassment Hotline.  See Cummins Aff., Ex. 20 at pp. 106-07 (Mork Dep.); Ex. 237 (Contact Information for Clay Adams).  Mork would then conduct the investigation without the assistance of Adams; however, Adams would ensure that there were resolutions to complaints and was available to talk

to Mork if she needed to talk things through. <u>See</u> Cummins Aff., Ex. 20 at p. 107 (Mork Dep.). Mork would send a summary of her investigation to Adams. <u>Id.</u>, Ex. 20 at p. 114. At least as to one investigation, Adams asked Mork to do some follow-up with an employee and Mork sent Adams a summary of her investigation of a complaint and asked if there was "anything she should do." <u>Id.</u>, Ex. 237, ABM06798-ABM06800 (February 2-3, 2005 email correspondence between Mork and Adams).

Dan MacDonald, ABM Kentucky's Regional Risk Management Director, and Janecek, who is now the Regional Safety Director for ABM Kentucky, assisted Mork in her investigations of complaints and sexual harassment training. <u>See</u> Mrachek Aff., Exs. 39 at p. 119 (Mork Dep.); 37 at pp. 41-42, 49, 78-79 (Janecek Dep.); 41 at pp. 65-68 (MacDonald Dep.); Cummins Aff, Ex. 20 at pp. 96-97 (Mork Dep.). Mork stated that she spoke to ABMI's corporate counsel including Maria Notoli-Miller, Katie Evens-O'Brien and Teuila Hanson regarding sexual harassment complaints. <u>See</u> Cummins Aff., Ex. 20 at pp. 97, 137, 152-53 (Mork Dep.). Southard also has consulted with ABMI human resource personnel regarding personnel issues, although he had not done so for three years, and has consulted ABMI in-house legal counsel. <u>See</u> Cummins Aff., Ex. 28 at pp. 137-41, 145 (Southard Dep.). Mork is the only person involved in making the determination or decision about the results of an investigation. <u>See</u> Mrachek Aff., Ex. 39 at p. 118 (Mork Dep.)

Mork had access to an ABMI human resources online manual, which she used to obtain clarification on policies or procedures. <u>Id.</u> at pp. 144-45. Mork stated that she would contact Miller or Adams if she ever had a question regarding policies and procedures found in the human resource manual. <u>Id.</u> at pp. 146-47. Mork also relied on ABMI Complaint Resolution Summary form and the ABMI procedures for processing an

employee complaint from plaintiff Pacheco in September 2005, and the corporate human resource contact listed on the form was Adams. Id., Ex. 271, ABM04431-4432.

According to Southard and Mork, ABM Kentucky makes all decisions with regards to hiring, firing, promotion, salary and wages, as it pertains to all employees in Minnesota, including plaintiffs. See Southard Aff., ¶ 5; Mork Decl., ¶ 6. Similarly, Miller stated that ABMI does not make any employment decisions for ABM Kentucky regarding employees in Minnesota and does not control, participate, or have any involvement with ABM Kentucky's hiring, firing, promotion, salaries, evaluations or discipline of its Minnesota employees. See Miller Aff., ¶ 8; see also Mork Decl., ¶ 6 ("ABMI does not control ABM's employment decisions."); Southard Aff., ¶ 5.

Mork testified that she attended a training institute by ABMI for human resources and safety professionals. Cummins Aff., Ex. 20 at p. 9 (Mork Dep.). Southard stated that ABMI provided diversity training to managers in the region. See Cummins Aff., Ex. 28 at pp. 66-70 (Southard Dep.).

According to Southard, someone outside of ABM Kentucky dictated mandatory sexual harassment training, and that he typically followed directives coming from ABMI on this issue, including from Adams. Id. at pp. 238-239. Directives from ABMI to its subsidiaries included a 2004 and 2005 interoffice memo enclosing copies of three items to be distributed as paycheck attachments or enclosures for all ABMI and all ABMI subsidiary employees: (1) unlawful harassment policy; (2) sexual harassment policy; (3) and a reminder of the harassment hotline. Id., Exs. 225, 226 (2004 and 2005 interoffice memo). The ABMI Human Resources Department also published for ABMI subsidiaries, a memorandum on how to recognize and deal with sexual harassment. Id., Ex. 227 (An Urgent Ten Minute Memo Recognizing and Responding to Sexual

Harassment).  Mork testified that she, MacDonald and Janecek, determined postings or distribution of employment policies.  See Mrachek Aff., Ex. 39 at pp. 83-84 (Mork Dep.).

In 2004, ABMI employee Adams sent out an interoffice memo to human resources managers regarding mandatory unlawful harassment training.  See Cummins Aff., Ex. 231.  The memo provided that it was mandatory that all supervisory personnel complete the training annually.  Id.  With regards to administering the training, the memo required that the individual who was conducting the training have completed at least Level 1 of ABMI Human Resource Certification Program and that requests for exception from this requirement were to be made directly to Donna Bella, former Human Resources employee for ABMI.  Cummins Aff, Ex. 28 (Southard Dep.) at pp. 139-40); Ex. 231.  An April 2005 memo from Adams to human resources directors regarding 2005-2006 harassment training outlined a new training program and stated that it was mandatory that all supervisory employees participate in the training program.  Id., Ex. 232.  Again, with regards to administering the training, the memo required that the individual who was conducting the training have completed at least Level 1 of ABMI Human Resource Certification Program and that requests for exception from this requirement were to be considered on a case-by-case basis.  Id.  The training for ABM Kentucky was conducted in February 2006 by ABM Kentucky employee Janecek.  Id., Ex. 233 (2006 ABM Annual Mandatory Unlawful Harassment & Right to Know Training Participant Roster), ABM03684.  As a part of the training for non-union managers, ABM Kentucky used a sexual harassment videotape from ABMI.  See Second Southard Aff., ¶ 4.

The ABM Janitorial Services Employee Handbook includes a preamble from the President and Chief Executive Officer for ABMI, which notifies employees that the

handbook is to serve as a useful reference for employment guidelines, procedures and policies and what is expected of employees. See Cummins Aff., Ex. 213, ABM00985. ABMI has also promulgated a Code of Business Conduct and Ethics, applicable to the employees of its subsidiaries, which addressed such issues as conflicts of interests; corporate opportunities and the duty of loyalty; gifts made to government and union personnel, customers and suppliers; fraud and theft; bribes; insider trading; compliance with laws, regulations and rules, including civil rights laws concerning harassment and job discrimination; protection of company assets; political contributions; confidentiality; accounting and employment safety as it related to using alcohol or drugs, making threats to other employees or possessing weapons. Id., Ex. 239, ABM07331-7334.

ABM Kentucky has promulgated General Work Rules, under the name of ABM Janitorial Services, which are applicable to Minnesota employees. See Mrachek Aff., Ex. 5 (ABM Janitorial Services General Work Rules).

ABM Kentucky is the signatory to the Collective Bargaining Agreement with Service Employees International Union, Local 26, AFL-CIO. See Mrachek Aff., Ex. 3 (Collective Bargaining Agreement). The most recent negotiation of the collective bargaining agreement with the union involved outside counsel, who was paid by ABM Kentucky, Southard, Mork, Ketchem, and Chris Bouvier, inside labor counsel for ABM Janitorial Services, Inc. See Second Southard Aff., ¶ 6.

The contract for the lease of ABM Kentucky's Harding Street N.E. location was made by ABM Illinois. See Mrachek Aff., Ex. 26. In addition, the cleaning contracts for the buildings where plaintiffs worked were in the name of ABM Janitorial Services, ABM Illinois dba ABM Janitorial Services, or American Building Maintenance. Id., Ex. 20.

### 4.    ABM Kentucky Financials

Ketchem, the Branch Manager for the Minneapolis Branch of ABM Kentucky, was responsible for the financial operation of the branch.  See Mrachek Aff., Ex. 38 at pp. 21-22 (Ketchem Dep.).   Ketchem created a monthly financial report that also included a budget.  Id. at p. 29.  The information in the financial report included the financial performance, revenue billed out, labor costs and all other costs incurred by the Minneapolis Branch.  Id.  Ketchem's financial report and budget was sent directly to Southard.  Id. at p. 30.  Southard received the branch budgets and either approved the budgets or sent them back to the branch manager with changes.  Mrachek Aff., Ex. 40 at pp. 77-78 (Southard Dep.).   Southard prepared the regional budget, which is comprised, in part, of the budgets submitted by the branch managers and ABM Kentucky's controller.  Id.  Southard submitted the regional budget to Jan Kaupas, Executive Vice President of ABM Janitorial Services, Inc., and Bob Juestel with ABM Janitorial Services, Inc.  Id. at pp. 11-12, 78, 125-26.  Southard also produced the financials for ABM Kentucky with the help of the accountant in his office, including monthly profit-and-loss statements.  Id. at pp. 242-44.  The profit-and-loss statement lists ABMI on the top of the document, as ABMI provides, pursuant to the Service Agreement, forms and software to create financials.  See Miller Aff., ¶ 13.

Miller stated that ABMI does not participate in the day-to-day finances of ABM Kentucky and its finances are not commingled with those of ABM Kentucky.  Id., ¶ 12. ABM Kentucky did not have annual reports for 2004, 2005 and 2006, as its financial results are reflected within the annual reports filed by ABMI for those years.  See Cummins Aff., Ex. 91 (Request for Admissions Nos. 36-38).

Invoices or bills for supplies and equipment were submitted to "American Building Maintenance" at the 760 Harding Street N.E. address, and paid for by ABM Janitorial in Saint Louis, which was ABM Kentucky's headquarters until it moved to Minnesota.  See Mrachek Aff., Ex. 35 (Invoices at Check Records); see also Southard Aff., ¶ 7.

With regards to payroll, Southard testified that ABM Kentucky in Minneapolis, generates the payroll records.  See Mrachek Aff., Ex. 40 at p. 242 (Mork Dep.); see also Ex. 38 at pp. 29-31 (Ketchem Dep.)   The Federal Identification Number for ABM Kentucky is 94-3336249.  See Mrachek Aff., Exs. 16 (W-9 Form; Request for Taxpayer identification Number and Certification); 18, ABM06652 (Minnesota Department of Employment and Economic Development-Employer Unemployment Quarterly Tax Report). Plaintiffs' W-2 forms for 2005 identify the employer's Federal Identification Number as 94-3336249.  See Mrachek Aff., Ex. 21 (ABM11562-11563, ABM11565, ABM11567, ABM11569-11570, ABM11572, ABM11574, ABM11576, ABM11578-11579).  Likewise, the 2005 W-2 forms for Southard, Mork, MacDonald and Janecek list their employer's identification number as 94-3336249.  Id., Ex. 22 (ABM07206-07209). The name of the employer on the W-2 forms for 2005 was listed as ABM  Janitorial Services and the address of the employer was listed as 760 Harding Street N.E., Minneapolis, MN 55413.  Id., Exs. 21, 22.

The Federal Identification Number for ABM Kentucky's predecessor, ABM Illinois, was 36-2780789, as evidenced by plaintiffs' and management's 2003 and 2004 W-2 forms.    Id.,  Exs.  21  (ABM11560-11561,  ABM11564,  ABM11566,  ABM11568, ABM11571, ABM11573, ABM11575, ABM11577); 22 (ABM07198-07205).   The W-2 forms for plaintiffs for 2003 and 2004 identify ABM Janitorial Services as the  name of the employer and the address of the employer as 760 Harding Street N.E., Minneapolis,

18

MN 55413.  Id.  ABMI's Federal Identification Number is 94-1369354.  See Miller Aff., ¶ 10.

The Minnesota Department of Employment and Economic Development identified on the Unemployment Tax Liability Determination that American Building Maintenance Co. of Kentucky, doing business as ABM Janitorial Services, became the successor employer effective January 1, 2005, and set forth the amount of unemployment tax liability ABM Kentucky would owe for 2005.  Mrachek Aff., Ex. 18 (Unemployment Tax Liability Determination, ABM06661).

ABM Kentucky pays all taxes, including unemployment taxes.  See Southard Aff., ¶ 3.  In this regard, the Minnesota Department of Employment and Economic Development sent a determination of unemployment benefits to American Building Maintenance Co. of Kentucky, doing business as ABM Janitorial Services, at the 760 Harding Street address to the attention of Mork.  Mrachek Aff., Ex. 18, ABM11211-11213, ABM111191 (Unemployment Tax Liability Determination).

B.  **Discussion**

1.  **Is ABMI Plaintiffs' Sole Employer?**

In response to ABMI's motion, plaintiffs first argued that the evidence conclusively establishes that ABMI is their sole employer.  See Pls.' Mem. at pp. 98-100.  In support of this assertion, plaintiffs point to the following documents that list ABM Industries, Inc., ABM Industries, ABMI, American Building Maintenance Industries, Inc., ABM Industries Incorporated, and make no mention of ABM Kentucky: tax forms for plaintiffs' supervisors (Cummins Aff., Ex. 218),[4] recognition forms to supervisors (id.,

---

4       The tax forms listed the employer as ABM Industries, Inc.

Ex. 219),[5] performance evaluations for plaintiffs' supervisors (id., Ex. 220),[6] a field manual on sex harassment policy and procedure for plaintiffs' supervisors (id., Ex. 221),[7] equal employment policy issued to plaintiffs' supervisors (id., Ex. 222),[8] business cards issued to supervisors (id., Ex. 223),[9] an employee savings plan for plaintiffs' supervisors (id., Ex. 254),[10] a stipulation for settlement with plaintiff Hernandez regarding a workers' compensations claim (id., Ex. 78),[11] and insurance filings (id., Ex. 224).[12]   See Pls.' Mem. at pp. 98-99.   In addition, plaintiffs argued that ABM Kentucky cannot be plaintiffs' employer as none of their paychecks have listed the

---

[5]   These forms were directed to various branch managers at ABM Janitorial or ABM Janitorial Services, 760 Harding St. N.E., Minneapolis, MN 55413, but listed ABM Industries Incorporated on the letterhead, and referenced a significant anniversary with ABM Industries.

[6]   The Performance Appraisals for various employees stated the "Company" was ABM Janitorial Services, ABM – Airport 747-3, ABM, or ABM PNC. The appraisals also listed ABM Industries Incorporated on the letterhead.

[7]   ABM Janitorial Services is listed on the cover of the field guide; ABM Industries Incorporated and ABM Industries, Inc. is referenced throughout the Participant's Workbook.

[8]   ABM and American Building Maintenance Industries, Inc. are listed on the letterhead of the policy, and American Building Maintenance Industries, Inc. and ABMI are referenced in the body of the policy.

[9]   This document is one business card issued to "Juan Flores, Foreman" and lists ABM Industries Incorporated on the card.

[10]   This document is the "ABM Industries, Inc. 2004 Employee Stock Purchase Plan" for Douglas Hussa.

[11]   This agreement lists ABMI as the employer.

[12]   These were workers compensation documents issued in 2005 for plaintiff Hernandez and listed ABM Industries Incorporated as employer.

name of ABM Kentucky as required by Minnesota law (id., Ex. 93-101)[13] and several supervisors testified that they had never heard of ABM Kentucky.   Id. at pp. 99-100 citing to various depositions of witnesses.   Plaintiffs also asserted that ABM Kentucky's corporate filings (Cummins Aff., Ex. 259)[14] and lease agreements (id., Ex. 250)[15] show that it is not operating in Minnesota.

This Court concludes that the evidence in the record does not conclusively establish that ABMI was the sole employer of plaintiffs as maintained by plaintiffs.  First, many of the documents relied upon by plaintiffs in support of this proposition are not admissible because they have not been properly authenticated.[16]  See, e.g., Cummins Exs. 220, 223, 224, 254, 255.

Second, even if all of the documents relied upon by plaintiffs were admissible, a number of them do identify ABM Kentucky, or its assumed name of ABM Janitorial Services, as the employer.   For example, the recognition forms were directed to the branch managers of ABM Janitorial Services at the Harding Street N.E. address (Cummins Aff., Ex. 219); the performance appraisals stated the "Company" was ABM Janitorial Services, ABM – Airport 747-3, ABM, or ABM PNC, while listing ABM Industries Incorporated on the letterhead (id., 220); the field guide referenced ABM

---

[13]    The pay stubs for plaintiffs list the employer as ABM Janitorial Services or ABM Jan. Services-N Central, located at 760 Harding St. N.E., Minneapolis, MN 55413.

[14]    The Foreign Annual Report for the State of Delaware for years 2003 and 2004 lists the corporation name as American Building Maintenance Co. of Kentucky.

[15]    The lease is dated September 1, 2005.  The lessee is identified as "American Building Maintenance Company of Illinois, a California corporation, (the Lessee)," whose address is 760 Harding St. N.E., Minneapolis, MN 55413.

[16]    As stated previously, to be considered on summary judgment, documents must be authenticated by an affidavit made on personal knowledge or via a deposition.  See Stuart, 217 F.3d at 636 n. 20.

Janitorial Services on its cover (id., Ex. 221); ABM, along with ABMI, was listed on the letterhead of the equal employment policy (id., Ex. 222); the pay stubs issued to plaintiffs stated their employer was ABM Janitorial Services or ABM Jan. Services-N Central at the Harding Street N.E. address (id., Exs. 93-101).

Third, the record is replete with documents that explicitly indicate that plaintiffs' employer was ABM Kentucky or ABM Janitorial Services, the assumed name for ABM Kentucky and ABM Illinois. The W-2 forms for plaintiffs for 2003 and 2004 identify ABM Janitorial Services as the name of their employer and address at 760 Harding Street N.E., Minneapolis, MN 55413. See Mrachek Aff., Ex. 21 (ABM11560-11561, ABM11564, ABM11566, ABM11568, ABM11571, ABM11573, ABM11575, ABM11577). The Federal Identification Number, 36-2780789, listed on the W-2 forms for 2003-2004, was for ABM Kentucky's predecessor, ABM Illinois. Id. Plaintiffs' W-2 forms for 2005 identify their employer as ABM Janitorial Services, located at 760 Harding Street N.E., Minneapolis, MN 55413, and list the ABM Kentucky's employer Federal Identification Number as 94-3336249. See Mrachek Aff., Ex. 16 (W-9 Form; Request for Taxpayer identification Number and Certification); Ex. 18 (Minnesota Department of Employment and Economic Development-Employer's Unemployment Quarterly Tax Report, ABM06652); Ex. 21 (ABM11562-11563, ABM11565, ABM11567, ABM11569-11570, ABM11572, ABM11574, ABM11576, ABM11578-11579). ABM Janitorial Services and the Harding Street N.E. address are both listed on plaintiffs' paychecks throughout 2005 and 2006 until the name of ABM Kentucky was changed to ABM Janitorial Services-North Central (same address) in 2007. See Cummins Aff, Exs. 93-101 (Paycheck

Stubs). In short, plaintiffs' own employee records show that ABM Illinois and ABM Kentucky, doing business as ABM Janitorial Services, served as plaintiffs' employers.[17]

Fourth, while the Foreign Annual Reports filed by ABM Kentucky with the State of Delaware for years 2003 and 2004 do not list Minnesota as a state in which ABM Kentucky operated (Cummins Aff., Ex. 259), this is consistent with the fact that it was ABM Illinois that was operating out of Minnesota in 2003 and 2004, as ABM Kentucky did not take over the Minnesota operations from ABM Illinois until January 1, 2005. See Mrachek Aff., Ex. 12 (Certificate of Authority to Transact Business in Minnesota issued by the Minnesota Secretary of State to "American Building Maintenance Co. of Kentucky" on December 12, 2004); Ex. 18 (Unemployment Tax Liability Determination, ABM06661, indicating that ABM Kentucky became the successor employer to ABM Illinois effective January 1, 2005).

Finally, with regards to the lease agreement of the building located at 760 Harding Street N.E., Minneapolis, MN 55413, the lessee is listed as ABM Illinois, however, there is no mention of ABMI. See Cummins Aff., Ex. 250. As such, the lease does not support plaintiffs' argument that ABMI was their sole employer.

In summary, based on the documents proffered by plaintiffs, along with the other documents in the record (not to mention the testimony of witnesses as discussed in the

---

[17] The only evidence plaintiffs have presented connecting any plaintiff to ABMI is a 2005 stipulation for settlement between the ABMI and plaintiff Hernandez and a notice of insurer's liability for Hernandez regarding a worker's compensation claim, which lists ABMI as the employer. See Cummins Aff., Ex. 78 (Stipulation for Settlement); 224 (Notice of Insurer's Liability). At the same time, however, Hernandez's W-2 forms for 2004 and 2005 list ABM Janitorial Services as her employer and state the Federal Employer Identification Numbers for ABM Illinois and ABM Kentucky. See Mrachek Aff., Ex. 21 (ABM11571-ABM11572). Similarly, Hernandez's pay stubs for 2004 state that her employer was ABM Janitorial Services. See Cummins Aff., Ex. 96.

next section), this Court concludes that ABMI was not plaintiffs' sole employer during the relevant time period.

### 2. Is ABMI Responsible for the Actions of ABM Kentucky?

"Employer" as set forth under Title VII is to be defined liberally. See Baker v. Stuart Broad. Co., 560 F.2d 389, 391 (8th Cir. 1977) (citation omitted). However, "[t]he law allows businesses to incorporate to limit liability and isolate liabilities among separate entities. (internal citation omitted). One way liability is limited in corporations is that shareholders generally are not liable for the acts of the corporation." Frank v. U.S. West, Inc., 3 F.3d 1357, 1362 (10th Cir. 1993) (citing Johnson v. Flowers Indus. Inc., 814 F.2d 978, 980-81 (4th Cir. 1987)). Under the doctrine of limited liability, the parent corporation retains the benefits of limited liability even if it exercised some control over its subsidiary. See Johnson, 814 F.2d at 980. "[O]wnership of a controlling interest in a corporation entitles the controlling stockholder to exercise the normal incidents of stock ownership, such as the right to choose directors and set general policies, without forfeiting the protection of limited liability." Id. at 980 (citation omitted). Consequently, "[t]here is a 'strong presumption that a parent company is not the employer of its subsidiary's employees, and the courts have found otherwise only in extraordinary circumstances.'" Brown v. Fred's, Inc., 494 F.3d 736, 739 (8th Cir. 2007) (emphasis added) (quoting Frank, 3 F.3d at 1362; see also Johnson, 814 F.2d at 981 ("Such situations are the exception, however. The doctrine of limited liability remains the rule. The parent company is the employer only if it 'exercises a degree of control that exceeds the control normally exercised by a parent corporation.'") (citation omitted)). "Although courts do, under certain circumstances, hold parent companies liable for the acts or omissions of their subsidiaries, the plaintiff has the burden of demonstrating that

it is appropriate in a given case." Halvorson v. Conseco Finance Corp., Civil No. 01-1774 (RHK/AJB), 2002 WL 31371938 at *10 (D. Minn. Oct. 21, 2002) (string citation omitted).

In the Eighth Circuit, a parent company may be held liable for the acts of its subsidiary for the purpose of establishing liability under Title VII if: (1) "the parent company so dominates the subsidiary's operations that the two are one entity and therefore one employer"; or (2) "the parent company is linked to the alleged discriminatory action because it controls 'individual employment decisions.'" Brown, 494 F.3d at 739 (citing Johnson, 814 F.2d at 981; Leichihman v. Pickwick Int'l, 814 F.2d 1263, 1268 (8th Cir. 1987)).

The Fourth Circuit, in Johnson, explained these two factors in this way:

> First, the parent could control the employment practices and decisions of the subsidiary. If the parent company hired and fired the subsidiary employees, routinely shifted them between the two companies, and supervised their daily operations, it would be hard to find that the parent was not their employer. Second, the parent might so dominate the subsidiary's operations that the parent and the subsidiary are one entity and thus one employer. For example, the subsidiary may be highly integrated with the parent's business operations, as evidenced by the commingling of funds and assets, the use of the same work force and business offices for both corporations, and the severe undercapitalization of the subsidiary. The parent might also fail to observe such basic corporate formalities as keeping separate books and holding separate shareholder and board meetings.

814 F.2d at 981.

"To hold a parent corporation liable for its subsidiary's discrimination, there must be evidence that the parent corporation exercised control over the 'individual employment decision[ ]' involved, . . . (internal citation omitted). The penultimate question is: '[W]hat entity made the final decisions regarding employment matters related to the person claiming discrimination?'" Iverson v. Ingersoll-Rand Co.,

125 Fed.Appx. 73, 76, 2004 WL 3015433 at *2 (8th Cir. Dec. 30, 2004) (citing Frank, 3 F.3d at 1363 (quoting Trevino v. Celanese Corp., 701 F.2d 397, 404 (5th Cir.1983)).

"More than a normal parent-subsidiary relationship is required." Id. (citing Leichihman, 814 F.2d at 1268.

This Court will now determine whether there is sufficient evidence in the record for a jury to conclude that ABMI so dominates ABM Kentucky's operations that the two companies are one entity and therefore, one employer, or whether ABMI is sufficiently linked to the alleged discriminatory action because it controls individual employment decisions.[18]

---

[18]    According to plaintiffs, defendant ABMI is liable in this case to all plaintiffs, since defendants ABMI and ABM Kentucky are an integrated enterprise or joint employers. See Pls.' Mem. at pp. 103-105. The "integrated enterprise" theory applies where "separate corporations are not what they appear to be, that in truth they are but divisions or departments of a single enterprise," so that, for all purposes, there is in fact only a single employer. See Scheidecker v. Arvig Enterprises, Inc., 122 F. Supp.2d 1031, 1037 (D. Minn. 2000) (citations omitted). On the other hand, under a "joint employer" relationship, the "analysis assumes separate legal entities exist, but that they have chosen to handle certain aspects of their employer-employee relationships jointly to the extent that "one company has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer." Id. at 1038 (citations omitted). The factors for ascertaining whether one company so dominates or controls another company such that liability must be imputed to the first company include: (1) the interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control. See Baker, 560 F.2d at 392; see also Scheidecker, 122 F. Supp.2d at 1038 (court uses same four Baker factors apply to an "integrated enterprise" or "joint employer" analysis). In the Eighth Circuit and within this District, the integrated enterprise and joint control theories, along with the four-factor Baker analysis, appear in cases where the court was asked to consolidate two defendants for the purpose of meeting Title VII's employee numerosity requirement or where the plaintiff is seeking to hold two companies jointly liable. See Sedlacek v. Hach, 752 F.2d 333 (8th Cir. 1985); Baker, supra; McDonald v. JP Marketing Associates, LLC, Civil No. 06-4328 ADM/AJB, 2007 WL 1114159 (D. Minn. April 13, 2007); Jackson v. NEXT Financial Group, Inc., Civil No. 04-4686 (RHK/JSM), 2005 WL 1630532 (D. Minn. July 11, 2005); Wilson v. Brinker Intern., Inc. 248 F.Supp.2d 856 (D. Minn. 2003), aff'd on other grounds, 382 F.3d 765 (8th Cir. 2004); Scheidecker, supra. The Eighth Circuit has not used the Baker four-factor analysis to determine whether a parent is liable for the actions of its subsidiary (see Brown, supra; Iverson, supra), and the Court has found no cases within the District of

a. **Does ABMI So Dominate ABM Kentucky's Operations that the Two Are One Entity?**

i. **Interrelation of Operations**

In assessing the interrelation of operations, "the key is the degree to which [ABMI] or its employees were in fact involved in the actual functioning of [ABM Kentucky]." Jackson, 2005 WL 1630532 at *5 (citation omitted).  Factors that support a finding of interrelated operations include "sharing of employees and equipment between two companies and the transfer of employees from one company to the other."  Id. (citing EEOC v. Financial Assurance, Inc., 624 F. Supp. 686, 690 (W.D. Mo. 1985)).  On the other hand, "merely because [employees within a subsidiary] ultimately report to officers in the parent company", or "because a parent corporation eventually benefits from the work of its subsidiaries", is not evidence of interrelated operations. See Frank, 3 F.3d at 1362 (citations omitted).

This Court finds that while ABMI had some involvement in the operations of ABM Kentucky, its activities were consistent with a parent-subsidiary relationship, and were not of the type or the extent to which a court could find that ABMI was involved in the actual functioning of ABM Kentucky,  much less that it so dominated ABM Kentucky's business practices that the two companies should be deemed to be one entity and one

---

Minnesota or the Eighth Circuit that have used the Baker test to determine parent liability for the acts of the subsidiary.  In fact, in Johnson, relied upon by the Eighth Circuit in Brown, the Fourth Circuit acknowledged that courts have used the four-factor test articulated in Baker for evaluating whether the degree of control that a parent company exercised has exceeded the control normally exercised by a parent corporation.  See Johnson, 814 F.2d at 981 n*.  However, the Fourth Circuit refused to use this test, stating: "We need not adopt such a mechanical test in every instance; the factors all point to the ultimate inquiry of parent domination. The four factors simply express relevant evidentiary inquiries whose importance will vary with the individual case."  Id.  Thus, while this Court will consider the factors set forth in Baker in analyzing AMBI's motion for summary judgment, ultimately its analysis is bound by Brown.

employer.  See Johnson, 814 F.3d at 982 ("Nor does the exercise of "oversight" permit disregard of the incidents of separate corporate entities. The district court specified that 'the relationship between [the parent] and [the subsidiary] is one of general oversight, not attention to detail, and it is characteristic of a parent-subsidiary relationship.' We agree that [the parent] did not dominate the business practices of [the subsidiary].").

Here, the day-to-day operations of ABM Kentucky were handled by ABM Kentucky employees and without the involvement or oversight of AMBI personnel.  The lease for ABM Kentucky's Minneapolis office was in the name of ABM Illinois, ABM Kentucky's predecessor.  See Cummins Aff., Ex. 250.  The cleaning contracts for the buildings where plaintiffs worked were in the name of ABM Janitorial Services, ABM Illinois dba ABM Janitorial Services, or American Building Maintenance.  Id., Ex. 20. ABM Kentucky, through its branch managers, was responsible for the performance of its accounts and customer relations, and no evidence was presented that ABMI had any involvement in the negotiation, oversight or performance of these contracts.  See Mrachek Aff., Ex. 38 at pp. 49-50 (Ketchum Dep.).  In addition, invoices and bills for supplies and equipment were submitted to American Building Maintenance at the Harding Street N.E. address and were paid by ABM Janitorial in St. Louis, which was ABM Kentucky's headquarters until it moved to Minnesota.  See Mrachek Aff., Ex. 35 (Invoices and Check Records); see also Southard Aff., ¶ 7.

ABM Kentucky, and not ABMI, made all decisions with regards to hiring, firing, promotion, salary and wages, as it pertains to all employees in Minnesota, including plaintiffs.  See Southard Aff., ¶ 5; Mork Decl., ¶ 6.  ABM Kentucky employees were responsible for the day-to-day financial operations of ABM Kentucky, including creation of the monthly financial reports for the branches and the regional budget, which was

submitted to ABM Janitorial Services, Inc., not ABMI.  See Mrachek Aff., Ex. 38 at pp. 21-22, 29-32 (Ketchem Dep.); 40 at pp. 11-12, 77-78, 125-26, 242-44 (Southard Dep.).  ABMI did not participate in the day-to-day finances of ABM Kentucky and its finances were not commingled with those of ABM Kentucky.  See Miller Aff., ¶¶ 12, 13.

ABM Kentucky developed its own hiring policies and practices, investigation policies and practices, safety policies and practices, work rules, affirmative action plans, attendance policies and practices, and disciplinary policies and practices.  See Second Southard Aff., ¶ 5.  In addition, ABM Kentucky developed and implemented its own human resources policies, and negotiated and maintained its own health insurance for its employees.  Id., ¶ 3.  ABM Kentucky was the signatory to the Collective Bargaining Agreement with Service Employees International Union, Local 26, AFL-CIO, and the most recent negotiation of the collective bargaining agreement with the union involved ABM Kentucky's outside counsel, Southard, Mork, Ketchem, and Chris Bouvier, inside labor counsel for ABM Janitorial Services, Inc.  See Mrachek Aff., Ex. 3 (Collective Bargaining Agreement); Second Southard Aff., ¶ 6.

With respect to human resource functions, ABM Kentucky had its own human resources department.  ABM Kentucky's human resources director was located at the Minneapolis Branch for ABM Kentucky at the Harding Street N.E. address.  See Mrachek Aff., Ex. 2 (Business Card), Ex. 39 at pp. 20-21 (Mork Dep.); see also Mork Decl. ¶ 1, Ex. 2.  ABM Kentucky's human resource employees were responsible for all aspects of the employer-employee relationship including worker's compensation, harassment and discrimination claims, safety, affirmative action, payroll, insurance, employee legal issues, payroll questions and concerns; maintenance of hiring packages, W-4 changes, termination reports, vacation, levies and garnishments, union

dues, stock and 401K, unemployment issues, COBRA issues, hiring and recruiting, leave-of-absences, FMLA issues, short-term disability, and notifications of open positions, development of training, new hire training, performance recognition and safety. See Mrachek Aff., Exs. 38 at pp. 29-31 (Ketchem Dep.); 39 at pp. 67-70, 76, 126, 133, 278-80, Dep. Ex. 13 (Mork Dep). Mork, ABM Kentucky's human resource director, handled employment legal issues, and was the only person involved in making the determination or decision about the results of an investigation. See Cummins Aff., Ex. 20 at p. 96 (Mork Dep.); Mrachek Aff., Ex. 39 at p. 118 (Mork Dep.). In addition, Mork dealt directly with union representatives in connection with handing grievances. See Mrachek Aff., Ex. 39 at p. 126 (Mork Dep.).

This is not to say that ABMI did not have some involvement in ABM Kentucky's operations. For example, pursuant to the Service Agreement between ABMI and ABM Kentucky, ABMI provided to ABM Kentucky a variety of services and items, in exchange for payment of a fee, such as worker's compensation insurance, obtaining licenses for sexual harassment videos, negotiating the contract for the Harassment Hotline, submitting motor vehicle record checks to a single provider, and drafting certain forms (such as performance evaluations). See Second Miller Aff., ¶ 5. ABM Kentucky managers received diversity training from ABMI, spoke to ABM Kentucky corporate counsel for guidance regarding sexual harassment complaints, had access to ABMI's human resources online manual, contacted ABMI's attorneys or human resource employees from time-to-time with questions regarding policies and procedures found in the human resource manual, received instructions on harassment training from ABMI and relied upon the ABMI Complaint resolution summary form and ABMI's procedures for processing one of the plaintiff's complaints. See Cummins Aff., Ex. 20 at pp. 9, 71-

74, 97, 106-07, 137, 144, 146-47, 152-53 (Mork Dep.); Ex. 28 at pp. 66-70, 137-41,

238-239 (Southard Dep.); Ex. 271, ABM04431-4432. Further, ABM Kentucky

employees were required to follow ABMI's Code of Business Conduct and Ethics,

(Cummins Aff., Ex. 239, ABM07331-7334), ABMI's name was listed a variety of ABM

Kentucky documents, (see e.g., Cummins Aff., Exs. 219, 220, 221, 222, 223, 254), and

ABM Kentucky's financial results were reflected in the annual reports filed by ABMI for

years 2004-2006. See Cummins Aff., Ex. 91 (Request for Admissions Nos. 36-38).

However, this level of involvement in ABM Kentucky's affairs does not show that

ABMI dominated or controlled ABM Kentucky's business or day-to-day practices. See

Brown, 484 F. 3d at 740-41 (finding that processing of payroll and performance of other

services by the parent company for the subsidiary for a fee, and the appearance of the

parent company's name on plaintiff's paycheck did not suggest that the parent

corporation and subsidiary were a single entity); Iverson, 2004 WL 3015433 at *3

(rejecting plaintiff's argument that the parent corporation was his employer under the

ADEA because various documents he had received had the name of the parent

corporation on them); Frank, 3 F.3d at 1363 (noting that plaintiff had not presented the

type of evidence routinely used to show interrelated operations such as "when the

parent kept subsidiary's books, issued its paychecks, and paid its bills"; the "parent and

subsidiary had common employees, the same headquarters, common advertising, and

the parent rented its properties to the subsidiary"; and the "parent and subsidiary shared

services, equipment, employees and office space, and parent controlled subsidiary's

payroll and benefit programs."); Johnson, 814 F.2d at 982 (finding that plaintiffs

produced no evidence that the parent corporation excessively interfered with the

business operations of the subsidiary where the subsidiary's "management [was]

responsible for the daily decisions in such vital areas as production, distribution, marketing, and advertising."); McDonald, 2007 WL 1114159 at *6 (finding evidence of interrelation of operations between two defendant companies where one company had some supervision and control over the employees of the other company, some ability to participate in or control hiring and firing, and some ability to determine compensation).

Rather, at best, the evidence shows that ABMI provided some training and administrative assistance and advice to ABM Kentucky, and that the day-to-day operations of ABM Kentucky were run by ABM Kentucky personnel without the involvement or oversight of ABMI.  Further, to the extent that ABMI reported its ABM Kentucky's financial results in its annual report or required employees of all subsidiaries to follow its code of conduct, this conduct is consistent with normal incidents of stock ownership.  The fact that a parent corporation exercises some control over its subsidiary, including setting general policies, does not negate the benefits of limited liability.  See Johnson, 814 F.2d at 980.  The parent company is the employer only if it "'exercises a degree of control that exceeds the control normally exercised by a parent corporation.'" (citation omitted).  Id. at 981.

In summary, the evidence before this Court does not rise to level of establishing that ABMI and ABM Kentucky were related in such a way that a jury could conclude that ABMI dominated or controlled ABM's operations.

### ii.  Common Management and Common Ownership

According to plaintiffs, the fact that there is common management between ABMI and ABM Kentucky, along with the fact that ABMI owns ABM Kentucky, confirms that ABMI is liable for plaintiffs' claims.  See Pls.' Mem. at pp. 108-111, 113-115.  ABM Kentucky's Regional Vice President is Southard.  See Mrachek Aff., Ex. 40 at p. 48,

Ex. 1 (Southard Dep.).   Southard reported directly to Jan Kaupas, the Executive Vice President for ABM Janitorial Services, Inc., and Jim McClure the President of ABM Janitorial Services, Inc.   Id. at pp. 11-13.   While Southard was responsible for everything that occurred at ABM Kentucky, including the Minnesota Branch, McClure of ABM Janitorial Services, Inc., and not ABMI, was the final authority on all matters of ABM Kentucky, which encompassed company policy, its implementation and enforcement. Id. at pp. 94-95.

ABM Kentucky and ABMI do, however, share the same Chief Executive Officer, Chief Financial Officer, Treasurer, Secretary and Vice President of Finance.   See Cummins Aff., Exs. 28 at pp. 132-33; 244-45; 246 (ABM7214, 7211, 7227, 7228 PABM 2943-94.   In addition, ABMI owns all of the shares of ABM Kentucky.   See Cummins Aff., Ex. 246, ABM07222-23; see also Miller Aff. ¶¶ 3, 4.

Evidence establishing common management and ownership between a parent and its subsidiary, alone, is insufficient to establish liability for a parent corporation, as common management and ownership are ordinary aspects of a parent-subsidiary relationship.   See Lusk v. Foxmeyer Health Corp., 129 F.3d 773, 778 (5th Cir. 1997); see also Frank, 3 F.3d at 1364 ("It is undisputed that Defendant is the sole shareholder of Northwestern Bell. However, this factor, standing alone, can never be sufficient to establish parent liability."); Colindres v. QuitFlex Mfg., 235 F.R.D. 347, 363 (S.D. Tex. March 31, 2006) ("The existence of common management and ownership and the "normal incidents" of a parent-subsidiary relationship, such as the parent's right to select directors and to set general policies, do not justify treating a parent and its subsidiary as a single employer.").   In other words, "[a] parent corporation's possession of a controlling interest in its subsidiary entitles the parent to the normal incidents of stock

ownership, such as the right to select directors and set general policies, without forfeiting the protection of limited liability." Lusk, 129 F.3d at 778 (citation omitted); see also Johnson, 814 F.2d at 980-81 (quoting Baker v. Raymond Int'l, Inc., 656 F.2d 173, 180 (5th Cir. 1981)) ("As the courts recognize, '(o)wnership of a controlling interest in a corporation entitles the controlling stockholder to exercise the normal incidents of stock ownership, such as the right to choose directors and set general policies, without forfeiting the protection of limited liability.'"). "The doctrine of limited liability, however, does not hold that [the parent corporation] is an employer merely because it chooses the subsidiary's directors. Id. at 982 (citing United States v. Jon-T Chemicals, Inc., 768 F.2d 686, 691 (5th Cir. 1985) ("One-hundred percent ownership and identity of directors and officers are, even together, an insufficient basis for applying the alter ego theory to pierce the corporate veil.")).[19] Instead, "[s]ome nexus to the subsidiary's daily employment decisions must be shown." Lusk, 129 F.3d at 778 (citation omitted).

As stated in the previous section, plaintiffs have not been met their burden of showing that ABMI controls the day-to-day business practices of ABM Kentucky, nor as discussed in the next section, have they shown that it controls the employment decisions of ABM Kentucky. As such, this Court places little weight on the common

---

[19]    In addition, it is a "well-established principle that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent two corporations separately, despite their common ownership." Lusk, 129 F.3d at 779, quoted in United States v. Bestfoods, 524 U.S. 51, 69 (1998). Thus, even if it were shown that Southard, the head of the ABM Kentucky, ultimately did report to the Chief Executive Officer of both ABM Kentucky and ABMI, Henrick Slipsager (a fact which was not shown), it "is not enough to present a material factual dispute, because this exercise of control is not to a degree that exceeds the control normally exercised by a parent corporation. To hold otherwise would mean that there would always be a material factual dispute as to this prong because the top officer of a subsidiary is, at some point, always held accountable to an officer of the parent corporation." Frank, 3 F.3d at 1362 (internal citations omitted).

management and ownership between ABM Kentucky and ABMI in determining whether ABMI should be held liable for plaintiffs' claims against ABM Kentucky.

      **b.**    **Is ABMI Linked to the Alleged Discriminatory Actions of ABM Kentucky Because It Controlled the Individual Employment Decisions?**[20]

Plaintiffs argued that ABMI handled the day-to-day labor-management functions in plaintiffs' work place by developing human resources policies; developing and distributing employee handbooks; developing and presenting the employment-related training; providing human resources personnel for assistance; providing employment-related legal advice; handling lawsuits, human resources information systems, and the collective bargaining process; administering the employment-benefits programs; developing and updating human resources forms; and participating in investigations.[21]

See Pls.' Mem. at pp. 111-12.

---

[20]    The Court notes that this prong addresses the second Baker factor– centralized control of employment decisions – used to evaluate a company's role under the integrated employer and joint control theories.

[21]    There is no evidence in the record to show that ABMI handled the collective bargaining process for ABM Kentucky, except to the extent the Service Agreement states that ABMI, through its legal department, will negotiate and draft service agreements.  See Cummins Aff., Ex. 242 ¶ 1.7(a).  To the contrary, the most recent negotiation of the collective bargaining agreement with the union involved outside counsel, who was paid by ABM Kentucky, Southard, Mork, Ketchem, and Chris Bouvier, inside labor counsel for ABM Janitorial Services, Inc.  See Second Southard Aff., ¶ 6. In addition, while plaintiffs claimed that ABMI employees actively participated in investigations of harassment complaints, Mork, the former head of human resources for ABM Kentucky testified that she and other ABM Kentucky employees, including MacDonald and Janecek investigated complaints and that ABMI legal counsel and human resources staff were available if guidance was needed.  See Mrachek Aff., Ex. 39 at pp. 106-07, 113-114, 116-17 (Mork Dep.); 37 at pp. 78-79 (Janecek Dep.); 41 at pp. 65-67 (MacDonald Dep.); Cummins Aff., Ex. 20 at p. 97, 137, 152-53 (Mork Dep.).  In addition, Mork testified that she was the only person involved in determining or deciding the outcome of an investigation.  See Mrachek Aff., Ex. 39 at p. 118 (Mork Dep.).  Plaintiffs did not present any evidence to the contrary.

Determining whether a parent corporation controls the labor relations of its subsidiary is a large part of the analysis of deciding whether to hold one entity responsible for the actions of another.  See Frank, 3 F.3d at 1363 (citations omitted); see generally, Jackson, 2005 WL 1630532 at *6 ("'centralized control of labor relations,' is often considered to carry the most weight in this analysis.").  "To satisfy the control prong, a parent must control the day-to-day employment decisions of the subsidiary." Frank, 3 F.3d at 1363; see also Iverson, 2004 WL 3015433 at *3 (in denying liability for the parent corporation, the Eighth Circuit concluded that the parent did not exercise control over the employment decisions in that case and the plaintiff did not allege facts that would show the sort of control of day-to-day employment decisions necessary for liability) (citation omitted).  It is not enough that the parent issue "broad general policy statements regarding employment matters. . . ."  Frank, 3 F.3d at 1363.  Rather, as stated in Iverson, "[t]he penultimate question is: '[W]hat entity made the final decisions regarding employment matters related to the person claiming discrimination?'" 2004 WL 3015433 at *2 (citing Frank, 3 F.3d at 1363 (quoting Trevino v. Celanese Corp., 701 F.2d 397, 404 (5th Cir.1983)).  Courts, in addressing this factor, have looked to one company's control over the payroll, hiring, firing, wages, hours, working conditions, daily activities or fringe benefits of the other company's employees.  See Jackson, 2005 WL 1630532 at *7 (citing Webb, 652 F. Supp. at 921; Nixon v. Northwestern Mut. Life Ins. Co., 58 F. Supp.2d 1269, 1275 (D. Kan. 1999)).

There is no dispute that ABMI employees, including legal employees, provided some training and support to ABM Kentucky human resource and management employees regarding harassment and that the Service Agreement contemplates this support.  However, plaintiffs' argument ignores the lack of overall involvement and

control that ABMI and its employees exert over ABM Kentucky in the actual day-to-day functioning of ABM Kentucky.   In particular, ABM Kentucky has its own human resources department with its own staff whose responsibilities include dealing with worker's compensation, harassment and discrimination claims, development and changes in sexual harassment policy and procedure, union grievances, safety, affirmative action, payroll, insurance, employee legal issues, hiring packages, W-4 changes and termination reports, vacation, levies and garnishments, union dues, stock and 401K plans, unemployment issues, employee insurance, COBRA, assisting in hiring and requiting, leaves of absence, FMLA, short-term disability, notifications of open positions, supervisor development training, and new hire training.   See Mrachek Aff., Ex. 38 at pp. 29-31 (Ketchem Dep.); Ex. 39 at pp. 67-70, 76, 126, 133, 278-80, Ex. 13 (List of Human Resources Responsibility).   In addition, ABM Kentucky makes all decisions with regards to hiring, firing, promotion, salary and wages with regards to all employees in Minnesota, including plaintiffs, and ABMI and its employees have no role in this.  See Southard Aff., ¶ 5, Mork Decl., ¶ 6, Miller Aff., ¶ 8.

The facts in this case are similar to those found in Cellini v. Harcourt Brace & Co., 51 F. Supp.2d 1028 (S.D. Cal. 1999), where the court found that the centralized control of employment decisions prong had not been satisfied because the plaintiff had produced no evidence that the defendant parent corporation exercised control over the subsidiary's employment decisions.  Id. at 1035.   The court reached this conclusion despite the showing that the parent corporation issued a code of conduct that applied to the subsidiary's employees, and provided employee benefits programs and sexual harassment seminars to these employees.  Id. at 1034.  As the evidence showed that the subsidiary's day-to-day employment decisions--such as hiring, performance

evaluations, and work assignments--were conducted by the subsidiary without the parent corporation's control, the court held that the control factor had not been met. Id.; see also Maddock v. KB Homes, Inc., No. CV-06-05241 CAS JTLX, 2007 WL 4287627 at *12 (C.D. Cal. Oct. 18, 2007) (evidence of providing training materials and human resource guidance, direction and support to management personnel by the parent does not establish involvement in the day-to-day personnel decisions of subsidiaries); EEOC v. Con-Way, Inc., No. CV 06-1337-MO, 2007 WL 2610367 at *4 (D. Or. Sept. 4, 2007) ("It is common for parent companies and their subsidiaries to have common pension and benefits plans in order to achieve certain economic efficiencies, and courts have held this type of action is not evidence of single employer status.") (citations omitted).

Plaintiffs have not produced evidence to establish that ABMI exercised day-to-day control over ABM Kentucky's employment decisions in a manner that would satisfy the centralized control of employment decisions control prong articulated in Brown and Baker.  As in Frank, Cellini and Maddock, dissemination of training materials, human resources policies, providing employee benefits programs and providing guidance and legal advice to management personnel, does not amount to a showing of the sort of control of day-to-day employment decisions necessary for liability.

For all these reasons, plaintiffs have not met their burden of showing that ABMI controls the day-to-day employment decisions of ABM Kentucky.

### 3.    Conclusion

The record before this Court does not support the contention that ABMI so dominates ABM Kentucky such that the two corporations are one entity and therefore, one employer, or that ABMI is linked to the alleged discriminatory actions of ABM Kentucky because it controls individual employment decisions.   While the undisputed

evidence shows that ABMI owns its subsidiary, ABM Kentucky, and the two companies have common management, the minimal interrelation of operations between the two companies and ABMI's lack of day-to-day control over ABM Kentucky's employment decisions, is fatal to plaintiffs' contention that ABMI should be held liable for the actions of ABM Kentucky, particularly given the strong presumption that a parent company is not the employer of its subsidiary's employees.   Where, as here, plaintiffs have failed to present material facts to dispute the presumption that ABMI should not be liable for ABM Kentucky's actions, summary judgment in favor of ABMI on plaintiffs' claims against it is appropriate.  See e.g., Frank, 3 F.3d at 1364 (upholding summary judgment after considering all four factors together on the grounds the plaintiffs failed to establish a genuine issue of material fact to dispute the presumption that the parent was not the plaintiffs' employer); Niland v. Buffalo Laborers Welfare Fund, No. 04-CV-0187F, 2007 WL 3047099 at *6 (W.D.N.Y. 2007 Oct. 18, 2007) ("Whether two entities constitute a "single employer" is a question of fact.  Nevertheless, whether a defendant qualifies as an 'employer' as defined by Title VII may be resolved on summary judgment where the facts critical to the determination are undisputed.") (citations omitted); see generally, Jackson, 2005 WL 1630532 at *9 (finding that summary judgment was appropriate based on the court's review Baker factors in the context of Title VII's numerosity requirement despite a finding that some interrelation of operations between the companies existed).[22]

---

[22]   Plaintiffs have cited to several cases in the Eighth Circuit and this District for the proposition that summary judgment is unwarranted in this case.  See Pls.' Mem. at pp. 107-08, 111, 113, 114.  Plaintiffs' reliance on these cases is misplaced.  Sedlacek v. Hach, 752 F.2d 333 (8th Cir. 1985), was decided upon an appeal from a motion to dismiss, defendants conceded that they were a single employer and the court noted that the companies shared employees, management, equipment, location, and employee benefit programs, and were both almost entirely owned by both of the defendants.  Id. at

Therefore, this Court recommends that ABMI's motion for summary judgment be granted.   In light of this recommendation, the Court will proceed to consider only the claims brought against ABM Kentucky by plaintiffs Garcia, Laureano and Giron, as none of the other plaintiffs have claims in this case pending against ABM Kentucky.[23]

---

334, 335-36.   In <u>Baker</u>, there was no parent-subsidiary relationship at issue, and the president of both companies also controlled the day-to-day operations of both companies.   560 F.2d at 392.   In <u>Wilson v. Brinker Intern., Inc</u>. 248 F.Supp.2d 856 (D. Minn. 2003), <u>aff'd on other grounds</u>, 382 F.3d 765 (8th Cir. 2004), the matter of joint liability of two companies was presented to the jury, and the court concluded that plaintiff had presented sufficient evidence for a reasonable jury to find that defendants acted as joint employers.   However, the court never described the evidence that presented to the jury. <u>Id.</u> at 861.   In <u>Scheidecker</u>, the court concluded that triable issues existed regarding whether the companies were a "single employer" or a "joint employer" under Title VII.   122 F.Supp.2d at 1039.   However, <u>Scheidecker</u> did not involved a parent-subsidiary relationship.   Further, <u>Scheidecker</u> involved a situation where the defendant companies provided services to each other's customers, shared a human resources department and where the chair for the boards of both companies took direct employment action against the plaintiffs, facts not present here. <u>Id.</u> at 1038-39. <u>McDonald v. JP Marketing Associates, LLC</u>, Civil No. 06-4328 ADM/AJB, 2007 WL 1114159 (D. Minn. April 13, 2007) was a numerosity case, where the defendant was seeking dismissal on a motion to dismiss. <u>Id.</u> at *6.

[23]   Plaintiffs also maintained in their brief that defendants were estopped from arguing that ABMI and ABM Kentucky were not one and the same for the purposes of liability, based on a previous jury verdict that held ABMI liable for the actions of its subsidiary, American Building Maintenance Company West ("ABM West"). <u>See</u> Pls.' Mem. at pp. 101-02.   The case at issue was <u>Forbes, et al. v. American Building Maintenance Company West, ABM Industries, Inc.</u>, No. 99-2-05753-2 (Wash. Super. Ct. 2003), where the jury found that the parent, ABMI, should be held liable for ABM West's employment discrimination. <u>See</u> Cummins Aff., Ex. 253 (PAMB0393).   Collateral estoppel, otherwise referred to as issue preclusion precludes relitigation of identical issues of fact. <u>See</u> <u>Liberty Mut. Ins. Co. v. FAG Bearings Corp.</u>, 335 F.3d 752, 758 (8th Cir. 2003) (citing Restatement (Second) of Judgments § 27 (1982)); <u>see also</u> <u>Hauschildt v. Beckingham</u>, 686 N.W.2d 829, 837 (Minn. 2004).   Estoppel is not appropriate here because the fact issue of whether ABMI was liable for the actions of ABM Kentucky (as opposed to ABM West)  was not distinctly contested and directly determined in the earlier adjudication in <u>Forbes</u>.   At the hearing, plaintiffs' counsel conceded that plaintiffs could not argue estoppel. <u>See</u> Hearing Transcript, p. 65.

Plaintiffs' also relied on the representations of defendants' former counsel in this case, Mary Schultz, to show that ABMI and its subsidiaries were for all practical purposes one and the same. <u>See</u> Pls.' Mem. at p. 106.   In a separate case between Laeandre Cannon and ABMI in California, where Schultz served as legal counsel for Cannon, Schultz stated in an affidavit dated January 14, 2005, the following:

## IV.    QUID PRO QUO SEX HARASSMENT CLAIMS AGAINST ABM KENTUCKY

Plaintiffs Garcia, Laureano and Giron have asserted that ABM Kentucky's policies and practices constitute quid pro quo sex harassment under Title VII and the MHRA by making submission to unwelcome sexual advances and other sexual conduct and statements among the terms and conditions of their employment, and by using submission to, or rejection of, such sexual conduct and statements as a factor in ABM Kentucky's decisions about employment opportunities for plaintiffs.  <u>See</u> First Amended Complaint, ¶ 295.

### A.    <u>Legal Standard</u>

To prevail on a theory of quid pro quo sexual harassment, plaintiffs must show that they were: (1) a member of a protected class; (2) subjected to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors; (3) the harassment was based on sex; and (4) their submission to the unwelcome advances was an express or implied condition for receiving job benefits or their refusal to submit

<hr>

> In a prior trial with Defendant ABM Industries, Inc., the discovery phase lasted four years.  Much of the discovery concerned ABM Industries, Inc.'s corporate structure in trying to determine the real employer in interest . . . In the end, both the judges considering the issue and the jury agreed that the parent company [ABM Industries], divisions, and subsidiaries were, for all practical purposes, one and the same, and held the subsidiaries and the parent company jointly and severally liable for the verdict.

<u>See</u> Cummins Aff., Ex. 252, ¶¶ 2-4 (Affidavit of Mary Schultz in Response to Motion to Strike).  This representation was made by Schultz well before the instant suit was commenced and in her capacity as counsel for the plaintiff <u>against</u> ABMI, not as counsel <u>for</u> ABMI.  In any event, it is well established that "[s]tatements of counsel are not evidence and do not create issues of fact."  <u>Exeter Bancorporation, Inc., v. Kemper Secs. Group, Inc.</u>, 58 F.3d 1306, 1312 n. 5 (8th Cir. 1995) (citation omitted).  This Court places no weight on the statements made by Schultz as an advocate for different party in a different case.

resulted in a tangible job detriment.  See Cram v. Lamson & Sessions Co., 49 F.3d 466, 473 (8th Cir. 1995) (citation omitted).  ABM Kentucky argued that plaintiffs' claims for quid pro quo sexual harassment cannot survive summary judgment because their alleged harassers were not supervisors, and accordingly, did not have authority to take tangible employment action.  See Defs.' Mem. at p. 24.  In the alternative, ABM Kentucky argued that even if the harassers were supervisors, plaintiffs' claims fail because defendants are entitled to the Faragher/Ellerth defense.[24]  Id.

"Sexual harassment is quid pro quo if a tangible employment action follows the employee's refusals to submit to a supervisor's sexual demands."  Henthorn v. Capitol Communications, Inc., 359 F.3d 1021, 1026-27 (8th Cir. 2004) (citations omitted) (emphasis added).  Under Title VII, a supervisor is someone who has the power "to take tangible employment action against the victim, such as the authority to hire, fire, promote, or reassign to significantly different duties."  Joens v. John Morrell & Co., 354 F.3d 938, 940 (8th Cir. 2004) (day shift foreman not supervisor); see also Merritt v. Albemarle Corp., 496 F.3d 880, 884 (8th Cir. 2007) (alleged harasser, who was a team leader with the authority to assign employees to particular tasks, is not a supervisor, where he was not empowered to effect "'a significant change in [ ] employment status,'" and lacked the authority "'to make economic decisions affecting other employees.'") (quoting Pa. State Police v. Suders, 542 U.S. 129, 144 (2004)); Cheshewalla v. Rand & Son Constr. Co., 415 F.3d 847, 851 (8th Cir. 2005) (foreman not supervisor where he could not hire, fire, or promote the laborers, nor could he assign them to a different job site); Weyers v. Lear Operations Corp., 359 F.3d 1049, 1057 (8th Cir. 2004) ("Brosius himself did not have the authority to take tangible employment action against Weyers.

---

[24]   Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998); Faragher v. City of Boca Raton, 524 U.S. 775 (1998).

As was the case in <u>Joens</u>, he could not hire, fire, promote, or discipline employees within his department.").

Plaintiffs, citing to the United States Supreme Court cases <u>Ellerth</u> and <u>Faragher</u>, argued that employees who appear to have supervisory authority may also be considered supervisors under Title VII and Minnesota law.  <u>See</u> Pls.' Mem. at pp. 68-69 (citing <u>Ellerth</u>, 524 U.S. at 759).[25]   However, the Eighth Circuit in analyzing <u>Faragher/Ellerth</u> has rejected the theory that an employer can be liable for sexual harassment based on the apparent authority of an individual who is not a supervisor. <u>See</u> <u>Todd v. Ortho Biotech, Inc.</u>, 175 F.3d 595, 598 (8th Cir. 1999); <u>see also</u> <u>Weyers</u>, 359 F.3d at 1057 n. 7 ("Mendez testified that team leaders such as Brosius were viewed by the employees as supervisors. Under our holding in <u>Todd v. Ortho Biotech, Inc.</u>, however, Brosius's apparent authority would be an insufficient basis to support a finding

---

[25]   The language relied upon by plaintiffs in <u>Ellerth</u> for the proposition that an individual who appears to have supervisory authority may be held to be a supervisor under Title VII and MHRA is as follows:

> As a general rule, apparent authority is relevant where the agent purports to exercise a power which he or she does not have, as distinct from where the agent threatens to misuse actual power. Compare Restatement § 6 (defining "power") with § 8 (defining "apparent authority"). In the usual case, a supervisor's harassment involves misuse of actual power, not the false impression of its existence. Apparent authority analysis therefore is inappropriate in this context. If, in the unusual case, it is alleged there is a false impression that the actor was a supervisor, when he in fact was not, the victim's mistaken conclusion must be a reasonable one. Restatement § 8, Comment c ("Apparent authority exists only to the extent it is reasonable for the third person dealing with the agent to believe that the agent is authorized"). When a party seeks to impose vicarious liability*760 based on an agent's misuse of delegated authority, the Restatement's aided in the agency relation rule, rather than the apparent authority rule, appears to be the appropriate form of analysis.

Ellerth, 524 U.S. at 759.

of supervisor status.").[26]   Thus, this Court will proceed with determining whether the alleged harassers of Garcia, Laureano and Giron's had the actual authority to make a significant change in employment status or make economic decisions affecting employees.

**B.**      **General Facts Pertaining to the Authority of Supervisors**

According to plaintiffs, the Collective Bargaining Agreement between the Minneapolis-St. Paul Service Contract Cleaners Association and the Service Employees International Union, Local 26, AFL-CIO, to which ABM Kentucky is a signatory, mandates that plaintiffs' harassers were supervisors for the purposes of Title VII and the MHRA.  See Pls.' Mem. at p. 69.

The Collective Bargaining Agreement provides in relevant part:

> 2.1      The Company recognizes the Union as the exclusive bargaining agent for its employees engaged in the contract cleaning industry, wherever employed in the covered territory, performing janitorial services, including all janitors, porters, cleaners, if not previously covered by agreements with other Unions, and expressly agreed to by the Company, but exclusive of:
>
> * * *
>
> (b)      Hourly Paid Supervisors, Foremen.  An "hourly paid supervisor" or "foreman" is defined as an employee with the authority to hire, discharge, discipline or otherwise the effect changes of the status of employee on a job.

See Cummins Aff., Ex. 141, ABM03964-ABM03965, PAMBM 002860 (2003-2006 and 2007-2009 Collective Bargaining Agreements).  There is no dispute that the harassers

---

[26]      The Court notes that in Halvorson, supra, the court indicated that "in the unusual case where there is a false impression that the harasser possessed supervisory authority over the employee, the employer may be held liable so long as the employee's mistaken belief is a reasonable one."  2002 WL 31371938 at *9 (citing Ellerth, 524 U.S. at 759).  However, this Court believes that in light of the holdings in Todd and Weyer, using the theory of apparent authority as a basis for finding an employee to be a supervisor has been rejected by the Eighth Circuit.

at issue, Moises Enriquez, Francisco Martinez and Rudy Colindres, were classified as non-union employees.   See Cummins Aff., Exs. 107, 108, 114 (Personnel Action Notices).  However, while the definition of "Supervisors" and "Foremen" may be relevant to determining whether Enriquez, Martinez and Colindres were properly labeled by ABM Kentucky as non-union employees, as opposed to being covered by the Collective Bargaining Agreement, it does not assist the Court in determining whether they were given the actual authority to make a significant change in employment status or make economic decisions affecting other employees.

Plaintiffs also refer to the affidavits of two former ABM Kentucky supervisors in support of the proposition that plaintiffs' harassers were supervisors.   See Pls.' Mem. at p. 6.  In particular, Juan Carlos Cruz stated he had been a supervisor for ABM Kentucky and that he had the power to assign or reassign work duties to cleaners, the power discipline cleaners, and the ability promote cleaners.   See Cummins Aff., Ex. 34, ¶ 4 (Affidavit of Juan Carlos Cruz).   Cruz also stated, however, that he could not fire or assign cleaners to different buildings without his manager's approval.   Id.   Another former supervisor and project manager, Oued Soto, stated that he had the power to hire, fire, discipline and promote ABM Kentucky employees.   Id., Ex. 58, ¶ 2 (Affidavit of Oued Soto).   The Court finds that claims by some former ABM Kentucky supervisors as to their power to fire, hire and promote is immaterial to this Court's determination regarding the authority of Enriquez, Martinez and Colindres in the present case.

### C.   Plaintiff Garcia's Quid Pro Quo Claim

Garcia stated that her supervisor, Moises Enriquez, gave her more work, that he took five minutes off her break time, and that he wanted the bathrooms to be cleaner than they were.   See Cummins Aff., Ex. 6 at p. 350 (Garcia Dep.).   Enriquez testified

that managers introduced him as a supervisor and that was the title that he was given. Id., Ex. 4 at p. 47 (Enriquez Dep.).  With regards to his duties, Enriquez indicated that he handed out the general work rules to other employees, and that he explained some of the rules to prospective applicants; however, he never talked to any people actually employed by ABM Kentucky about the work rules.  Id. at pp. 19-20 (Enriquez Dep.). Enriquez stated that Tom Righer, the Project Manager for the One Financial Plaza work site, was the one who made sure that the cleaners were doing a good job and that he would tell Enriquez to check on something that was not done properly.  Id. at p. 69; see also Cummins, Aff., Ex. 120, PABM 000526.  According to Enrique z, he never checked on the work of the cleaners that worked at the One Financial Plaza on his own initiative. Id. at p. 71.  If any area was "tagged" for cleaning, Enriquez would be ordered by Righer to make sure it was cleaned.  Id.

Under this set of facts, the Court concludes that no reasonable fact-finder could find that Enriquez had the actual authority to take tangible employment action against Garcia or any other ABM Kentucky employee, as no evidence was presented that Enriquez had the authority to hire, fire, promote, or reassign employees to significantly different duties.  Instead, it appears that Enriquez merely served as Righer's "eyes" in terms of ensuring that the cleaning at his work site was being done.  As such, this Court finds that Enriquez was not a supervisor for the purposes of Garcia's  quid pro quo sexual harassment claim, and therefore, ABM Kentucky's motion for summary judgment on this claim should be granted.

### D.  Plaintiff Giron's Quid Pro Quo Claim

With regards to his work duties, Colindres testified that he told employees where their areas were at the work site and what their tasks were going to be.  See Cummins

Aff., Ex. 3 at p. 100 (Colindres Dep.). Colindres talked to employees as part of his job and would tell them when they were not doing their job correctly. Id. at p. 74.

Colindres indicated that his boss was in charge of ensuring that company rules were followed. See Mrachek Aff., Ex. 45 at p. 56 (Colindres Dep.). Colindres's responsibilities at his work site were to receive the keys to the work site and hand them to the employees, check the floor to make sure the lights were out, inspect the floors to make sure they were clean and make sure the vacuum cleaners were put away and were in working order. Id. at pp. 57-60. Colindres had received an employee conference report from his supervisor that admonished him for allowing his staff to lay on the floor at a work site. See Cummins Aff., Ex. 130 (Colindres Employee Conference Report). He was warned to have complete control over his staff and their actions. Id.

Colindres testified that he was in charge of making sure that the time cards were punched by employees and then would give them to his boss. See Mrachek Aff., Ex. 45 at p. 60 (Colindres Dep.).

When he wrote up reports on employees, Colindres testified that he consulted with his boss to see what could be done. Id. at p. 100. Colindres stated that the first step in the disciplinary process was to tell an employee that they were not doing the job well. Id. at pp. 76-77. Step two of the disciplinary process was to give an employee a written warning that goes into their file; and step three was to give a final written warning. Id. at pp. 77-78.[27] Colindres testified that he never recommended that any

---

[27]   The Field Guide for ABM states that the employee disciplinary process includes verbal and written warnings from supervisors. See Cummins Aff., Ex. 221 at p. 83, ABM07623 (ABM Janitorial Services Field Guide 2004). However, suspensions of employment cannot be made by immediate supervisors without the approval of their area manager. Id. at pp. 93-94 (ABM07633-ABM07634). With regards to termination, a

employee be terminated or suspended while he was a supervisor.  Id. at p. 116. Colindres also stated that he had never evaluated employees.  Id.

Based on these facts, the Court concludes that no reasonable fact-finder could find that Colindres had the actual authority to take tangible employment action against Giron or any other ABM Kentucky employee, as there was no evidence presented that he had the authority to hire, fire, promote, or reassign employees to significantly different duties.  Colindres's job was to make certain that cleaners were doing their jobs correctly and to tell them where to work at the site and what tasks to perform.  While he could issue verbal and written warning to cleaners, he had to consult with his boss first. Colindres had never recommended that any employee be terminated or suspended, nor had he ever evaluated an employee.  Further, while Colindres could tell workers where their work areas were located, there was no evidence provided that he could reassign them to significantly different duties.[28]   As such, this Court finds that Colindres was not a supervisor for the purposes of Giron's quid pro quo sexual harassment claim, and therefore, ABM Kentucky's motion for summary judgment on this claim should be granted.

---

Project Manager who believes termination is appropriate must contact their area supervisor and human resources before taking any action involving the termination of an employee.  Id., at p. 96 (ABM07636).

[28]   Even if written reports issued by Colindres were used in a final determination with regards to the termination or suspension of an employee, or even if he made some work assignments, these facts are not sufficient to find that Colindres was a supervisor.  See Weyers, 359 F.3d at 1057 (finding that although a team leader had the authority to assign employees to particular tasks, he could not reassign them to significantly different duties and that while performance evaluations issued by the team leader factored into the termination of the plaintiff by the night shift superintendent, this was not sufficient to show that the team leader himself had the authority to take tangible employment action against the plaintiff); Cheshewalla, 415 F.3d at 851 (foreman not supervisor even where he was consulted about hiring, firing, or promoting laborers).

E.   **Plaintiff Laureano's Quid Pro Quo Claim**

Laureano stated that her supervisor, Francisco Martinez, told her that he gave full-time status to a female employee who was "with him" and he would only give Laureano extra hours, full-time status and a raise in salary, if she would "pay attention to him" and go out with him.  <u>See</u> Cummins Aff., Ex. 15 at pp. 14-19, 143 (Laureano Dep.).  At the same time, Martinez gave her more work than she already had because she told him that she did not want to be "with him."  <u>Id.</u> at p. 138.  Laureano also testified that Martinez threatened her by stating that if she would not be "with him," he was going to fire her and that he could fire anyone.  <u>Id.</u>; <u>see</u> <u>also</u> Cummins Aff. Ex. 44, ¶ 2 (Laureano Affidavit).

With regards to his work duties, Martinez testified that he was a project manager. He also stated that he had previously been a supervisor or lead person.  <u>See</u> Cummins Aff., Ex. 18, at p. 29 (Martinez Dep.).  Martinez indicated that his duties as a supervisor or lead person involved cleaning and making sure everyone else was doing their job properly and if they did not, he would talk to them verbally and then write a report and forward it to the office.  <u>Id.</u> at pp. 29, 32.  The written reports included statements that the employee had received retraining and that he or she was told that they needed to get better and or ask questions if they had any.  <u>Id.</u> at p. 32.  Martinez indicated that these written reports could be considered written warnings, but that was something the human resource department determined.  <u>Id.</u>  Martinez issued an Employee Conference Report for Laureano on May 26, 2005, which stated that she had left the job site early without asking him, in violation of work rules, and that future failure to comply would lead to suspension and possible termination.  <u>See</u> Cummins Aff., Ex. 131, ABM01199 (May 26, 2005 Employee Conference Report). Martinez issued a second Employee

Conference Report to Laureano on August 22, 2005 for watching television during her work shift on the library television.   Id., ABM01196 (August 22, 2005 Employee Conference Report).   The report also stated that Laureano understood that she was not allowed to use customer equipment and that failure to comply with ABM Kentucky rules and policies would result in disciplinary action, up to suspension and termination.   Id.

Martinez's job functions primarily included touring the various facilities he supervised for inspection, ordering supplies, conducting training on topics such as cleaning and sexual harassment, and supervising approximately 20 cleaners.   See Mrachek Aff., Ex. 47 pp. 45-52 (Martinez Dep.).   Martinez stated that he worked with employees, he did not manage supervisors, did not work with customers and did not direct scheduling.   Id. at pp. 45-46.   According to Martinez, his boss, Account Manager Barb Higgens, determined which employees were going to work particular hours.   Id. at p. 47.   Martinez testified that he could not carry out disciplinary action, but could only prepare a report and give it to human resources and provide training.   Id. at pp. 49-51. The company made sure there was sufficient staff at the various facilities.   Id. at pp. 50-51.   Martinez lacked the authority to promote employees.   Id. at p. 108.

Based on the undisputed evidence in the record, this Court concludes that Martinez did not have the actual authority to take tangible employment action against Laureano or other ABM Kentucky employees, as there is no evidence that he had the authority to hire, fire, promote, or reassign employees to significantly different duties. Like Colindres, Martinez issued reports regarding employee conduct, but could only forward these reports to human resources, who would then decide what action to take. Even if these reports were used in determining whether an employee should be terminated, the reports do not constitute a tangible employment action.   See Weyers,

359 F.3d at 1057. In addition, the fact that Colindres may have told Laureano that he could fire her, give her full-time employment or raise her salary, without the actual authority to do so, does not support a finding of liability on the part of ABM Kentucky.

Therefore, this Court finds that Martinez was not a supervisor for the purposes of Laureano's quid pro quo sexual harassment claim, and ABM Kentucky's motion for summary judgment on this claim should be granted.

## V.   HOSTILE WORK ENVIRONMENT CLAIMS

Plaintiffs Garcia, Laureano and Giron asserted that ABM Kentucky's policies and practices created and maintained a hostile work environment based on sex, in violation of Title VII and the MHRA, as plaintiffs have been subjected to unwelcome conduct and statements based on sex that was objectively and subjectively offensive and was so severe and pervasive as to alter materially the terms and conditions of employment. See First Amended Complaint, ¶ 296.

### A.   Factual Background

#### 1.   ABM Kentucky Harassment Policies and Training

ABM Kentucky's policies on sexual harassment are communicated to employees via several different avenues. The ABM Janitorial Services Employee Handbook ("Employee Handbook") states in relevant part with regards to harassment as follows:

> If you witness unlawful harassment on the job, you are expected to report it immediately to your supervisor, any other member of management, or your local Human Resources Representative. It is the responsibility of any employee who has been harassed or otherwise discriminated against, or has witnessed such harassment or discrimination, to immediately report all such conduct to their direct supervisor or to a senior supervisor. Furthermore, it is the responsibility of any supervisor who receives such report to immediately communicate it to their management and to their Human Resource representatives.

51

See Mrachek Aff., Ex. 4 at pp. 22-23; Cummins Aff., Ex. 213 at p. 22-23.  According to the Employee Handbook, once a harassment complaint is received, the company's policy is to immediately conduct an investigation, and take the necessary remedial action to the extent that harassment is found, including termination of the harasser.  Id. at p. 23.  The Employee Handbook also explains that "[n]o individual will suffer any reprisals or retaliation for reporting any incidents of harassment. . . ."  Id.  At the end of the Employee Handbook, there is a Receipt and Acknowledgement form, which states that the employee has read and understands the Handbook and provides a space for the employee's signature.  Id. at p. 34.

The ABM Janitorial Services General Work Rules ("Work Rules") state in a paragraph entitled "Sexual Harassment", that "[i]f you experience or witness sexual harassment on the job, you are expected to report it immediately to your supervisor and or the ABM Main Office at 378-0646."  See Mrachek Aff., Ex. 5, ¶ 6; Cummins Aff., Ex. 212, ¶ 6.  The paragraph also states that no retaliation will take place for reporting harassment and that supervisors must report any harassment brought to their attention to the ABM Main Office or face disciplinary action.  Id.  The Work Rules are provided to new hires.  See Mrachek Aff., Ex. 39 at p. 59 (Mork Dep.).  However, the Work Rules are only provided to employees in English.  See Cummins Aff., Ex. 14 at pp. 198-99 (Ketchem Dep.).

Employees are also provided with a notice of a Harassment Hotline ("Hotline Notice"), which provides a toll-free number that "allows ANY employee to report any allegation of sexual harassment, discrimination, retaliation, theft, or any safety concern that occurs in the workplace or any harassment by a third party."  See Mrachek Aff., Ex. 6 (Employee Information Regarding Harassment Hotline) (emphasis in original).

The Hotline Notice states that the Harassment Hotline was meant to provide employees with a simple complaint process without fear of retaliation.  Id.  In addition, the Hotline Notice states that sexual harassment is not tolerated under any circumstances and that the only way to stop such behavior in the workplace is through communication and "total employee/employer cooperation."  Id.  The Hotline Notice is a two-sided form that sets out the notice on one side in English and the other side in Spanish.  Id.  The Hotline Notice contains a section for an employee's signature stating, "I have read this document and I understand that I can report any act of harassment (sexual or otherwise) to either a company representative or call the HR Harassment Hotline® without fear of retaliation or job loss."  Id.

Additional notice of ABM Kentucky's harassment policy includes the Unlawful Harassment Policy, provided in both English and Spanish, which instructs employees who have been harassed to immediately report all such conduct to their direct supervisor or to a senior supervisor, includes information and a telephone number for the Harassment Hotline, and is either distributed to employees or posted.  See Mrachek Aff., Ex. 7 (Unlawful Harassment Policy in English), Ex. 53 (Unlawful Harassment Policy in Spanish attached to Sandoval Dep., Ex. 18); Ex. 39 at pp. 50-55, Exs. 4, 6 (Mork Dep.).  A Sexual Harassment Policy is also given to employees upon being hired.  Id., Ex. 39 at p. 59 (Mork Dep.)  The policy provides a procedure for employees to report sexual harassment:

> Employees should report incidents of sexual harassment or other unlawful harassment promptly to their supervisor.  If the supervisor is unavailable or the employee believes that it would be inappropriate to contact this person, the employee should contact the next level of management or ABM's Human Resource Department.  Employees may also call ABM's 24-hour Harassment Hotline at 1-80-977-8674 [sic] (ID code number enclosed).

Mrachek Aff., Ex. 8.  The Sexual Harassment Policy includes an employee signature page by which employees acknowledge that they have received a copy of the Sexual Harassment Policy and that it is their responsibility to read the information provided by the policy.  Id., Ex. 9 (Sexual Harassment Information Sheet Acknowledgement).

The Unlawful Harassment Policy, the Sexual Harassment Policy and Harassment Hotline reminder (in Spanish and English) have been included with employees' paychecks for the past five years.  See Mrachek Aff., Ex. 39 at pp. 54-55, Dep. Exs. 4, 6 (Mork Dep.).  The reminders for the Harassment Hotline (in both Spanish and English) state in relevant part:

> **We want to remind you. . .  Don't be a victim**
> Our Company is extremely concerned about harassment . . .
> that can occur in the workplace.  We will not tolerate this
> type of conduct.
> If you believe you have been a victim or are a witness to
> harassment . . ., please call the toll free telephone number
> identified on this document.  We will act quickly and
> investigate your report thoroughly.

Id., Ex. 10 (Reminders for the Harassment Hotline) (emphasis in original).

In addition, the Unlawful Harassment Policy and the Harassment Hotline, both in English and in Spanish, are required to be posted in the workplace and the safety committee audits the posting annually.  See Mrachek Aff., Ex. 39 at pp. 54-57 (Mork Dep.); see also Second Affidavit of Jacqueline A. Mrachek in Support of Defendants' Motion for Summary Judgment ("Second Mrachek Aff."), Ex. 1. at p. 158 (Janecek Dep.).

### 2.    Plaintiff Garcia

Plaintiff Garcia's hire date by ABM Kentucky was on or about June 10, 2005. See Mrachek Aff., Ex. 42 at pp. 50-51 (Garcia Dep.); see also Cummins Aff., Ex. 6

(Garcia Dep.).   On June 10, 2005, plaintiff signed the receipt and acknowledgement forms for the Employee Handbook, the Work Rules, the Sexual Harassment Policy and the Harassment Hotline.   <u>See</u> Mrachek Aff., Ex. 42, Dep. Exs. J, K, L, N (Garcia Dep.). By signing the acknowledgement form for the Employee Handbook, Garcia represented that she had read and understood the handbook.   <u>Id.</u>, Ex. J.

Garcia testified that she did not remember receiving a copy of the handbook, but claims that it was read to her and that she understood what had been read to her.   <u>See</u> Mrachek Aff., Ex. 42, at pp. 294-97 (Garcia Dep.).   By signing the acknowledgement for the Work Rules, Garcia represented that she had received a copy of the rules, they had been explained to her and that she understood the rules.   <u>Id.</u>, Ex. K.   Garcia stated at her deposition that she signed the acknowledgement form, however, she was told to "just sign it and that's it" and that "it wasn't important."   <u>Id.</u> at pp. 301-02.   At the same time, she acknowledged that she understood that the acknowledgement form was a representation by her that the Work Rules had been explained to her and that she understood the rules.   <u>Id.</u>   As to the Sexual Harassment Information Sheet Acknowledgement, Garcia signed the acknowledgement, which represented that she had been provided with a copy of ABM Kentucky's Sexual Harassment Policy and that it was her responsibility to read this information.   <u>Id.</u>, Ex. L.   However, Garcia claimed that she never received a copy of the Sexual Harassment Policy as the form was put in front of her to sign.   <u>Id.</u> at pp. 313-14.   Finally, by signing the acknowledgement form for the Harassment Hotline, Garcia represented that she had read information regarding the Harassment Hotline and that she understood that she could report any harassment through the Hotline.   <u>Id.</u>, Ex. N.   Again, Garcia claimed that she had been given everything in a pile and was told to sign it.   <u>Id.</u> at pp. 325-26.   Garcia also testified that

she received a notice in Spanish from ABM Kentucky in March 2006 that required her and other employees to report harassment. Id. at pp. 347-48.

With regards to her claim of sexual harassment, Garcia testified Enriquez touched her five different times. The first time, approximately six months after being hired by ABM Kentucky (which would have been December of 2005), Enriquez approached her while he was checking the floor, and gave her a hug by placing his right arm around her shoulders as both of them were facing the same direction. Id. at pp. 52, 54-57. In response, Garcia told Enriquez, "what is wrong with you?" and that she did not like to be touched by anyone. Id. at pp. 56, 104. Garcia stated that Enriquez responded by laughing and then kept walking. Id. at p. 56. According to Garcia, Enriquez tried to her hug her in the same manner, approximately two to three weeks later, when she was punching in for her shift. Id. at pp. 58, 67-68, 77. She elbowed him and again told him "what's wrong with you?" Id. at p. 68. Enriquez told her, "who is going to find out if I hug you," laughed and then walked away. Id. at pp. 68-69. The third time Enriquez touched Garcia was when he came up behind Garcia and patted her on her back, rubbed her back in a circular motion a couple of times, and then patted her back again. Id. at pp. 76, 80, 85-86, 87-89. This incident occurred sometime prior to March 2006. Id. at p. 80. Garcia stated that she shrugged Enriquez's hand off, elbowed him and told him, "What's wrong with you?" Enriquez laughed and left. Id. at pp. 88-90. As he was leaving, Garcia claimed that she observed Enriquez slap the buttocks of a female co-worker. Id. at p. 111. The next time Enriquez touched Garcia was around March 2006. He placed his hand on her stomach when she was pregnant. Id. at pp. 64, 70-72, 78, 92.

The last allegation of physical contact by Enriquez occurred approximately one-and-half months after the March incident, when Garcia was entering the elevator and Enriquez was exiting it.   Id. at pp. 92, 97.   Garcia testified that Enriquez came from behind her and placed his arms around her stomach, gave her a quick hug, lasting about a second, and then moved to her side and laughed.   Id. at pp. 96-97, 99-100. Garcia stated that she got scared when his arms went around her.   Id. at p. 97.   Garcia claimed that she got mad and asked him "are you nuts?" and "what's wrong with you?" and that Enriquez told her, "who's going to find out?"   Id. at pp. 66, 74, 97-98.   Garcia asserted that these contacts with Enriquez were "repulsive," "uncomfortable," and that they "bothered" her because she did not liked be touched by anyone, and that she did not know what his intent was by virtue of his contacts with her.   Id. at pp. 102-104, 110. Garcia also stated that she did not appreciate his mocking laughter.   Id. at pp. 103, 110.

In addition to touching her, Garcia testified that Enriquez talked several times about having sex with his sister-in-law, aunt and cousin while Garcia was in a group of other employees.   Id. at pp. 489-91, 495.   Garcia asserted that she told Enriquez to be quiet and asked him how he was able to talk like that.   Id. at pp. 489-90.   This conversation started approximately a few days to a month after Garcia began working in 2005.   Id. at p. 492.   This conversation occurred again a week later and a third time between a day and a month later after the second conversation.   Id.   Garcia testified that she had no recollection of any more instances in which Enriquez made these statements.   Id. at p. 495.

Garcia claimed that she reported the conduct by Enriquez to Enriquez when he touched her a second time, as he was her supervisor and he spoke Spanish.   Id. at p. 109.

On June 9, 2006, Garcia, her husband, and the Union representative met with Mork. Id. at p. 62. At the meeting, Garcia reported that Enriquez had hugged her three times, that he touched her stomach when she was pregnant, and about the comments he had made regarding sex. Id. at pp. 63-64. Garcia testified that Mork told her that she would talk to Enriquez and the manager, which sounded good to Garcia. Id. at p. 113.

On June 9, 2006, Enriquez was suspended for three days arising out of the harassment complaint. See Mrachek Aff., Ex. 64 (June 9, 2006 Employee Conference Report). On June 12, 2006, Mork sent a letter to Garcia in English, acknowledging her sexual harassment complaint. See Mrachek Aff., Ex. 42 at p. 149-150, Dep. Ex. C (Garcia Dep.). On July 11, 2006, Mork sent a letter to Garcia informing her that the investigation into her complaint had been completed and that the results were inconclusive, as ABM Kentucky was not able to identify other witnesses or corroborating evidence to support a finding of harassment. See Mrachek Aff., Ex. 42 at pp. 154-58, Dep. Ex. B (Garcia Dep.). The letter, written in English, and read to her by her husband, specified that even though the complaint could not be validated, ABM Kentucky would take action to ensure no further harassment occurred and that ABM Kentucky had a continuing commitment to protect her from retaliation for making the report. Id. The letter also set forth that there was evidence that Garcia had made several inappropriate comments in the workplace that could be a violation of the sexual harassment policy and attached the sexual harassment policy as part of the letter. Id. Mork sent another letter to Garcia on August 17, 2006, notifying her that she had interviewed all of the witnesses provided by her and Enriquez and that they had not provided any evidence Enriquez had harassed her. Id., at p. 179, Dep. Ex. D. The

letter invited Garcia to provide additional names of witnesses so that she could interview them.  Id.  Garcia provided a list of additional witnesses to Mork on August 23, 2006. Id., at p. 180, Dep. Ex. E.  Mork stated that none of the other witnesses corroborated Garcia's allegations.  See Mork Decl., ¶ 11.

Despite the inconclusive findings, Enriquez was transferred to a different account.  See Mrachek Aff., Ex. 64, ABM04948.  Garcia testified that she never had any further problems with Enriquez and that it was her belief that Enriquez had been transferred to a different building.  See Mrachek Aff., Ex. 42 at pp. 113-14 (Garcia Dep.).

### 3.    Plaintiff Laureano

Laureano began her employment with ABM Kentucky at the end of 2005 at the St. Anthony, Maple Grove, Crystal, and Golden Valley Library work sites.  See Mrachek Aff., Ex. 46 at pp. 47-48 (Laureano Dep.).  Laureano, under a different name, began working for ABM Kentucky at the Hyatt worksite in 2006.  Id., at pp. 60-63, 86-87. Laureano signed the receipt and acknowledgement forms for the Employee Handbook, the Sexual Harassment Policy and the Harassment Hotline for her employment with ABM Kentucky on the Hyatt account.  Id. at pp. 115-16, 120-23, Dep. Exs. 9, 16, 17 (Laureano Dep.).  The only notice in the record given to Laureano, when she worked on the Golden Valley Library account, was a Spanish translation of the Harassment Hotline Information Sheet signed by her.  Id. at p. 121, Dep. Ex. 12.  With regards to posting of the sexual harassment policy, Laureano testified that the policies were posted in English at the Hyatt building, but were not posted at the libraries where she worked.  Id. at pp. 119-120.  Laureano stated during her report to the Harassment Hotline that ABM Kentucky had a harassment policy, that the harassment policy was posted and that she

was given an employee handout on sexual harassment when she was initially hired. See Mrachek Aff., Ex. 85 (Harassment Hotline Incorporated-Written Confirmation Report).

With regards to training, Laureano testified that she attended a two-hour sexual harassment awareness training at ABM Kentucky's main office when she began working for ABM Kentucky under the name of Laureano and again when she was working at the Hyatt building under the name of Gonzalez. See Mrachek Aff., Ex. 46 at pp. 109-10 (Laureano Dep.).  A man, by the last name of Camacho, performed the training in Spanish and an "American person" who spoke Spanish performed the other training. Id. at p. 112.  Laureano indicated that she learned at the trainings that if supervisors or coworkers asked her out or to go to a place that she did not want, or if they looked at her in a way that she did not agree with, that would constitute sexual harassment. Id. at p. 111.  In addition, she was told at the training that if she experienced sexual harassment that she should "report it to the office." Id. Laureano testified that she received training on sexual harassment from her supervisor at the Hyatt building, was handed a "sexual harassment sheet," and was told that that if she was being harassed she needed to contact him right away. Id. at p. 114.  At the libraries, Martinez gave her a sheet in English and told her it was about sexual harassment and that she should sign it. See Cummins Aff., Ex. 15 at pp. 113-14 (Laureano Dep.).

Laureano alleged that beginning in early 2006, Martinez made numerous sexual comments to her including: that she had a beautiful body; that she was very pretty; asking why they were not lovers; "hello love;" "hello honey;" and "hi beauty." Mrachek Aff., Ex. 46 at pp. 152-59 (Laureano Dep.).  Laureano testified that she told Martinez

that she did not like his comments and that she did not like the way he looked at her. Id. at p. 153.   Martinez also asked Laureano and her sister out and attempted to open the bathroom door at the Golden Valley library when she was using it on at least two occasions.   Id. at pp. 158-60.   Laureano testified that on another occasion, Martinez forcibly hugged her and tried to kiss her by force and told her that if she would just give him one kiss he would not do things against her that he did not want to do.   Id. at p. 161. In another incident, sometime in 2005, Laureano stated that Martinez put his hand on her hand for about 30 seconds and that she threw hot water on his hand to get it off.   Id. at pp. 167-68.   Laureano also testified that Martinez cornered her in a closet at the Crystal library in April of 2006 and told her he was going to rape her since there were no cameras around.   Id. at p. 172.   Martinez had placed his hand around her waist and when she tried to push back, he pulled her arm and brought her back up against him with her back towards Martinez.   Id. at pp. 172-73.   Laureano screamed and Martinez asked her why she was being so difficult.   Id. at 173.   After she refused to kiss him, Martinez left the closet laughing.   Id. at p. 174.

On May 29, 2006, Laureano made a report to the Harassment Hotline.   See Mrachek Aff., Ex. 85 (Harassment Hotline Incorporated-Written Confirmation Report); see also Cummins Aff., Ex. 15 at pp. 126-27 (Laureano Dep.).   Laureano also testified that she called the ABM Kentucky office to ask if she could report sexual harassment, but was told that they could not handle those issues.   See Cummins Aff., Ex. 15 at pp. 127-28.   However, Laureano could not recall if she made this call to the ABM Kentucky office before or after her call to the Harassment Hotline.   Id. at p. 127.   In a May 31, 2006 letter to Laureano from Mork, Laureano was notified that ABM Kentucky had received the harassment complaint she had made against Martinez and that she

should call Mork so that ABM Kentucky could learn more about the harassment.  See Mrachek Aff., Ex. 86.  On May 30, 2006, Martinez was suspended from employment for three days in order to complete the investigation into Laureano's allegations.  Id., Ex. 87 (Suspension Notice).  Laureano met with Mork and told her about the harassment and how Martinez made several attempts to grab her forcibly.  Id., Ex. 46 at p. 145 (Laureano Dep.).  After the meeting, Laureano reported that Martinez stopped going to the libraries, that no one else harassed her and that her work at the libraries and at Hyatt did not change.  Id. at pp. 146-48.

The results from the investigation were inconclusive as there were no witnesses available to corroborate the reports by Laureano.  Id., Ex. 88 (June 2, 2006 Letter from Mork to Martinez).

Laureano testified that she was terminated weeks after the meeting with Mork about her sexual harassment complaints.  Id., Ex. 46 at pp. 149-50.  In a letter dated July 26, 2006, Mork notified Laureano that she was terminated from employment for working at two different ABM Kentucky accounts using two different names and for falsifying time card information.  Id., at p. 87, Dep. Ex. 8.  Laureano acknowledged that she was terminated for using two names and that she did not disagree with ABM Kentucky's actions in this regard.  Id. at pp. 86-87.

### 4.    Plaintiff Giron

Giron began working part-time with ABM Kentucky on January 20, 2003, cleaning at the Normandale Lake Office Parks work site.  See Mrachek Aff., Ex. 44 at pp. 71-72 (Giron Dep.).  Giron testified that she never received any sexual harassment training when she began her employment at ABM Kentucky.  Id. at p. 107.  However, she did acknowledge that she received the Sexual Harassment Policy when she first

started working and that she also observed it hanging in the workplace.  Id. at pp. 107-08.   Giron understood the harassment policy set forth that supervisors and co-employees could not engage in sexual harassment.   Giron signed the Sexual Harassment Information Acknowledgement Sheet on January 20, 2003.  Id., Dep. Ex. 1. With regards to reporting harassment, Giron testified that she understood that the policy was to report to her supervisor and then to the company.  Id. at pp. 108-09.  She also testified that she learned about being able to report harassment at monthly meetings, attended by employees and supervisors, where sexual harassment policies and procedures were outlined and the sexual harassment policy was handed out.  Id. at pp. 119-20.  While Giron testified that she was not aware of a 1-800 number employees could use to report problems in the workplace, she did sign the acknowledgement form for the Harassment Hotline on January 20, 2003, which stated that she understood that she could report any harassment to either a company representative or to the Harassment Hotline.  Id., at p. 109, Dep. Ex. 1.  Giron testified that she recalled seeing the Employee Handbook when she filled out her application but did not remember what its contents were.  Id. at pp. 110-12.  Giron signed the receipt and acknowledgement forms for the Employee Handbook on January 20, 2003.  Id., Dep. Ex. 3.  Giron also signed the acknowledgement for the Work Rules on January 20, 2003, but testified that she did not recall receiving the document.  Id., at p. 112, Dep. Ex. 5.

Giron testified that Colindres started making inappropriate comments to her within three months of beginning her employment with ABM Kentucky.  See Cummins Aff, Ex. 7 at p. 125 (Giron Dep.).  Colindres' first inappropriate comment consisted of him telling Giron that her breasts and buttocks looked beautiful.  Id.  She stated that he made similar comments every time he came up to her floor, which was about two to

three times per week. Id. at pp. 125-26. Colindres also told Giron that she had beautiful hair and nails, that her lips were so beautiful than he could bite them, that her neck was so beautiful that he could kiss it all over, and he asked her to wear mini-skirts or shorts because she had beautiful legs. Id. at pp. 126-27. Giron stated that Colindres asked her to have sexual relations with him and that if she would "be with him," it would be possible for her to move up to a full-time position. Id. at pp. 128-29. The sexual propositions started occurring a year after she started working at ABM Kentucky, happened approximately 20 times, and that Colindres offered financial help if she would have sex with him. Id. at pp. 129-31. The proposition for sex in exchange for money and the comments about her breasts and buttocks continued up until the day she met with human resources. Id. at pp. 132, 135.

Giron also stated that every time Colindres would come up to her floor, he would come from behind, touch her back and try to hug her from behind, that he placed his hands on her stomach, and that he hugged her approximately ten times. Id. at pp. 141-42. This conduct continued up until the day Colindres left. See Cummins Aff, Ex. 7 at p. 141 (Giron Dep.). The first actual hug took place five months after Giron started employment and she testified that his penis was against her buttocks. Id. at pp. 142-44. She told him he should not be doing that and if he was to do it again she was going to report him to the union. Id. at p. 143. The next hug took place two days later. Id. Giron also recounted that Colindres entered the bathroom twice when she was using it. Id. at pp. 149-50.

The first time Giron reported Colindres' activities to anyone at ABM Kentucky was at a January 2006 union meeting during which Mork was also in attendance. See Mrachek Aff., Ex. 44 at pp. 98-101, 104 (Giron Dep.). Giron told Mork all of her

problems regarding Colindres. Id. at pp. 101-02. Mork told Giron at the meeting that she was going to do everything possible to resolve the problem. Id. at p. 103. Colindres was suspended for three days, and was prohibited from entering Giron's work site. At the conclusion of the investigation, Colindres' salary was reduced, he was transferred out of the building and warned that he would most likely be terminated if another incident occurred. Id., Ex. 45 at pp. 120-22 (Colindres Dep.); Ex. 65 (Colindres Employee Conference Report); Mork Decl., ¶ 13.

According to Giron, that was the last day she saw Colindres and that he did not show up to the workplace starting the next day. Id. at pp. 103-04. In addition, Giron testified that she no longer experienced any form of harassment in the workplace after the meeting. Id. at p. 104.

### B.   Legal Standard

To establish a prima facie case of hostile work environment sexual harassment by non-supervisory co-workers, a plaintiff must establish the following: (1) membership in a protected group; (2) the occurrence of unwelcome harassment; (3) a causal nexus between the harassment and her membership in the protected group; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action. See Meriwether v. Caraustar Packaging Co., 326 F.3d 990, 993 (8th Cir. 2003) (citing Jacob-Mua v. Veneman, 289 F.3d 517, 520 (8th Cir. 2002)).

### C.   Garcia's Hostile Workplace Claim

ABM Kentucky has challenged plaintiff Garcia's hostile work environment claim on the grounds that her claims of harassment by Enriquez were not so severe or pervasive as to constitute actionable harassment. See Defs.' Mem. at p. 38. In

addition, ABM Kentucky maintained that it did not and could not have known about Enriquez's conduct until Garcia reported it and then it took prompt remedial action.  Id. at p. 39.

To prevail on her hostile workplace claim, Garcia "must demonstrate the unwelcome harassment was sufficiently severe or pervasive as to affect a term, condition, or privilege of employment by creating an objectively hostile or abusive environment."  Meriwether, 326 F.3d at 993 (citing Bowen v. Mo. Dep't of Soc. Servs., 311 F.3d 878, 883 (8th Cir. 2002)).  The harassment at issue must be both subjectively and objectively offensive, in such a manner that at reasonable person would find it to be hostile or abusive.  Erenberg v. Methodist Hosp., 357 F.3d 787, 792 (8th Cir. 2004).  In making this determination, courts are to look at all of the circumstances together, "'including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  Id. (quoting Breeding v. Arthur J. Gallagher and Co., 164 F.3d 1151, 1158 (8th Cir. 1999)); see also Hathaway v. Runyon, 132 F.3d 1214, 1222 (8th Cir. 1997) (quotations omitted)  ("[A] work environment is shaped by the accumulation of abusive conduct, and the resulting harm cannot be measured by carving it into a series of discrete incidents.").  "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  Breeding, 164 F.3d at 1158.  "'More than a few isolated incidents are required,' and the alleged harassment must be 'so intimidating, offensive, or hostile that it poisoned the work environment.'"  Tuggle v. Mangan, 348 F.3d 714, 720 (8th Cir. 2003) (quoting Scusa v. Nestle U.S.A. Co., 181 F.3d 958, 967 (8th Cir. 1999)).  A plaintiff must prove

that her workplace was "permeated with discriminatory intimidation, ridicule, and insult." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).

Plaintiffs argued that in determining whether a hostile work place existed, this Court should take into account the harassment of other employees, regardless of whether plaintiffs, including Garcia, had knowledge of these events.  See Pls.' Mem. at pp. 27-29.  However, the Eighth Circuit has concluded that an individual asserting a hostile work environment claim may only rely on evidence relating to harassment that she was aware of during the time she was allegedly subjected to a hostile work environment.  See Cottrill v. MFA, Inc., 443 F.3d 629, 636-37 (8th Cir. 2006) (citations omitted); see also Jones v. United Parcel Service, Inc., 461 F.3d 982, 992 (8th Cir. 2006) ("To be actionable, the environment must objectively be hostile or abusive, and the employee must subjectively perceive it as such.") (emphasis added).  As such, this Court will only focus on those events that Garcia was aware of during the time she was allegedly subjected to a hostile work environment.

Garcia bases her hostile work environment claim on the following allegations that occurred between her start date of June 10, 2005 through June 9, 2006, the date she spoke with human resources: (1) Enriquez talked about having sex with his sister-in-law, aunt and cousin, while Garcia was with a group of other employees during three instances in 2005; (2) sometime in December 2005, Enriquez gave her a hug by placing his right arm around her shoulders while both were facing the same direction; (3) Enriquez tried to hug her in the same manner, approximately two to three weeks later; (4) sometime prior to March 2006, Enriquez came up behind Garcia and patted her on her back, then rubbed her back in a circular motion a couple of times, and then patted her back again; 5) as he was leaving, she observed him slap the butt of a female

co-worker; (6) in March of 2006, Enriquez placed his hand on her stomach when she was pregnant; and (7) approximately a month and a half later, Enriquez came behind Garcia and placed his arms around her stomach, gave her a quick hug, lasting about a second.  Garcia stated that she was "bothered" by Enriquez's "hugs" because she did not like being touched and also referred to Enrique patting her back as "gross."  See Mrachek Aff., Ex, 42 at pp. 85, 103, 104 (Garcia Dep.).

While this Court does not condone Enriquez's alleged actions towards Garcia, this conduct does not demonstrate that Garcia's workplace was "permeated with discriminatory intimidation, ridicule, and insult" that was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.  See, e.g., LeGrand v. Area Res. for Cmty. & Human Servs., 394 F.3d 1098, 1100-03 (8th Cir. 2005) (on review from an order granting summary judgment, the Eighth Circuit found no objectively hostile work environment created by defendant's unwelcome sexual advances over a nine-month period, where the harasser asked the victim to watch pornographic movies with him and "to jerk off with him" to relieve stress; the harasser mentioned the pornographic movies again, suggested the plaintiff would advance in the company, if he watched "these flicks" and "jerked" the harasser's "dick off;" the harasser kissed the plaintiff on the mouth; the harasser grabbed the plaintiffs' buttocks, and reached for the plaintiff's genitals; and the harasser grabbed the plaintiff's thigh during a meeting); Duncan v. Gen. Motors Corp., 300 F.3d 928, 933-34 (8th Cir. 2002) (reversing a decision from the district court denying a motion for judgment as a matter of law and finding no actionable hostile work environment claim where a co-worker repeatedly petted the plaintiff's hand; told her he wanted to have a relationship with her; requested that she make a sketch of a planter, shaped like a slouched man

with a hole in the front of his pants that allowed for a cactus to protrude; put up a poster portraying the plaintiff as president of "Man Hater's Club of America;" was required to use a computer with a screen saver displaying a picture of a naked woman; the co-worker showed the plaintiff a penis-shaped pacifier on his desk; and the harasser once forced her to go with him to a bar); Adusumilli v. City of Chicago, 164 F.3d 353, 357, 361-62 (7th Cir. 1998) (on review from an order granting summary judgment and holding conduct insufficient to support hostile environment claim when employee teased plaintiff, made sexual jokes aimed at her, told her not to wave at police officers "because people would think she was a prostitute," commented about low-necked tops, leered at her breasts, and touched her arm, fingers, or buttocks on four occasions), cert. denied, 528 U.S. 988 (1999).

In summary, this Court finds that Garcia failed to "clear the high threshold" of showing that the conduct she experienced was so severe or pervasive as to alter a term, condition, or privilege of her employment.  Having failed to muster sufficient evidence to support her hostile work environment claim, ABM Kentucky's motion for summary judgment on this claim should be granted.

ABM Kentucky also argued that Garcia's hostile workplace claim must fail because once ABM Kentucky learned about the harassment, it took timely and effective remedial action.  See Defs.' Mem. at p. 39.  In opposition, plaintiffs argued that Garcia reported the harassment to ABM Kentucky through her harasser and supervisor, Enriquez, Enriquez did not stop the harassment, and therefore, ABM Kentucky did not

take prompt remedial action.  See Pls.' Mem. at p. 48 (citing Cummins Aff., Ex. 6 at pp. 51, 68-69, 74, 98. 104-05, 489-90 (Garcia Dep.)).[29]

Given that this Court has already concluded that Enriquez was a co-worker and not a supervisor for the purposes of ABM Kentucky's liability, Garcia must prove that ABM Kentucky "knew or should have known about the harassment and failed to take prompt and remedial action reasonably calculated to end the harassment."  Stuart v. General Motors Corp., 217 F.3d 621, 633 (8th Cir. 2000) (citation omitted).  Factors the Court may consider when assessing the reasonableness of ABM Kentucky's remedial measures include:

> [T]he amount of time elapsed between the notice of harassment, which includes but is not limited to a complaint of sexual harassment, and the remedial action, and the options available to the employer such as employee training sessions, disciplinary action taken against the harasser(s), reprimands in personnel files, and terminations, and whether or not the measures ended the harassment.

Id.

Plaintiffs' argument that ABM Kentucky did not prompt remedial action is premised on their theory that Garcia's resistance to Enriquez's sexual harassment constituted notice to ABM Kentucky, which then set in motion its duty to take prompt remedial action.  In support of this argument, plaintiffs rely on ABM Kentucky's various policies that require an employee who is experiencing sexual harassment to report the conduct to their supervisor.  For example, the Employee Handbook states that:

> It is the responsibility of any employee who has been harassed or otherwise discriminated against, or has witnessed such harassment or discrimination, to immediately

---

[29]    The citations provided by plaintiffs pertain to Garcia asking Enriquez what was wrong with him and elbowing him when he tried to hug her, that the hugs occurred again despite her comments to him, and telling Enriquez that she did not like to be touched.

> report all such conduct to their direct supervisor or to a
> senior supervisor.  Furthermore, it is the responsibility of any
> supervisor who receives such report to immediately
> communicate it to their management and to their Human
> Resource representatives.

See Mrachek Aff., Ex. 4 at pp. 22-23; Cummins Aff., Ex. 213 at p. 22-23.  Similarly, the

Work Rules state "[i]f you experience or witness sexual harassment on the job, you are

expected to report it immediately to your supervisor and or the ABM Main Office at 378-

0646."  See Mrachek Aff., Ex. 5, ¶ 6; Cummins Aff., Ex. 212, ¶ 6.  The Unlawful

Harassment Policy instructs employees who have been harassed to immediately report

all such conduct to their direct supervisor or to a senior supervisor and includes

information and a telephone number for the Harassment Hotline.  See Mrachek Aff.,

Ex. 7 (Unlawful Harassment Policy).   The Sexual Harassment Policy instructs

employees to report sexual harassment to their supervisor, and that if they do not wish

to do so, to report such conduct to the next level of management, the human resource

department or to the Harassment Hotline.  See Mrachek Aff., Ex. 8.

Plaintiffs' "report" theory is rejected.  This Court has already determined that

Enriquez was not a supervisor under the law.  Even if resisting Enriquez's overtures, or

telling him to "stop" were deemed to be a "report," this "report" was made to a co-worker

and not to a person who the law presumes to stand in the shoes of the employer such

that the employer has been put on notice that it needs to take timely and appropriate

action.[30]  As such, ABM Kentucky was not aware of Enriquez's sexual harassment until

---

[30]     If Enriquez were Garcia's supervisor, no report was required, as an employer is
automatically subject to vicarious liability for the sexual  harassment of its supervisory
employees.  See Weger v. City of Ladue, 500 F.3d 710, 718 (8th Cir. 2007) (citing
Williams v. Mo. Dept. of Mental Health, 407 F.3d 972, 975-76 (8th Cir.), cert. denied,
546 U.S. 1091 (2006), citing Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 807-08).  In
this situation, because the actions of the supervisor are deemed to be the actions of the
employer, the law presumes that the employer has knowledge of the supervisor's

Garcia reported his conduct to Mork on June 9, 2006.  Garcia testified that Mork told her that she would talk to Enriquez and the manager, which sounded good to Garcia, as she believed that Enriquez would no longer bother her.  <u>See</u> Mrachek Aff., Ex. 42 at p. 113 (Garcia Dep.).  Indeed, on June 9, 2006, the same day Garcia spoke to Mork, Enriquez was suspended for three days arising out of the harassment complaint.  <u>See</u> Mrachek Aff., Ex. 64 (June 9, 2006 Employee Conference Report).  Additionally, Enriquez was transferred to a different account.  <u>See</u> Mrachek Aff., Ex. 64, ABM04948. Garcia testified that she never had any further problems with Enriquez.  Mrachek Aff., Ex. 42 at pp. 113-14.

Once ABM Kentucky received actual notice of the harassment, it acted quickly to suspend Enriquez and then transferred him.  After that point in time, Garcia suffered no additional harassment.  This Court finds that ABM Kentucky's response to the report of harassment was prompt and adequate, and therefore, its motion for summary judgment as to Garcia's hostile workplace claim should also be granted on this basis.[31]

---

improper conduct.  <u>Bush</u>, 2007 WL 1321853 at *3 ("knowledge of a supervisor's sexually harassing conduct is automatically imputed to the employer").  If the supervisor takes tangible adverse action against the plaintiff employee in connection with a hostile work environment claim, the employer is absolutely liable for his actions.  <u>Escobar v. Swift and Co.</u>, 494 F. Supp.2d 1054, 1060 (D. Minn. 2007).  Only if the supervisor has not taken a tangible adverse employment action against the plaintiff employee, can the employer assert the affirmative defense that it had in place policies and procedures to prevent and correct sexually harassing behavior, and that the plaintiff employee unreasonably failed to take advantage of those preventative or corrective opportunities. <u>See</u> <u>Ellerth</u>, 524 U.S. at 765; <u>Faragher</u>, 524 U.S. at 807-08; <u>Weger</u>, 500 F.3d at 718; <u>Escobar</u>, 494 F. Supp.2d at 1060.

[31]  Plaintiffs argued that defendants cannot reasonably deny knowledge of sexual harassment in the workplace when they have received over 100 reports of sex harassment from employees in the Twin Cities.  <u>See</u> Pls.' Mem. at pp. 56-59.  However, plaintiffs have not cited to any authority that multiple cases of sex harassment in a geographical area will automatically impute knowledge on an employer of individual harassment, nor will the Court reach such a conclusion in this case.

### D.   Laureano's Hostile Workplace Claim

ABM Kentucky argued that Laureano's hostile workplace claim fails because once it learned about the harassment, it took timely and effective remedial action. See Defs.' Mem. at pp. 49-50. In opposition, plaintiffs argued that Laureano reported her harassment to ABM Kentucky through her harasser and supervisor, Martinez, he did not stop, and therefore, ABM Kentucky did not take prompt remedial action. See Pls.' Mem. at p. 48 (citing Cummins Aff., Ex. 15 at pp. 18, 151-53, 167, 171-74 (Laureano Dep.)).[32]

As Martinez was not a supervisor, resisting Martinez's overtures, or saying "no" to him or telling him to "stop" did not amount to a report so as to trigger ABM Kentucky's duty to take timely and appropriate action. As such, ABM Kentucky was not made aware of the sexual harassment until May 29, 2006, when Laureano called the Harassment Hotline.[33] Mrachek Aff., Ex. 46, Dep. Ex. 85 (Harassment Hotline Incorporated-Written Confirmation Report). The next day, May 30, 2006, Martinez was suspended from employment for three days in order to complete the investigation into Laureano's allegations. Id., Ex. 87 (Suspension Notice). Laureano met with Mork and told her about the harassment and how Martinez made several attempts to grab her forcibly. Id., Ex. 46 at p. 145 (Laureano Dep.). After the meeting, Laureano testified

---

[32]   The citations provided by plaintiffs pertain to Laureano telling Martinez that she would not go out with him in exchange for additional hours and a raise, she did not like his comments about her body, she did not like the way he looked at her, she threw hot water on his hand when his hand was on her hand, and she yelled and resisted his alleged attempt to rape her.

[33]   This Court notes that Laureano also testified that she called the ABM Kentucky office to ask if she could report sexual harassment, but was told that they could not handle those issues. See Cummins Aff., Ex. 15 at pp. 127-28 (Laureano Dep.). However, this is not a material fact since Laureano could not recall if she made this call to the ABM Kentucky office before or after her call to the Harassment Hotline. Id. at p. 127.

that Martinez stopped coming to the libraries and that no one else harassed her.   Id. at pp. 146-48.

Based on this record, the Court finds that once ABM Kentucky received actual notice of the harassment, it acted within one day to suspend Martinez and then transferred him.   After that point in time, Laureano suffered no additional harassment. This Court finds that ABM Kentucky's response to the report of harassment was prompt and adequate, and therefore, its motion for summary judgment as to Laureano's hostile workplace claim should be granted.

### E.   Giron's Hostile Workplace Claim

ABM Kentucky argued that Giron's hostile workplace claim fails because she did not report her harassment until January 2006, and once ABM Kentucky learned about the harassment, it took timely and effective remedial action.   See Defs.' Mem. at pp. 44-45.   Plaintiffs again asserted that Giron reported her harassment to ABM Kentucky through her harasser and supervisor, Colindres.   See Pls.' Mem. at pp. 14, 48 (citing Cummins Aff., Ex. 7 at pp. 78, 125, 127, 142-46, 148, 151-53 (Giron Dep.)).   Giron's "report" to Colindres was in response to his first hug, at which time she told him that he should not be doing that and if he was to do it again she was going to report him to the union.   Id., at pp. 142-44.[34]   Apart from this comment to Colindres, the first time she reported Colindres' activities to anyone at ABM Kentucky was at a January 2006 union meeting.   See Mrachek Aff., Ex. 44 at pp. 98-102, 104 (Giron Dep.).   According to Giron, that was the last day she saw Colindres and that he did not show up to the

---

[34]    The rest of plaintiffs' citations to Giron's deposition transcript pertain to Giron rejecting Colindres' propositions, his inappropriate comments, she showed him she was angry when he made comments about her appearance, and she told him not to make movements towards her when it appeared as though Colindres was going to hug her. See Cummins Aff., Ex. 7 at pp. 78, 125, 127, 148, 151-53.

workplace starting the next day.  Id. at pp. 103-04.  In addition, Giron testified that she

no longer experienced any form of harassment in the workplace after the meeting.  Id.

at p. 104.

As Colindres was not a supervisor, telling him to stop did not amount to a report

to ABM Kentucky so as to prompt ABM Kentucky's duty to take timely and appropriate

action.  The evidence is clear that the first time Giron reported Colindres to ABM

Kentucky was at a January 2006 union meeting.  Thereafter, he was suspended,

demoted, transferred and warned that if another incident occurred, he would mostly

likely be terminated.  Mrachek Aff., Ex. 65 (Colindres Employee Conference Report).

After she made the report, Giron never saw Colindres or experienced harassment

again.  On this record, this Court finds that undisputed facts lead to a finding that ABM

Kentucky's response to the actual report of harassment was reasonably prompt and

adequate and therefore, its motion for summary judgment as to Giron's hostile

workplace claim should be granted.

## VI.    RETALIATION CLAIMS

ABM Kentucky argued that it is entitled to summary judgment on the retaliation

claims by Garcia, Laureano, and Giron.  In particular, it claims that summary judgment

is appropriate as it pertains to Garcia because no adverse action was taken against her

and because the alleged retaliation took place before she reported her concerns to

Mork.  See Defs.' Mem. at pp. 40-41.  With regards to Laureano, ABM Kentucky

maintains that her claim fails because she was not terminated for making a report of

harassment.  Id. at p. 51.  As to Giron, ABM Kentucky asserted that she never made a

claim of retaliation in the First Amended Complaint.  Id. at p. 46.

To prevail on a retaliation claim, plaintiffs must first establish a prima facie case by showing: "(1) they engaged in protected conduct; (2) reasonable employees would have found the challenged retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct." Weger v. City of Ladue, 500 F.3d 710, 726 (8th Cir. 2007) (citations omitted).[35]

A.     **Garcia's Retaliation Claim**

It is plaintiffs' position that Garcia engaged in protective conduct by reacting negatively to Enriquez placing his arm around her. See Pls.' Mem. at pp. 67, 90-91. Plaintiffs also argued generally that Garcia suffered many forms of adverse employment actions that involved the terms of and conditions of her employment. See Pls.' Mem. at pp. 93-94 citing to Argument Section II.B.1 (Pls. Mem. pp. 63-68). However, plaintiffs only cited to testimony regarding a reduction in Garcia's break time in support of this general argument. Id. at p. 67 (citing Cummins Aff., Ex. 6 at p. 350 (Garcia Dep.)). At her deposition, Garcia testified that after she had spurned Enriquez's s attempt to put his arm around her, her break time was decreased from 15 minutes to 10 minutes. See Cummins Aff., Ex. 6 at pp. 350, 362 (Garcia Dep.).

The determination of whether a challenged retaliatory action is materially adverse "is 'objective, requiring us to consider whether a reasonable employee in the plaintiff's position might have been dissuaded from making a discrimination claim because of the employer's retaliatory actions.'" Weger, 500 F.3d at 726 (quoting Carrington v. City of Des Moines, Iowa, 481 F.3d 1046, 1050 (8th Cir. 2007), quoting Higgins v. Gonzales,

---

[35]     The elements of a reprisal claim under the MHRA include that (1) the plaintiff engaged in a protected activity; (2) suffered an adverse employment action; and (3) that there is a causal connection between the two. See Olson v. International Business Machines, No. Civ. 05-118 MJD/AJB, 2006 WL 503291 at *13 (D. Minn. March 1, 2006) (citing Heisler v. Metro. Council, 339 F.3d 622, 632 n. 6 (8th Cir. 2003)).

481 F.3d 578, 589 (8th Cir. 2007)).  For example, "petty slights, minor annoyances, and simple lack of good manners will not create such deterrence."  Burlington Northern and Santa Fe Ry. Co. v. White, 126 S.Ct. 2405, 2415 (2006);  see generally, Clegg v. Arkansas Dept. of Correction, 496 F.3d 922, 929 (8th Cir. 2007) (finding that a lower employment evaluation, a failure to provide employment tools and notices of new department policies, not immediately having plaintiff attend certain meetings, and temporary remedial training did not amount to an adverse employment action).  Further, Garcia "must do more than allege that actions taken by her employer created the potential for harm; rather, she must show some tangible harm flowing from the employer's actions."  Black v. Independent School Dist. No. 316, 476 F.Supp.2d 1115, 1123 (D. Minn. 2007).  In this case, Garcia has not set forth what tangible harm resulted from a five-minute decrease in her break time (e.g., she did not have sufficient time to go to the restroom).

Viewing the record in the light most favorable to Garcia, a reasonable  fact-finder could not conclude that a decrease in break time from 15 minutes to 10 minutes was materially adverse, such that it would have deterred a reasonable employee in Garcia's position from making a discrimination claim.  In fact, the evidence before this Court supports the opposite finding– i.e. when Garcia did report Enrique z's conduct to ABM Kentucky in June 2006, ABM Kentucky suspended Enriquez during its investigation and then transferred him to another location, and Garcia stated she had no further problems with him.  See Mrachek Aff., Ex. 42 at p. 62; Ex. 64 ABM04956  (June 9, 2006 Employee Conference Report), ABM04948 (June 14, 2006 Employee Conference Report).

For all the reasons stated above, this Court finds ABM Kentucky's motion for summary judgment should be granted as it relates to Garcia's retaliation claim.

**B.**    **Laureano's Retaliation Claim**

Plaintiffs contend that ABM Kentucky took tangible employment action against Laureano based on the fact that her harasser, Martinez, would not give her full-time employment and because she was terminated. See Pls.' Mem. at pp. 67, 93, 94 (citing Cummins Aff., Ex. 15 at pp. 14-18, 138 (Laureano Dep.)). The citations provided by plaintiffs to Laureano's deposition pertain to Laureano being refused full-time status by Martinez. In particular, Laureano testified that when she asked for eight hours of work she was told by Martinez that there were no full-time positions available. See Cummins Aff., Ex. 15 at pp. 14-15 (Laureano Dep.). However, Laureano she did not believe him because he told her he had given such a position to a woman who was his girlfriend, and that if Laureano would go out with him she could receive full-time employment. Id. at pp. 14-18. In other words, it appears plaintiffs are arguing that ABM Kentucky retaliated against Laureano because Martinez refused to provide her with full-time work since she would not go out with him.

This Court has already determined that Martinez was a co-worker for the purposes of imputing liability to ABM Kentucky. The law only protects employees from retaliation by their employers and not "hostility or retaliation from co-workers, members of her community, and even friends." Kipp v. Missouri Highway and Transp. Com'n., 280 F.3d 893, 897 (8th Cir. 2002) (citing Scusa, 181 F.3d at 970). As such, this Court finds that Laureano has no viable claim arising out of Martinez's alleged retaliation.

As to her termination, ABM Kentucky argued that it had legitimate reason for terminating Laureano. See Carrington, 481 F.3d at 1050 (finding that if a plaintiff makes

a makes a prima facie case, then the employer must "articulate a legitimate, non-discriminatory reason for the dismissal.  The burden then shifts back to [plaintiff] to show the proffered justification was in fact a pretext, a cover up for retaliation." (citation and marks omitted).

During her deposition, Laureano acknowledged that she was terminated for using two different names at two separate work sites and that she did not disagree with ABM Kentucky's actions in this regard.  <u>See</u> Mrachek Aff. Ex. 46 at pp. 86-87 (Laureano Dep.).  Therefore, viewing the record in the light most favorable to Laureano, a reasonable fact-finder could not find that she was terminated for engaging in protected activity.

For all the reasons started above, this Court finds that ABM Kentucky's motion for summary judgment should be granted as it relates to Laureano's retaliation claim.

### C.  Giron's Retaliation Claim

Plaintiffs did not respond to defendants' assertion that Giron never asserted made a claim of retaliation in the First Amended Complaint.  <u>See</u> Pls. Mem. at pp. 90-95.  While it is true that the First Amended Complaint set forth a retaliation claim for all plaintiffs, it did so based on the facts previously alleged in the pleading.  <u>See</u> First Amended Complaint, ¶¶ 301-02.  The section in the First Amended Complaint outlining the facts of Giron's claims, however, makes no mention of any action that could be construed as retaliation.  <u>Id.</u>, ¶¶ 285-292.  Nevertheless, as the First Amended Complaint could be amended at any time to conform to the evidence pursuant to Fed. R. Civ. P. 15(b), the Court will consider Giron's response to ABM Kentucky's argument regarding retaliation.

Plaintiffs alleged that the adverse employment action suffered by Giron related to her being given an undesirable reassignment, being denied leave and being threatened with termination.  <u>See</u> Pls.' Mem. at pp. 67, 93, 94 (citing Cummins Aff., Ex. 7 at pp. 81-82, 89-90 156 (Giron Dep.)).   These alleged retaliatory acts were undertaken by her harasser, Colindres.  Giron testified that the first time she reported Colindres' activities to ABM Kentucky was at a union meeting and that after meeting, she never saw or was bothered by Colindres again.  <u>See</u> Mrachek Aff., Ex. 44 at pp. 98-102, 104 (Giron Dep.).  Given that the alleged retaliation occurred before Giron, by her own account, reported the harassment to ABM Kentucky, this Court finds that a reasonable fact-finder could not conclude that there was a casual connection between the protected activity and the retaliation alleged.

For all the reasons stated above, this Court finds ABM Kentucky's motion for summary judgment should be granted as it relates to Giron's retaliation claim.

## VII.    SEX DISCRIMINATION CLAIMS

Plaintiffs alleged that in violation of Title VII and the MHRA (1) defendants discharged and otherwise discriminated against them regarding the terms, conditions and privileges of employment because of their gender; and (2) through practice and policy, defendants denied plaintiffs the opportunity to be promoted to supervisory positions due to their gender.  <u>See</u> First Amended Complaint, ¶¶ 298-300.   ABM Kentucky argued that plaintiffs' gender discrimination claims fail because they have not provided any evidence that they were the subject of any sex discrimination and because plaintiffs did not suffer any adverse action.  <u>See</u> Defs.' Mem. at pp. 96-97.  Further, ABM Kentucky has asked that the Court grant summary judgment as to plaintiffs' First

Amended Complaint to the extent they relied any on a "pattern and practice" of discrimination. Id. at p. 98.

In order to establish a prima facie case of sex discrimination, a plaintiff must demonstrate that she: (1) is a member of a protected group; (2) was qualified for the job at issue; (3) suffered an adverse employment action; and (4) circumstances exist which create an inference of discrimination. See Wheeler v. Aventis Pharms., 360 F.3d 853, 857 (8th Cir. 2004) (citation omitted). The fourth element can be met by showing that similarly situated employees of the opposite sex were treated differently. See Schurmeier v. Nash Finch Co., Civ. No. 06-3860, 2007 WL 4179392 at *3 (D. Minn. Nov. 20, 2007) (citing Johnson v. Baptist Med. Ctr., 97 F.3d 1070, 1072 (8th Cir. 1996)); see also Wells v. SCI Management, L.P., 469 F.3d 697, 701 (8th Cir. 2006) ("[Plaintiff's] attempts to satisfy the fourth element by showing that she was treated differently from similarly situated males, which is a typical means of proof for the fourth element in a gender discrimination case.") (citation omitted). An inference of discrimination also arises "where there is some evidence of a causal connection between a plaintiff's [protected characteristic] and the adverse employment action taken against the plaintiff." See Allen v. Interior Constr. Servs., Ltd., 214 F.3d 978, 982 (8th Cir. 2000).

### A.   Tangible Employment Action Based on Sex

#### 1.   Garcia

Plaintiffs contend that ABM Kentucky took tangible employment action against Garcia based on the fact her harasser, Enriquez, decreased her break time. See Pls.' Mem. at pp. 67, 89-90 (citing Cummins Aff., Ex. 6 at p. 350 (Garcia Dep.)). As stated previously, Garcia testified after she had spurned Enriquez's attempt to put his arm around her, her break time had been decreased from 15 minutes to 10 minutes. See

Cummins Aff., Ex. 6 at pp. 350, 362 (Garcia Dep.).  Because the decrease in break time by five minutes did not involve a change in pay or benefits and only minor changes in Garcia's working conditions, the decrease did not constitute an adverse employment action.  See Holland v. Sam's Club, 487 F.3d 641, 645 (8th Cir. 2007) (citation omitted); see also Zhuang v. Datacard Corp., 414 F.3d 849, 854 (8th Cir. 2005) (finding that "a transfer involving only minor changes in working conditions and no reduction in pay or benefits does not constitute an adverse employment action.") (alterations omitted).

### 2.    Giron

Plaintiffs contend that ABM Kentucky took tangible employment action against Giron based on her claim that she was given an undesirable reassignment and that she was denied leave.  See Pls.' Mem. at pp. 67, 89-90 (citing Cummins Aff., Ex. 7 at pp. 81-82, 89-90 (Giron Dep.)).  The cites to Giron's deposition transcript pertain to Giron being given an extra floor to clean after she rejected Colindres' propositions and that she was denied time off on two to five occasions.  Plaintiffs have not pointed this Court to any evidence to show that similarly situated males were not also assigned with extra floors to clean.  See Wells, 469 F.3d at 701.  Further, Giron did not present evidence to show that Colindres gave her the extra work based on her gender.

As for the denied time off, there is no mention in the record as to why Giron requested the leave or why she was denied the leave, nor was any evidence presented that similarly situated males were granted leave in similar situations.

Accordingly, this Court finds that Giron cannot establish a prima facie case of sex discrimination based on being assigned extra work or denial of leave.

### 3.   Laureano

Plaintiffs contend that ABM Kentucky took tangible employment action against Laureano based on the fact her harasser, Martinez, would not give her full-time employment and because she was terminated.  <u>See</u> Pls.' Mem. at pp. 67, 89-90 (citing Cummins Aff., Ex. 15 at pp. 14-18 (Laureano Dep.)).  The citations provided by plaintiffs concern Laureano being refused full-time employment status by Martinez.  In particular, Laureano testified that when she asked for eight hours of work, she was told by Martinez that there were no full-time positions available.  However, plaintiffs have not presented any evidence that Martinez treated male employees in a different manner-- <u>i.e.</u>, that he gave full-time employment to similarly situated male employees--so as to support an inference of discrimination. Nor has Laureano presented any evidence to support her claim that ABM Kentucky did not give her full-time work based on her gender.

As to Laureano's termination, Laureano acknowledged that she was terminated for using two different names at two separate work sites and that she did not disagree with ABM Kentucky's actions in this regard.  <u>See</u> Mrachek Aff. Ex. 46 at pp. 86-87 (Laureano Dep.).  Further, plaintiffs presented no evidence to show that similarly situated males (<u>i.e.</u> males who used different names at different work sites) were not terminated for similar conduct.  Therefore, viewing the record in the light most favorable to Laureano, a reasonable fact-finder could not find that her termination was a result of gender discrimination.

### B.   <u>Failure to Promote</u>

Plaintiffs claimed that ABM Kentucky, through practice and policy, denied plaintiffs the opportunity to be promoted to supervisory positions due to their gender.

Plaintiffs relied on a MDHR report that ABM Kentucky's "'use of gender-specific position titles discourages potentially qualified candidates.'" <u>See</u> Pls.' Mem. at p. 89 (quoting Cummins Aff., Ex. 266, ¶ 6).  However, the undisputed evidence in this case shows that not only did plaintiffs Garcia, Laureano and Giron not apply for any supervisory positions, they expressed no interest in any other job at ABM Kentucky, so as to find that ABM Kentucky's posting practices discouraged them from applying for a supervisory position.  <u>See</u> Mrachek Aff., Exs. 42 at p. 470 (Garcia Dep.); 44 at pp. 120-21 (Giron Dep.); 46 at p. 88 (Laureano Dep.).  Given that plaintiffs did not apply for any supervisory positions and expressed no interest having a different job at ABM Kentucky, this Court, viewing the record in the light most favorable to plaintiffs, cannot find that a reasonable fact-finder would conclude that ABM Kentucky denied plaintiffs the opportunity to be promoted to supervisory positions due to their gender.  <u>See</u> <u>generally</u>, <u>Allen v. Tobacco Superstore, Inc.</u>, 475 F.3d 931, 937 (8th Cir. 2007) ("Failure to formally apply for a management position does not bar a plaintiff from establishing a prima facie claim, as long as the plaintiff 'made every reasonable attempt to convey [her] interest in the job to the employer.'") (quoting <u>Chambers v. Wynne Sch. Dist.</u>, 909 F.2d 1214, 1217 (8th Cir. 1990)).

### C.    <u>Pattern and Practice of Discrimination</u>

Plaintiffs asserted ABM Kentucky engaged in a "pattern and practice of discrimination.  <u>See</u> First Amended Complaint, ¶¶ 87-105.  However, "the pattern-or-practice method of proving discrimination is not available to individual plaintiffs."  <u>Bacon v. Honda of America Mfg., Inc.</u>, 370 F.3d 565, 575 (6th Cir. 2004), <u>cert.</u> denied 543 U.S. 1151 (2005); <u>see</u> <u>also</u> <u>Craik v. Minnesota State University Bd.</u>, 731 F.2d 465, 469 (8th Cir. 2004) ("How the prima facie case is established and the consequences of its

establishment, however, depend on whether the case is (1) brought by a single plaintiff on his or her own account or (2) a class action alleging a pattern or practice of discrimination.").[36]  As such, plaintiffs cannot assert a separate, stand-alone pattern-or-practice claim.

For all the reasons stated above, this Court finds that ABM Kentucky's motion for summary judgment should be granted as it relates to Garcia, Laureano and Giron's gender discrimination claims against ABM Kentucky.

## RECOMMENDATION

For the reasons set forth above and based on all the files, records, and proceedings herein,

**IT IS RECOMMENDED THAT:**

Defendants' Motion for Summary Judgment [Docket No. 147] be **GRANTED**.

Dated:      March 20, 2008

s/ *Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by March 31, 2008, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under this Rules shall be limited to 3500 words.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is  therefore not appealable directly to the Circuit Court of Appeals.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report

---

[36]     This Court notes that plaintiffs did not argue that any pattern-or-practice evidence is circumstantial evidence of ABM Kentucky's discriminatory animus.  See Pls.' Mem. at pp. 67, 86-90.

and Recommendations, the party making the objections shall timely order and file a complete transcript of the hearing on or before March 31, 2008.