# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 08-2271

_____

| | | |
|---|---|---|
| Francisca Sandoval; Ines Hernandez; Miriam Pacheco; Eva Reyes; Arminda Gomez; Nidia Guerrero; Lucila Marquez; Maria Perez; Azucena Garcia; Estela Laureano; Marlene Giron, | * * * * * * * | |
| Plaintiffs - Appellants, | * * | |
| v. | * * | |
| American Building Maintenance Industries, Inc., also known as ABM Industries, Incorporated, doing business as ABM Janitorial Services; American Building Maintenance Co. of Kentucky, | * * * * * * * | Appeal from the United States District Court for the District of Minnesota. |
| Defendants - Appellees. | * * | |
| _____ | * * | |
| Equal Employment Opportunity Commission; National Employment Lawyers Association, | * * * * | |
| Amici on behalf of Appellants. | * * | |

_____

Submitted: February 11, 2009
Filed: August 26, 2009

_____

Before BYE, JOHN R. GIBSON, and GRUENDER, Circuit Judges.

_____

BYE, Circuit Judge.

Francisca Sandoval, Ines Hernandez, Miriam Pacheco, Eva Reyes, Arminda Gomez, Nidia Guerrero, Lucila Marquez, Maria Perez, Azucena Garcia, Estela Laureano, and Marlene Giron (collectively "Appellants" or "Plaintiffs"), brought suit against American Building Maintenance Industries, Inc. (ABMI), d/b/a ABM Janitorial Services, and American Building Maintenance of Kentucky (ABMK)[1] under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e to 2000e-17, and the Minnesota Human Rights Act (MHRA), Minn. Stat. Ann. §§ 363A.01 to 363A.41, alleging sexual harassment, hostile workplace, and other employment-related claims. The district court dismissed the claims brought by eight of the appellants (Sandoval, Hernandez, Pachecho, Reyes, Gomez, Guerrero, Marquez, Perez (collectively "Original Plaintiffs")) against ABMK, holding the claims were brought more than ninety days after the Equal Employment Opportunity Commission (EEOC) issued right-to-sue letters.[2] Thereafter, ABMI moved for summary judgment, arguing it was not the appellants' employer, and ABMK moved for summary judgment, arguing the claims brought against it by the timely plaintiffs should be dismissed on the merits.

_____

[1]ABMI is the parent corporation of ABM Janitorial Services, which is a wholly owned subsidiary of ABMI. ABM Janitorial Services, in turn, is the parent corporation of ABMK, which is a wholly owned subsidiary of ABM Janitorial Services.

[2]There is no dispute three of the appellants (Garcia, Laureano, Giron (collectively "Timely Plaintiffs")) filed timely complaints against ABMK.

-2-

The district court granted ABMI's motion, holding it was not appellants' employer. Additionally, the district court granted summary judgment to ABMK, holding the timely plaintiffs failed to allege actionable claims for sexual harassment, hostile workplace or other employment-related claims under Title VII or the MHRA.  On appeal, appellants argue the district court erred in 1) finding the amended complaint was untimely or did not relate back to the original complaint, 2) finding ABMI was not the appellants' employer by acting as an integrated enterprise with ABMK, and 3) dismissing the timely plaintiffs' claims of sexual harassment, hostile workplace, and other employment-related claims on the merits.  We reverse in part and remand.

I

On May 2, 2006, the original plaintiffs, who had filed EEOC claims of discrimination against ABMI, requested right-to-sue letters from the EEOC.  By May 11, 2006, the EEOC had issued the letters and informed the original plaintiffs any action must be filed within ninety days of receiving the letters.  On May 15, 2006, the original plaintiffs filed suit against ABMI, a/k/a ABM Industries Incorporated, d/b/a ABM Janitorial Services.  The complaint did not name ABMK.  On June 28, 2006, defense counsel called the appellants' attorney and informed him ABMK was the appellants' employer, not ABMI.  Appellants' counsel requested verification of the information and researched ABMK's status as an employer in Minnesota.  On June 29, 2006, defense counsel wrote appellants' counsel verifying that ABMK was the appellants' employer and offered a stipulation allowing appellants to amend the complaint to add ABMK.  Appellants' counsel requested further verification and declined the stipulation.

On July 28, 2006, appellants' counsel sent a proposed stipulation to defense counsel regarding amending the complaint to add ABMK as a defendant.  Defense counsel agreed to the stipulation in principle but requested additional language indicating the amendment did not relate back to the date of the original complaint.  On

-3-

August 9, 2006, appellants' counsel agreed to the additional language but the stipulation was not signed. On August 11, 2006, appellants' counsel informed defense counsel he intended to add three additional plaintiffs and would wait until they received right-to-sue letters from the EEOC before amending the complaint. Defense counsel indicated the amendment naming ABMK should be made immediately. Appellants' counsel refused, preferring instead to make both amendments at the same time. On September 15, 2006, more than one month after the ninety-day time limit had passed as to the original plaintiffs, the amended complaint adding ABMK and the three timely plaintiffs was filed.

ABMK moved for dismissal, arguing the amendment was untimely. The original plaintiffs resisted, arguing equitable tolling or the relation back doctrine saved the untimely amendment. The district court disagreed, finding the original plaintiffs had not acted reasonably or in good faith in failing to amend the complaint sooner. In particular, the court found appellants' counsel was informed early on of the identity of the appellants' employer and was offered multiple opportunities to amend the complaint. Despite this information, counsel unreasonably delayed in filing the amendment. Similarly, the district court concluded the relation back doctrine did not apply because the failure to name ABMK was not the result of a mistake as to its identity. Instead, the district court concluded appellants' counsel was informed ABMK was the proper party nearly two months before the statute of limitations expired and failed to make a timely motion to amend.

Thereafter, ABMI and ABMK moved for summary judgment on the discrimination, hostile workplace, and other employment-related claims. ABMI argued it was not the appellants' employer and the claims against it should be dismissed. ABMK argued the claims filed by the timely plaintiffs should be dismissed because there was no evidence of sexual harassment, hostile workplace or other employment-related misconduct. The district court concluded there was insufficient evidence to show ABMI exercised sufficient control over ABMK to make

-4-

it the appellants' employer.  The court further found there was insufficient evidence to support the timely filed sexual harassment, hostile workplace and other employment-related claims.  Accordingly, the district court granted summary judgment and dismissed all the claims.

On appeal, the appellants argue the district court erred in finding the amended complaint untimely under either equitable tolling or the relation back doctrine. Additionally, the appellants argue the court erred in finding ABMI was not their employer, and that the sexual harassment, hostile workplace, and other employment-related claims lacked merit.

## II

We review the district court's grant of summary judgment de novo, viewing the evidence and drawing all reasonable inferences in the light most favorable to the appellants, the nonmoving parties. Holland v. Sam's Club, 487 F.3d 641, 643 (8th Cir. 2007).  We will affirm if no genuine issue of material fact exists and the defendants are entitled to judgment as a matter of law.  Id.  But "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

## A

The original plaintiffs first argue the district court erred in concluding neither equitable tolling or the relation back doctrine saved the untimely filed amendment. Equitable tolling requires, among other elements, a finding the original plaintiffs acted reasonably and in good faith. Pecoraro v. Diocese of Rapid City, 435 F.3d 870, 875 (8th Cir. 2006).  The failure to bring a timely claim is reasonable if "despite all due diligence, [the original plaintiffs were] unable to obtain vital information bearing on

-5-

the existence of [the] claim." <u>Dring v. McDonnell Douglas Corp.</u>, 58 F.3d 1323, 1328 (8th Cir. 1995) (citations omitted).  Here the original plaintiffs did not act with due diligence.  Defense counsel informed appellants' counsel he needed to amend the complaint to include ABMK, and offered multiple opportunities to amend. Nevertheless, counsel waited nearly three months until the ninety-day time limit was past to file the amendment.  We conclude the delay was not reasonable.

Similarly, under the relation back doctrine, the original plaintiffs must show the failure to name ABMK was the result of a mistake concerning the identity of the proper party.  <u>Shea v. Evensten</u>, 208 F.3d 712, 720 (8th Cir. 2000).  The original plaintiffs argue ABMK was on notice it should have been named in the complaint and was not prejudiced by the delay.  It is true ABMK was on notice.  Further, ABMK does not argue it was prejudiced.  The original plaintiffs, however, offer no explanation for waiting until after the statute of limitations expired before filing the amended complaint.  Inasmuch as the original plaintiffs were aware of ABMK's identity for nearly two months before the statute expired, it cannot be argued a mistake caused the failure to file a timely complaint against ABMK.  Rather, the complaint was not filed because counsel preferred to wait and file the amendment adding ABMK at the same time he sought to add the timely plaintiffs.  Therefore, we affirm the district court's order holding the amendment adding ABMK was untimely.

## B

Appellants next argue the district court erred in concluding ABMI was not their employer.  "Title VII of the Civil Rights act of 1964 is to be accorded a liberal construction in order to carry out the purposes of Congress to eliminate the inconvenience, unfairness and humiliation of . . . discrimination."  <u>Baker v. Stuart Broad. Co.</u>, 560 F.2d 389, 391 (8th Cir. 1977) (quotation marks and citations omitted). In particular, "[s]uch liberal construction is also to be given to the definition of 'employer.'"  <u>Id.</u> (citation omitted).  The legal standard in this circuit for determining

-6-

a parent corporation's liability for a subsidiary's commission of practices prohibited by Title VII was first set forth more than thirty years ago in <u>Baker</u>. <u>Id.</u> at 392. The court adopted a four-part test treating related but distinct entities as an integrated enterprise based on 1) interrelation of operations, 2) common management, 3) centralized control of labor relations, and 4) common ownership or financial control. <u>Id.</u> In <u>Baker,</u> the court found "sufficient facts to hold as a matter of law" two affiliated broadcasting corporations – Stuart and Grand Island – "share management and ownership," and "a sufficient interrelation of operations between the two companies." <u>Id.</u> Specifically, the court noted Stuart "provides management services for Grand Island . . . includ[ing] . . . check writing and completion of the necessary forms for broadcast license renewals . . . [and] issues policy manuals which Grand Island . . . is to follow." <u>Id.</u> Further, "[w]hile evidence as to control of labor relations [was] less clearly developed in the record . . . the record support[ed] a conclusion that Stuart Broadcasting and Grand Island Broadcasting should be consolidated . . . ." <u>Id.</u> Our reliance upon, and the continued viability of, <u>Baker's</u> four-part test is supported by EEOC guidance and Congressional intent.

Under the EEOC's interpretation of Title VII, "[t]he separate entities that form an integrated enterprise are treated as a single employer for purposes of both coverage and liability," and "relief can be obtained from any of the entities that form part of the integrated enterprise." EEOC Compliance Manual, Section 2: Threshold Issues, No. 915.003, at 44. "The factors to be considered in determining whether separate entities should be treated as an integrated enterprise" mirror those set forth in <u>Baker</u>, and include the degree of interrelation between the operations, the degree to which the entities share common management, centralized control of labor relations, and the degree of common ownership or financial control. <u>Id.</u> at 44-45. When evaluating the degree of interrelation, the EEOC considers sharing services such as check writing, preparation of mutual policy manuals, contract negotiations, completion of business licenses, sharing payroll and insurance programs, sharing services of managers and personnel, sharing office space, equipment, and storage, and operating the entities as

-7-

a single unit. Id. The degree to which the entities share common management includes whether the same individuals manage or supervise the different entities or whether the entities have common officers and boards of directors. Id. The EEOC also considers the extent to which there is a centralized source of authority for development of personnel policy, maintenance of personal records, human resources, and employment decisions. Id. Finally, the degree of common ownership or financial control asks whether one company owns the majority or all shares of the other and if the entities share common officers or directors. Id.

Similarly, Congress has demonstrated its support for the Baker four-factor test by codifying the standard in a 1984 amendment to the Age Discrimination in Employment Act (ADEA), and in a provision of the 1991 Civil Rights Act amending Title VII and the Americans with Disabilities Act (ADA). See 29 U.S.C. § 623(h) (ADEA); 42 U.S.C. § 2000e-1(c) (Title VII); 42 U.S.C. § 12112(c)(2) (ADA). In EEOC v. Arabian American Oil Co., 499 U.S. 244, 246 (1991), the Supreme Court held Title VII did not apply "extraterritorially to regulate the employment practices of United States employers who employ United States citizens abroad." In reaching its decision, the Supreme Court noted Congress had previously acted to extend the reach of, among other statutes, the ADEA to cover U.S. citizens employed abroad by U.S. corporations or their foreign subsidiaries.

> [A]fter several courts had held that the ADEA did not apply overseas, Congress amended [the ADEA] to provide: "The term 'employee' includes any individual who is a citizen of the United States employed by an employer in a workplace in a foreign country." 29 U.S.C. § 630(f). Congress also amended § 4(g)(1), which states: "If an employer controls a corporation whose place of incorporation is in a foreign country, any practice by such corporation prohibited under this section shall be presumed to be such practice by such employer." 29 U.S.C. § 623(h)(1). The expressed purpose of these changes was to "mak[e] provisions of the Act apply to citizens of the United States employed in foreign countries

by U.S. corporations or their subsidiaries."  S. Rep. No. 98-467, p.2 (1984), U.S. Code Cong. & Admin. News 1984 pp. 2974, 2975.

Id. at 258-59.

In extending the reach of the ADEA, Congress codified the four-factor integrated enterprise test as the standard to determine "whether an employer controls a corporation" overseas, and is thereby "presumed" liable for unlawful discrimination against the U.S. citizen employees of the foreign subsidiary.  29 U.S.C. § 623(h). "The purpose behind the amendment [was] to ensure that the citizens of the United States who are employed in a foreign workplace by U.S. corporations or their subsidiaries enjoy the protections of the [ADEA]."  In Arabian American, the Supreme Court suggested "Congress, should it wish to do so, may similarly amend Title VII." 499 U.S. at 259.  Congress immediately acted by adding a provision to the 1991 Civil Rights Act to include functionally identical language in Title VII and the ADA.  As amended, Title VII now protects U.S. citizens employed "in a foreign country," 42 U.S.C. § 2000e(f), under the following circumstances:

> (c)(1) If an employer controls a corporation whose place of incorporation is a foreign country, any practice prohibited by section 2000e-2 or 2000e-3 of this title engaged in by such corporation shall be presumed to be engaged in by such employer.
> (2) Sections 2000e-2 and 2000e-3 of this title shall not apply with respect to the foreign operations of an employer that is a foreign person not controlled by an American employer.
> (3) For purposes of this subsection the determination of whether an employer controls a corporation shall be based on –
> *(A) the interrelation of operations;*
> *(B) the common management;*
> *(C) the centralized control of labor relations; and*
> *(D) the common ownership or financial control, of the employer and the corporation.*

42 U.S.C. § 2000e-1(c) (emphasis added); see also 42 U.S.C. § 12112(c)(2) (ADA).

Congress' express purpose was to "extend the protections of Title VII and the [ADA] to American citizens working overseas for American employers," by enacting a provision that "parallels a 1984 amendment to the [ADEA]." 137 Cong. Rec. S15235-02 (Sen. Kennedy) (Oct. 25, 1991); see also 137 Cong. Rec. S15477-01 (Sen. Dole) (Oct. 30, 1991) (same). In doing so, Congress again approved the four-factor integrated enterprise test to determine when an employer will be presumed liable for the unlawful employment practices of a subsidiary or corporate affiliate. "A foreign entity will be found to be controlled only if it is, in effect, an integrated enterprise with an American employer." EEOC Enforcement Guidance: Application of Title VII and the [ADA] to Conduct Overseas and to Foreign Employers Discriminating in the United States, No. N-915.002 at 4, 18 n.6 (Oct. 20, 1993) ("The factors identified . . . are the same as those relied upon by the Commission for determining when two or more entities (whether foreign or domestic) may be treated as an integrated enterprise or a single employer."). The intent of these amendments was to extend to U.S. citizens employed abroad by American employers, or by foreign affiliates controlled by such employers, the same protections from discrimination they would enjoy at home. Therefore, Congress plainly intended the term "employer" be interpreted in accord with the four-factor integrated enterprise test.

The Fourth Circuit, in deciding whether a parent corporation is liable for unlawful discrimination against a subsidiary's employees, has emphasized "the doctrine of limited liability" derived from corporate law and applies "a strong presumption" that "when a subsidiary hires employees . . . the subsidiary, not the parent company, is the employer." Johnson v. Flowers Indus., Inc., 814 F.2d 978, 980 (4th Cir. 1987). "In an employment context," the court held, the parent company can be the employer of a subsidiary's workers if it exercises excessive control in one of two ways. The parent could control the employment practices and decisions of the subsidiary or the parent might so dominate the subsidiary's operations that the parent and the subsidiary are one entity and thus one employer. Id. at 981. The Fourth Circuit acknowledged the four-factor test applied by this and other courts to assess the

-10-

degree of control exercised by a parent corporation over a subsidiary, but saw no "need [to] adopt such a mechanical test in every instance; the factors all point to the ultimate inquiry of parent domination" and "simply express relevant evidentiary inquiries whose importance will vary with the individual case." Id. at 981 n*. The Tenth Circuit has adopted Johnson, reasoning a "strong presumption that a parent company is not the employer of its subsidiary's employees" will be overcome "only in extraordinary circumstances." Frank v. U.S. West, Inc., 3 F.3d 1357, 1362 (10th Cir. 1993) (citing Johnson, 814 F.2d at 980-81).

Recently, our court in Brown v. Fred's, Inc., 494 F.3d 736, 739 (8th Cir. 2007), applied "a strong presumption that a parent company is not the employer of its subsidiary's employees," id. (quoting Frank and citing Johnson), and held a Title VII plaintiff to the standard announced in Johnson: "A parent company may employ its subsidiary's employees if (a) the parent company so dominates the subsidiary's operations that the two are one entity and therefore one employer, . . . or (b) the parent company is linked to the alleged discriminatory action because it controls individual employment decisions." Id. (internal quotation marks omitted). Without citing Baker or the four-factor test, or EEOC and Congressional support for the test, the Brown court affirmed summary judgment for the parent corporation, finding "nothing" to suggest the parent and subsidiary "were a single entity," and insufficient evidence the parent "actually controlled individual employment decisions regarding [plaintiff]." Id. at 739-40.

As demonstrated below, the evidence of common ownership and management of ABMI and ABMK; ABMI's involvement, pursuant to the Service Agreement, in several areas of ABMK's operations; and ABMI's public representations of centralized corporate control of labor and human resources, demonstrate ABMI is the appellants' employer for purposes of the integrated enterprise test. The district court concluded otherwise based on the above-cited language in Brown, and held a parent corporation can only be considered the employer of its subsidiary's employees if the parent

-11-

dominates the subsidiary's operations, or was directly involved in the alleged unlawful action. 494 F.3d at 739. Additionally, the district court applied a "strong presumption" against holding a parent liable for the unlawful employment practices of its subsidiary. Id. We conclude, however, Brown should not be read as establishing a new integrated enterprise test in our circuit. Rather, it may be harmonized with Baker by noting the traditional four-factor standard is the means by which plaintiffs demonstrate corporate dominance over a subsidiary's operations and establish affiliate liability. In other words, applying the Baker test is how to prove the "parental domination" standard set forth in Brown. Furthermore, assuming the presumption articulated in Brown informs the analysis set forth in Baker, it is overcome in this case by evidence of ABMI's and ABMK's 1) interrelation of operations, 2) common management, 3) centralized control of labor relations, and 4) common ownership or financial control.

The district court concluded ABMI's involvement in the operations of ABMK was insufficient to find ABMI was involved in the actual functioning of ABMK. It based its conclusion primarily on a finding as to the day-to-day operations of ABMK being handled by ABMK employees, without the involvement or oversight of ABMI personnel. Substantial evidence, however, including ABMI's and ABMK's corporate documents, and publications disseminated on ABMI's website contradict the district court's conclusion.

ABMI and ABMK share the same Chief Executive Officer, Chief Financial Officer, Treasurer, Secretary, and Vice President of Finance. Additionally, the Chief Executive Officer and Chief Financial Officer for ABMI approved the appointments of the Executive Vice President, Vice President of Finance, Secretary, and the Board of Directors for ABMK. In addition and importantly, ABMI owns and thereby controls all of ABMK's issued and outstanding shares of common stock.

-12-

Significantly, ABMI and ABMK entered into a Service Agreement whereby ABMI agreed to provide certain services to ABMK, including accounting services, administrative services, electronic services, employee benefits, human resources, insurance, legal services, safety advice, and treasury services. Through its human resources department, ABMI agreed to provide ABMK with the following services:

a) Assist in the development of human resource policies applicable to Subsidiary;
b) Assist on the development and distribution of employee handbooks and employment-related forms for use by Subsidiary;
c) Assist Subsidiary with employment-related workplace posting requirements;
d) Provide employee relations personnel to assist Subsidiary with employment-related problems;
e) Provide employment related legal advice and guidance;
f) Manage all employment-related lawsuits, claims and liability;
g) Preparation of Annual Affirmative Action Plan(s);
h) Provide support for Subsidiary in cases of governmental audits;
i) Manage human resources information services;
j) Develop and present employment-related division training programs.

The accounting services included providing financial policies and procedures, payroll tax, depositing, independent audits, and preparing and filing federal and state income tax returns and other necessary reports. The administrative services included negotiating and managing national accounts, management of uniform company logos and signage, and purchasing business cards and stationary. Electronic services related to computer telecommunications systems and included purchasing equipment, development of software, and technical support. Employment benefits services included administration of employee benefits programs. The insurance services included negotiating insurance coverage for workers and managing worker compensation insurance and claims. As for legal services, ABMI's legal department agreed to negotiate and draft service and procurement agreements on behalf of ABMK. ABMI further agreed to provide ABMK with advice necessary to enable

-13-

ABMK to comply with laws dealing with employee safety, to develop and distribute safety-related training and education materials, and to publish and distribute appropriate safety manuals. Finally, treasury services included establishing and maintaining banking relationships. In exchange for these services, ABMK agreed to pay ABMI one percent of its gross operating revenue and to "follow policies and guidelines developed pursuant to the Service Agreement, as well as such corporate guidelines as may be developed and promulgated from time to time." In a subsequent Service Agreement, ABMI agreed to also provide real estate and marketing services, and ABMK agreed to pay ABMI separate amounts for electronic services, employee benefits services, insurance services, and safety services.

In addition, ABMI purchased ABMK's workers' compensation insurance, obtained licenses for sexual harassment videos, submitted motor vehicle record checks to a single provider, and drafted certain forms such as performance evaluations. ABMI also negotiated the contract for a harassment hotline, which ABMK employees could access to report sexual harassment, discrimination, retaliation, theft, or safety concerns in the workplace. ABMI would forward any reports to ABMK's human resources department and ABMK would conduct an investigation. ABMI employees, however, were available to provide assistance and direction in such investigations, and the results were forwarded to ABMI to ensure the complaints were resolved.

ABMK's human resources director also had access to ABMI's human resources online manual, which was used to clarify the operation policies and procedures ABMK was required to follow, and contacted ABMI when questions arose regarding information contained in the manual. Further, ABMK relied on ABMI's Complaint Resolution Summary form (which listed ABMI's human resource department's contact information) and ABMI's procedures for processing employee complaints.

ABMI also dictated mandatory sexual harassment and diversity training and provided the training to ABMK's human resources and safety professionals. ABMI

-14-

further directed ABMK to include the following attachments in each employees paycheck: 1) unlawful harassment policy; 2) sexual harassment policy; and 3) a reminder of the harassment hotline. ABMI's human resources department also published and distributed a memorandum on how to recognize and deal with sexual harassment to all ABMI subsidiaries. In 2004, ABMI notified its subsidiaries' human resources managers about mandatory unlawful harassment training. The notice indicated training was mandatory on an annual basis for all supervisory personnel, persons conducting the training were required to first complete at least Level 1 of ABMI's Human Resource Certification Program, and exceptions from the requirement could only be approved by ABMI's human resources department. In April 2005, ABMI issued a similar notice to its subsidiaries' human resources directors outlining changes in the 2005-2006 mandatory harassment training and reiterating that exceptions could only be approved by ABMI.

The ABM Janitorial Services Employee Handbook, provided by ABMK to all employees, includes a preamble from ABMI's President and Chief Executive Officer, advising employees the handbook is a useful reference for employment guidelines, procedures, policies, and details what is expected of employees. ABMI has also promulgated a Code of Business Conduct and Ethics, applicable to the employees of its subsidiaries, which addresses conflicts of interests; corporate opportunities and the duty of loyalty; gifts made to government and union personnel, customers and suppliers; fraud and theft; bribes; insider trading; compliance with laws, regulations and rules, including civil rights laws concerning harassment and job discrimination; protection of company assets; political contributions; confidentiality; accounting and employment safety as it relates to using alcohol or drugs, threats made against other employees and possessing weapons.

According to these documents, ABMI exercises significant control, through "the involvement or oversight of ABMI personnel," over its janitorial subsidiaries, particularly in areas affecting labor and human resources. In its 2007 Annual Report

-15-

to Stockholders, ABMI reported that its subsidiary, ABM Janitorial, had a "work force of 47,000 employees operating out of 111 branch offices." According to the report:

> ABM Janitorial Service's vast market coverage, corporate oversight and local operational expertise allow our branches to deliver quality service to our clients, regardless of their size or location. Our corporate professionals have developed comprehensive standards for all procedures and protocols in the areas of human resources, safety and training. These programs are distributed subsidiary-wide, providing our employees with the latest in cleaning methods, technology and safety guidelines. Experienced management and supervision, along with a well-trained, dedicated work force, are the keys to providing the superior service upon which our customers rely.

In the 2006 Fall/Winter Issue of its "Alliance Magazine,"ABMI described in detail the "comprehensive standards for all procedures and protocols in the areas of human resources, safety and training," and noted ABMI's centralized "corporate professionals" provide assistance "subsidiary-wide" to managers, supervisors, and employees. In particular, the magazine explained "how ABMI's dynamic corporate Human Resources Department trains and inspires a field of 50-plus [HR] generalists who serve ABMI's subsidiary companies with 73,000 employees nationwide." Erin Andre, Senior Vice President of Human Resources for ABMI, explained her department's "corporate objective is to partner" with subsidiaries "to ensure that we hire and retain the best mix of talent to meet customer and business needs while maintaining 'Best in Class' HR practices." To accomplish those goals, ABMI's centralized human resources department directly responds, on a daily basis, to a wide range of inquiries from employees, supervisors, and human resource managers throughout the company's subsidiaries, and instructs subsidiaries on the application of federal labor laws to the company's entire workforce.

Additionally, the centralized employee benefits office "administers a wealth of employee benefit packages" "includ[ing] health and life insurance, short- and

long-term disability coverage, and a personal accident plan," offered to employees of ABMI subsidiaries nationwide. Corporate human resources also trains and monitors the human relations personnel and practices of ABMI subsidiaries. In addition to a library of video-based and written materials, the human resources department produces annual programs on unlawful harassment and supervisory development. This training is supplemented by ongoing assistance provided by human resources representatives of ABMI's subsidiary companies. To ensure the reliability of this assistance, human resources representatives must become certified by successfully completing ABMI's [human resources] certification program.

As structured by ABMI, "[f]our corporate [human resources] directors support 51 HR field directors who provide service to ABMI's subsidiary companies," and "assist [HR] field directors and their management teams in effective workforce management by providing timely and accurate advice." To ensure subsidiaries follow the policies, practices, and procedures established in ABMI corporate headquarters, "ABM's [human resources] Department has developed and officially rolled out the HR Audit Protocol, which is designed to measure the Company's compliance with a number of performance standards regarding employee records and HR practices." There are audits to ensure all locations are adhering to proper procedures regarding new hires, such as conducting background checks and reviewing appropriate documentation, and audits in connection with wage and hour laws, as well as equal employment and Family Medical Leave Act notifications required by the government. Human resources directors perform field audits, creating a partnership between corporate staff and field directors to make sure the branches are in compliance with comprehensive standards. "The data gathered" enables "the Company to look for patterns – strengths or gaps – and to adjust corporate policies or training accordingly."

ABMI personnel also establish and monitor compliance with policies and procedures governing job performance and employee safety for all subsidiaries. ABMI's "corporate [human resources] and safety departments deliver far-reaching

programs" to all subsidiaries in the area of employee training. In particular, ABMI has implemented a comprehensive "proprietary" training program "developed to standardize the way ABM cleaned and to enable supervisors to quickly and confidently train new employees." The centralized department of safety services "manages occupational and environmental safety programs that benefit and safeguard the field," including "programs that support all ABM subsidiaries;" "programs that have broad application, but which are tailored to address specific service needs by individual subsidiaries;" and "special or site-specific programs." "There are some 25 safety directors or coordinators Company-wide . . . and no subsidiary or branch has been left out of the 'mix.'" ABMI ensures "[e]ach [subsidiary] has someone who is assigned responsibility for ensuring that an effective safety management process is in place." "Every year, all of the Company's safety directors and coordinators gather for an extensive training session, which [in 2006] was divided into two 50-hour segments." "Corporate safety staff also visit local safety directors across the country to provide counsel and assistance with programs and procedures." While ABMI's Director of Safety Services announced plans to "'roll out a new set of comprehensive safety policies addressing anything and everything we do in the field,'" the Assistant Director focused "most of [her] time on ensuring that ABM has an effective safety program and that every ABM subsidiary provides its employees with a safe work environment." To achieve the "main objective . . . to see every ABM employee go home safely at the end of every work shift," the Assistant Director developed "a solid understanding of what our employees encounter on a day-to-day basis" and "can apply technical knowledge to assist the field in integrating safety management into the operations."

These descriptions of ABMI's involvement in the operations of its subsidiaries, and in particular ABMK's, are sufficient to create a genuine issue of material fact with respect to whether ABMI and ABMK are an integrated enterprise. Accordingly, we reverse the district court's grant of summary judgment on this issue. See Frank v. U.S. West, Inc., 3 F.3d 1357, 1364 (10th Cir. 1993) (applying the four-factor test to

determine whether a genuine issue of material fact precluded summary judgment on the issue of integrated enterprise).

C

We next consider the district court's grant of summary judgment against the timely plaintiffs on their Title VII and MHRA claims, which are governed by the same standards. See Wittenburg v. Am. Exp. Fin. Advisors, Inc., 464 F.3d 831, 842 n.16 (8th Cir. 2006).

Garcia, Laureano, and Giron asserted timely claims against ABMK for quid pro quo sexual harassment, arguing their on-site supervisors subjected them to unwanted sexual advances and other sexual conduct, and when rebuffed, denied them job benefits or took adverse actions against them resulting in tangible job detriment. They also alleged the supervisors' sexual harassment was severe and pervasive, affected a term, condition or privilege of employment, and ABMK had actual or constructive notice of the harassment. Finally, they each alleged claims for retaliation and sexual discrimination.

The district court concluded the on-site supervisors had no authority to take adverse employment actions against the timely plaintiffs. In other words, they did not have the authority to hire, fire, demote, etcetera, and therefore the claims of quid pro quo harassment against ABMK necessarily failed. Additionally, the court concluded, with respect to Garcia's hostile workplace claim, the actions of her supervisor, while repugnant, were insufficient to show the workplace was permeated with discriminatory intimidation, ridicule, and insult. The district court dismissed Laureano's and Giron's hostile workplace claims, finding ABMK had no notice of the harassment until it was reported to management, and thereafter it took timely and effective remedial action. The district court also dismissed the retaliation claims, concluding 1) Garcia failed to allege a materially adverse employment action, 2)

-19-

Laureano only alleged retaliation by a co-worker, not her employer, and she conceded ABMK had a legitimate nondiscriminatory reason for her termination, and 3) Giron failed to establish a causal connection between her reports of harassment and the alleged retaliatory acts.  Finally, the district court dismissed the sex discrimination claims, finding, among other things, the timely plaintiffs failed to present any evidence tending to show the alleged discriminatory actions were taken because of gender.

For the reasons stated in the district court's order, we affirm its dismissal of the timely plaintiffs' retaliation, sex discrimination, and quid pro quo sexual harassment claims, and its dismissal of Garcia's hostile workplace claim.  <u>See</u> 8th Cir. R. 47B. For the reasons stated below, we reverse and remand the district court's dismissal of Laureano's and Giron's hostile workplace claims, with instructions to determine whether evidence of widespread sexual harassment was sufficient to put ABMK on constructive notice.

Title VII prohibits employment discrimination based on sex and covers a broad spectrum of disparate treatment.  42 U.S.C. § 2000e-2; <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993).  A plaintiff may prevail in a discrimination claim by showing the inappropriate conduct creates a "hostile work environment."  <u>See</u> 29 C.F.R. § 1604.11(a)(3).  Laureano's and Giron's hostile work environment claims require proof 1) they are members of a protected group, 2) they were subjected to unwelcome sexual harassment, 3) the harassment was based on sex, and 4) the harassment affected a term, condition or privilege of their employment.  <u>Duncan v. Gen. Motors Corp.</u>, 300 F.3d 928, 933 (8th Cir. 2002).  To establish a prima facie case of hostile work environment sexual harassment by non-supervisory co-workers, they must also establish ABMK knew or should have known of the harassment and failed to take prompt remedial action.  <u>Meriwether v. Caraustar Packaging Co.</u>, 326 F.3d 990, 993 (8th Cir. 2003) (quotation marks omitted).  The fourth element involves both objective and subjective components.  <u>Id.</u> at 934.  The harassment must be "severe or pervasive

-20-

enough to create an objectively hostile or abusive work environment" and the victim must subjectively believe her working conditions have been altered. Harris, 510 U.S. at 21-22. "There is no bright line between sexual harassment and merely unpleasant conduct . . . ." Hathaway v. Runyon, 132 F.3d 1214, 1221 (8th Cir. 1997). Accordingly, we view the "totality of the circumstances" in determining whether there is a hostile work environment. Klein v. McGowen, 198 F.3d 705, 709 (8th Cir. 1999). The factors we look to include the frequency of the behavior, its severity, whether physical threats are involved, and whether the behavior interferes with a plaintiff's performance on the job. Duncan, 300 F.3d at 934.

With respect to Laureano's and Giron's hostile workplace claims, the district court determined the on-site supervisors were co-employees, and ABMK took prompt remedial action when the harassment was reported. We agree the district court properly concluded the timely plaintiffs' supervisors were not authorized to take adverse employment actions against them, and thus ABMK was not liable under a theory of quid pro quo harassment. Additionally, we agree the plaintiffs' complaints to their supervisors were insufficient to put ABMK on notice of the harassment, especially in light of the extensive anti-harassment policy and procedures it had established, which, when accessed, ended the harassment. Nonetheless, the district court refused to consider evidence offered to show ABMK knew or should have known sexual harassment was rampant throughout the company, thereby giving it constructive notice.

Title VII adopts ordinary tort principles of negligence in evaluating employer liability for sexual harassment, Engel v. Rapid City School District, 506 F.3d 1118, 1123 (8th Cir. 2007), and an employer may be negligent although it did not have actual notice if it reasonably should have anticipated the harassment, i.e., if it had constructive notice. Here, ABMK exercised reasonable care to prevent sexually harassing behavior by establishing an anti-harassment policy and reporting procedures, Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998) and Faragher

-21-

v. City of Boca Raton, 524 U.S. 775 (1998) (setting forth the Ellerth/Faragher affirmative defense), but plaintiffs allege it was aware of nearly one hundred similar complaints made during the time plaintiffs were employed.  Thus, they argue ABMK had constructive notice of rampant sexual harassment by on-site supervisors.

An employer has actual notice of harassment when sufficient information either comes to the attention of someone who has the power to terminate the harassment, or it comes to someone who can reasonably be expected to report or refer a complaint to someone who can put an end to it.  Young v. Bayer Corp., 123 F.3d 672, 674 (7th Cir. 1999).  "[A]ctual notice is such notice as is positively proved to have been given to a party directly and personally, *or such as he is presumed to have received personally because the evidence within his knowledge was sufficient to put him upon inquiry*." Black's Law Dictionary 1061-62 (6th ed. 1990) (emphasis added).  In the context of sexual harassment claims, "[a]ctual notice is established by proof that management *knew* of the harassment."  Watson v. Blue Circle, Inc., 324 F.3d 1252, 1259 (11th Cir. 2003) (emphasis added).  Whereas, constructive notice "is established when the harassment was so severe and pervasive that management reasonably *should* have known of it."  Id. (emphasis added); see also Martin v. Wal-Mart Stores, Inc., 183 F.3d 770, 772 (8th Cir. 1999) (noting an employer is deemed to have actual notice of a dangerous condition if an employee created or was aware of the hazard). "Constructive notice . . . is established when the harassment was so severe and pervasive that management reasonably should have known of it."  Watson, 324 F.3d at 1259.  "[A]n employer may be charged with constructive knowledge of previous sexual harassment . . . if the harassment was so broad in scope, and so permeated the workplace, *that it must have come to the attention of someone authorized to do something about it*."  Fall v. Ind. Univ. Bd. of Tr., 12 F. Supp. 2d 870, 882 (N.D. Ind. 1998) (emphasis added) (citations omitted).

> [T]here can be constructive notice in two situations: where an employee provides management level personnel with enough information to raise

a probability of sexual harassment in the mind of a reasonable employer,
or where the harassment is so pervasive and open that a reasonable
employer would have had to be aware of it.

. . .

[T]hese standards strike the correct balance between protecting the rights
of the employee and the employer by faulting the employer for turning
a blind eye to overt signs of harassment but not requiring it to attain a
level of omniscience, in the absence of actual notice . . . .

Kunin v. Sears Roebuck and Co., 175 F.3d 289, 294 (3d Cir. 1999).

Here, the district court refused to consider evidence of other sexual harassment
claims, concluding it was barred by Eighth Circuit precedent limiting a plaintiff's
evidence in sexual harassment/hostile workplace cases to instances of harassment of
which a plaintiff is aware. A plaintiff, however, is not limited to offering such
evidence only to prove the subjective component of a sexual harassment claim.
Irrespective of whether a plaintiff was aware of the other incidents, the evidence is
highly probative of the type of workplace environment she was subjected to, and
whether a reasonable employer should have discovered the sexual harassment.

When judging the severity and pervasiveness of workplace sexual harassment,
this court has long held harassment directed towards other female employees is
relevant and must be considered. See Hall v. Gus Constr. Co., 842 F.2d 1010, 1014-
15 (8th Cir. 1988) ("We also reject appellants' contention that the district court
erroneously considered all of the women's claims together in determining that the
harassment was sufficiently pervasive and severe . . . ."). In Williams v. Conagra
Poultry Co., 378 F.3d 790, 793-94 (8th Cir. 2004), the court discussed the distinction
between evidence offered to prove the substance of a plaintiff's hostile work
environment claim versus evidence offered to prove the severity and pervasiveness
of harassment in the workplace. In Williams, the plaintiff (Williams) offered the
testimony of several co-workers detailing a host of racially motivated harassment that

-23-

occurred during his employment at Conagra's plant.  Id. at 793.  Conagra objected because Williams conceded he was unaware of the incidents, and according to Conagra, the evidence could not be used to prove Williams found the workplace subjectively hostile.  Id. at 794.  This court, recognizing the evidence was irrelevant to Williams's subjective perceptions of his workplace, nonetheless found the evidence highly relevant to prove, among other things, the type of workplace environment to which Williams was subjected.  Id.

Accordingly, we conclude the district court erred in disregarding the evidence of widespread sexual harassment.  Though the evidence cannot be used to prove the timely plaintiffs found their workplace subjectively hostile, it is highly relevant to prove the sexual harassment was severe and pervasive and that ABMK had constructive notice.

## III

To summarize:  We affirm the district court's holding as to the motion to amend the complaint to add ABMK was untimely.  We also affirm the district court's dismissal of the timely plaintiffs' retaliation, sex discrimination, and quid pro quo sexual harassment claims, and its dismissal of Garcia's hostile workplace claim.  We reverse the district court's holding as to there being no genuine issue of material fact as to whether ABMI and ABMK acted as an integrated enterprise and remand for further proceedings consistent with this opinion.  Finally, we reverse and remand the district court's dismissal of Laureano's and Giron's hostile workplace claims, with instructions to consider the appellants' evidence of widespread sexual harassment.

GRUENDER, Circuit Judge, concurring in part and dissenting in part.

Because I would affirm the district court's grant of summary judgment to ABMK in all respects, I concur in part and dissent in part.  I concur in Parts I and II.A

-24-

of the Court's opinion.  I also agree with the Court's determination in Part II.B that under the four-factor test set out in *Baker v. Stuart Broadcasting Co.*, 560 F.2d 389, 392 (8th Cir. 1977), there is a material question of fact with respect to whether ABMI and ABMK are an integrated enterprise.[3]  I also concur in the Court's holding in Part II.C that the district court properly granted summary judgment dismissing Garcia's, Laureano's, and Giron's retaliation, sex discrimination, and quid pro quo sexual harassment claims and Garcia's hostile work environment claim.  No matter what job title the alleged harassers may have claimed, no reasonable factfinder could find that they were in fact supervisors because they had no authority to take tangible employment actions against the victims.  *See Joens v. John Morrell & Co.*, 354 F.3d 938, 940 (8th Cir. 2004) (noting that the majority of circuits that have addressed the question have found that a supervisor is one with power "to take tangible employment action against the victim, such as the authority to hire, fire, promote, or reassign to significantly different duties"); *Noviello v. City of Boston*, 398 F.3d 76, 95 (1st Cir. 2005) ("[C]ourts must distinguish employees who are supervisors merely as a function of nomenclature from those who are entrusted with actual supervisory powers." (internal quotation omitted)).

---

[3]While I would find that *Brown v. Fred's Inc.*, 494 F.3d 736, 739 (8th Cir. 2007), creates a "strong presumption" against finding that a parent company is the employer of its subsidiary's employees and a distinct standard for determining integrated enterprise status, I note that when faced with two divergent lines of cases within a circuit, we may choose which line to follow, *see Kostelec v. State Farm Fire & Cas. Co.*, 64 F.3d 1220, 1228 n.8 (8th Cir. 1995).  Accordingly, for the purposes of this dissent I will assume that the Court may choose to follow *Baker*.  Nevertheless, I am not convinced by the Court's discussion of Congress's decision to incorporate the four-factor test for United States citizens employed in a foreign country.  *See ante* at 8-10.  If Congress had wished to incorporate this test for companies operating within the United States, it could have done so.  In fact, we may presume that Congress did not intend this test to apply to companies operating within the United States.  *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537 (1994) ("[I]t is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another.").

While I agree with the Court that "the plaintiffs' complaints to their supervisors were insufficient to put ABMK on notice of the harassment," *ante* at 21, I respectfully dissent from the Court's decision to reverse and remand the district court's dismissal of Laureano's and Giron's hostile work environment claims. As the Court notes, "[t]o establish a prima facie case of hostile work environment sexual harassment by non-supervisory co-workers, [Laureano and Giron] must . . . establish that ABMK knew or should have known of the harassment and failed to take prompt remedial action." *Ante* at 20-21 (citing *Meriwether v. Caraustar Packaging Co.*, 326 F.3d 990, 993 (8th Cir. 2003)). I would hold that Laureano and Giron have failed to establish that ABMK had actual or constructive notice of the harassment.

The Court holds that it was error for the district court to disregard the evidence of "nearly one hundred similar complaints during the time plaintiffs were employed," concluding that ABMK should have known of the "rampant sexual harassment by on-site supervisors." *Ante* at 22. The Court does not find that this evidence created a material question of fact with respect to whether ABMK had constructive notice of the harassment, only that the district court erred by disregarding this evidence. However, the Court ignores the fact that Laureano and Giron's proffered evidence in this regard involved numerous sexual harassment complaints concerning different victims and different employees at different locations. ABMK has approximately 400 locations at which it provides janitorial services in Minnesota, including office buildings throughout Minneapolis and St. Paul. In their opening brief, the appellants state that during the period of harassment at least 85 other employees reported similar treatment by the appellants' alleged harassers "or other first-line supervisors" and list numerous citations to the record that purportedly support this claim. However, a thorough review of these citations reveals only one instance in which a coworker alleged that she was harassed by Laureano's or Giron's alleged harassers, and even that instance does not support their claim that ABMK knew of the harassment. In an affidavit, Marlene Jiron states that she was harassed by Giron's alleged harasser. However, in that affidavit, Jiron also explicitly states that she did "not report[] the

supervisor to the manager." Thus, there is nothing in the record to suggest that ABMK had notice of harassment committed by Laureano's or Giron's alleged harassers. Moreover, there is nothing in the record supporting a claim that ABMK had any notice of harassment occurring at the locations where Laureano and Giron worked.

The Court cites no authority for the proposition that an employer may have constructive notice of harassment by employees at one location based on harassment of other victims by different employees at a different location. While we have previously acknowledged that a court may consider evidence of harassment of which the plaintiff was not aware, *see Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 793-94 (8th Cir. 2004), the evidence in *Williams* was admitted in furtherance of the plaintiff's claims that the harassment was severe or pervasive, not to demonstrate that the employer had constructive notice of harassment suffered by one employee based on harassment suffered by a different employee at a different location, *id.* at 794. Here, the Court endorses Laureano and Giron's effort to use evidence of harassment at other locations committed by other employees against other victims to establish that ABMK had constructive notice of the harassment they suffered. Such a holding undermines the whole notion of constructive notice. For example, under the Court's theory, an employer could be held to have constructive notice of sexual harassment in a warehouse in Missouri based on complaints of sexual harassment in its headquarters in Florida. Under this theory, the employer that had notice of harassment at its headquarters "should have anticipated" harassment at its warehouse. *See ante* at 22.

Because I do not agree that an employer should be held to have constructive notice based on harassment committed by different employees and occurring at different locations, I respectfully dissent on this point. I would find instead that the district court did not err when it refused to consider the proffered evidence of harassment at different locations involving different employees with respect to

-27-

constructive notice.  In the absence of any other evidence that ABMK knew or should have known of the harassment alleged by Laureano and Giron and failed to take prompt remedial action, I would affirm the district court's grant of summary judgment to ABMK on Laureano's and Giron's hostile work environment claim as well.

Accordingly, because I agree with Parts I and II.A of the Court's opinion, and because I would find that summary judgment was appropriate for Garcia's, Laureano's, and Giron's claims of retaliation, sex discrimination, quid pro quo sexual harassment, and hostile work environment, I would affirm the district court's grant of summary judgment to ABMK in all respects.

_____