# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| FRANCISCA SANDOVAL, INES HERNANDEZ, MIRIAM PACHECHO, EVA REYES, ARMINDA GOMEZ, NIDIA GUERRERO, LUCILA MARQUEZ, MARIA PEREZ, AZUCENA GARCIA, ESTELA LAUREANO, and MARLENE GIRON, | Civil No. 06-1772 (JRT/JSM) |

Plaintiffs,

<b>MEMORANDUM OPINION<br>AND ORDER</b>

v.

AMERICAN BUILDING
MAINTENANCE INDUSTRIES, INC,
also known as ABM Industries,
Incorporated d/b/a ABM Janitorial
Services, and AMERICAN BUILDING
MAINTENANCE CO. OF KENTUCKY,

Defendants.

---

Justin D. Cummins, Brendan D. Cummins, Kelly A. Jeanetta, M. William O'Brien, and Francis P. Rojas, **MILLER O'BRIEN CUMMINS, PLLP**, 120 South Sixth Street, Suite 2400, Minneapolis, MN 55402, for plaintiffs.

Kathryn Mrkonich Wilson and Holly M. Robbins, **LITTLER MENDELSON, PC**, 80 South Eighth Street, Suite 1300, Minneapolis, MN 55402-2136; and Joel D. O'Malley and Robert R. Reinhart, **DORSEY & WHITNEY LLP**, 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402-1498, for defendants.

This case is before the Court on remand from the United States Court of Appeals

for the Eighth Circuit. Plaintiffs and defendants have filed motions for summary

judgment on the remaining issues in the case.  For the reasons set forth below, the Court denies plaintiffs' motion and grants defendants' motion in its entirety.

## BACKGROUND

On May 12, 2006, plaintiffs Francisca Sandoval, Ines Hernandez, Miriam Pacheco, Eva Reyes, Arminda Gomez, Nidia Guerrero, Lucila Marquez, and Maria Perez (collectively, the "original plaintiffs") brought this action against American Building Maintenance Industries, Inc. ("ABMI"), alleging claims for sexual harassment, sex discrimination, and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, and the Minnesota Human Rights Act (the "MHRA"), Minn. Stat. §§ 363A.01 to 363A.41.  (Compl. ¶ 1, Docket No. 1.)  On June 29, 2006, ABMI notified the original plaintiffs that American Building Maintenance Co. of Kentucky ("ABMK") was plaintiffs' employer, not ABMI.  (Brasel Aff. Ex. C, Docket No. 42.)  The parties proposed stipulations that would amend the complaint to add ABMK, but did not finalize an agreement to a stipulation.  (Brasel Aff. Ex. E, Docket No. 42.)  Plaintiffs also intended to amend their complaint to add three plaintiffs: Azucena Garcia, Estela Laureano, and Marlene Giron (collectively, the "timely plaintiffs").[1]  (Brasel Aff. Ex. H, Docket No. 42.)  On September 15, 2006 – more than one month after the deadline for the original plaintiffs to amend their complaint had

---

[1] The Court refers to the original plaintiffs and the timely plaintiffs collectively as "plaintiffs."

passed – plaintiffs filed an amended complaint adding the timely plaintiffs and adding ABMK as a defendant. (Am. Compl., Docket No. 25.)

ABMK filed a motion to dismiss the original plaintiffs. (Mot. to Dismiss or in the Alternative for Summ. J., Docket No. 35.) ABMK argued that the initial complaint against ABMK was untimely and that the relation-back doctrine under Federal Rule of Civil Procedure 15 did not permit plaintiffs to amend their complaint. (Defs.' Mem. in Supp. of Mot. to Dismiss or in the Alternative for Summ. J. at 7-8, Docket No. 41.) The district court granted ABMK's motion to dismiss the original plaintiffs' claims against ABMK, finding that the relation-back doctrine did not save the untimely amendment and that equitable tolling did not apply. (Order, Docket No. 76.)

ABMI and ABMK (collectively, "defendants") filed a motion for summary judgment on plaintiffs' Title VII *quid pro quo* sexual harassment, hostile work environment, sex discrimination, and retaliation claims. (Mot. for Summ. J., Docket No. 147.) ABMI moved for summary judgment on the issue of whether it was plaintiffs' employer for Title VII purposes. (*Id*.) ABMK moved for summary judgment on the merits of plaintiffs' claims. (*Id*.) The district court granted ABMI's motion as to the original plaintiffs, concluding ABMI and ABMK were not an "integrated enterprise," and, therefore, plaintiffs could not allege a Title VII claim against ABMI as the parent company of plaintiffs' actual employer, ABMK. *Sandoval v. American Bldg. Maint. Indus., Inc.* (*Sandoval I*), 552 F. Supp. 2d 867, 891-92 (D. Minn. 2009). The district court also granted defendants' motion as to the merits of the timely plaintiffs' claims. *Id.* at 916. The district court did not address the merits of the original plaintiffs' claims,

because the original plaintiffs did not timely file claims against ABMK, and because the court concluded ABMI was not plaintiffs' employer and therefore was not liable. *Id.* at 892.

Plaintiffs appealed the district court's orders on the motion to dismiss and on the motion for summary judgment. The Eighth Circuit affirmed in part and reversed in part. *Sandoval v. American Bldg. Maint. Indus., Inc.* (*Sandoval II*), 578 F.3d 787 (8th Cir. 2009). The Eighth Circuit affirmed the district court's order denying plaintiffs' motion to amend, concluding that neither equitable tolling nor the relation-back doctrine permitted plaintiffs to amend their complaint after the deadline for amendment had passed. *Id*. at 792. The Eighth Circuit also affirmed the district court's grant of summary judgment on the merits of the timely plaintiffs' *quid pro quo* sexual harassment, retaliation, and sex discrimination claims, and on the merits of timely plaintiff Garcia's hostile work environment claim. *Id*. at 800. The Eighth Circuit reversed the district court's ruling that there was no genuine issue of material fact that ABMI and ABMK acted as an integrated enterprise for the purposes of establishing an employer-employee relationship between the original plaintiffs and ABMI. *Id.* The Eighth Circuit remanded "for further proceedings consistent with this opinion." *Id.* at 801. The Eighth Circuit also reversed and remanded the district court's grant of summary judgment on Laureano and Giron's hostile work environment claims "with instructions to consider the [plaintiffs'] evidence of widespread sexual harassment" in determining whether Laureano and Giron's work environment was objectively hostile and whether ABMK had constructive notice of plaintiffs' harassment. *Id.* at 803.

On remand, plaintiffs filed a motion for summary judgment arguing that the undisputed facts demonstrate that ABMI and ABMK are an integrated enterprise, and that ABMI was the original plaintiffs' employer. (Pls.' Mot. for Summ. J., Docket No. 221.) Defendants filed a motion for summary judgment on the merits of the original plaintiffs' claims and on the merits of Laureano and Giron's hostile work environment claims. (Defs.' Mot. for Summ. J., Docket No. 225.) The Court first considers plaintiffs' motion for summary judgment on the integrated enterprise issue and then addresses defendants' motion for summary judgment on plaintiffs' remaining claims.

## DISCUSSION

### I.     STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.    PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs argue that there is no genuine dispute of fact that ABMI was plaintiffs' employer.  Plaintiffs assert that on appeal, the Eighth Circuit declared ABMI to be plaintiffs' employer, (Pls.' Mem. in Supp. of Mot. for Summ. J. at 2, Docket No. 223); that ABMI has conceded it is plaintiffs' employer, (*id.* at 2-3); and that undisputed facts show that ABMI dominated plaintiffs' workplace throughout plaintiffs' employment, (*id.* at 3).

### A.    The Eighth Circuit Decision in *Sandoval II*

As an initial matter, the Court disagrees with plaintiffs' characterization of the Eighth Circuit's decision in *Sandoval II*.  Although the Eighth Circuit stated, "ABMI is the [plaintiffs'] employer," *Sandoval II*, 578 F.3d at 796, the Eighth Circuit reviewed the facts in a light most favorable to plaintiffs, the non-moving party in the initial motion for summary judgment before the district court.  *See, e.g.*, *Merriam v. Nat'l Union Fire Ins. Co.*, 572 F.3d 579, 583 (8th Cir. 2009).  Contrary to plaintiffs' argument, the Eighth Circuit expressly held that the "descriptions of ABMI's involvement in the operations of its subsidiaries, and in particular ABMK's, **are sufficient to create a genuine issue of material fact** with respect to whether ABMI and ABMK are an integrated enterprise." *Sandoval II*, 578 F.3d at 800 (emphasis added); *see also id.* at 803 (Gruender, J., concurring in part and dissenting in part) ("I also agree with the Court's determination . . . that under the four-factor test set out in *Baker v. Stuart Broadcasting Co.,* 560 F.2d

389, 392 (8th Cir. 1977), there is a material question of fact with respect to whether ABMI and ABMK are an integrated enterprise.").

Here, the Court views the facts in a light most favorable to defendants, the non-movants, and concludes that there is a genuine fact dispute with respect to whether ABMI and ABMK are an integrated enterprise for the purposes of imposing liability on ABMI under Title VII and the MHRA.

### B. Genuine Issues of Material Fact Exist Regarding Whether ABMI Was Plaintiffs' Employer

Under Title VII, "separate entities that form an integrated enterprise are treated as a single employer for the purposes of both coverage and liability and relief can be obtained from any of the entities that form part of the integrated enterprise." *See generally Sandoval II*, 578 F.3d 793 (internal quotation marks omitted). However, there is a "strong presumption that a parent company is not the employer of its subsidiary's employees." *Brown v. Fred's, Inc.*, 494 F.3d 736, 739 (8th Cir. 2007). For a parent company to be liable as an integrated enterprise, the parent company must either "so dominate the subsidiary's operations that the two are one entity and therefore one employer," or be "linked to the alleged discriminatory action because [the parent company] controls individual employment decisions." *Sandoval II*, 578 F.3d at 795 (internal quotation marks omitted). Courts consider four factors to determine if a parent company sufficiently dominates operations or controls individual employment decisions of a subsidiary: "the degree of interrelation between the operations, the degree to which the entities share common management, centralized control of labor relations, and the

degree of common ownership or financial control." *Id*. at 793; *accord id.* at 796. Evidence of these four factors can overcome the strong presumption against parent company liability. *Id*. at 796.

### 1. Interrelation Between the Operations

"When evaluating the degree of interrelation [between the operations], the [Court] considers sharing services such as check writing, preparation of mutual policy manuals, contract negotiations, completion of business licenses, sharing payroll and insurance programs, sharing services of managers and personnel, sharing office space, equipment, and storage, and operating the entities as a single unit." *Sandoval II*, 578 F.3d at 793.

Both parties submit evidence that ABMK and ABMI are parties to a service agreement. Under the agreement, ABMI agrees to perform certain services for ABMK, including services for human resources, treasury, employee benefits, accounting, insurance, administration, real estate, information technology, safety, marketing and legal assistance. (Cummins Aff. Ex. 34, Docket No. 224; Mrachek Aff. Ex. 31, Docket No. 169.) In exchange, ABMK pays ABMI one percent of its annual revenue, and pays for the employee benefits, insurance, electronic services, and safety services it receives. (Cummins Aff. Ex. 34, Docket No. 224; Mrachek Aff. Ex. 31, Docket No. 169.) Plaintiffs contend that the functions that ABMI performs for ABMK demonstrate that ABMI and ABMK share operations and that evidence of ABMI's name on ABMK's documents, including insurance claims, establishes interrelation between operations. (Cummins Aff. Ex. 46, Docket No. 224.) Taking facts in a light most favorable to

defendants, however, a reasonable fact-finder could conclude that ABMI does not share these operations with ABMK, but rather performs them independently for charge, similar to an independent contractor. Thus, a genuine issue of material fact exists regarding the extent to which ABMK and ABMI share operational functions.

### 2. Common Management

"The degree to which the entities share common management includes whether the same individuals manage or supervise the different entities or whether the entities have common officers and boards of directors." *Sandoval II*, 578 F.3d at 793.

Plaintiffs cite ABMI's corporate filings, which show ABMI and ABMK have the same Chief Executive Officer, Chief Financial Officer, Treasurer, Secretary, Vice President of Finance, Auditors and Accountants, Bond and Insurance Signatories, Principal Place of Business, Officer Place of Business, Director Place of Business, Website and Counsel. (Cummins Aff. Exs. 35-37, 39-41, Docket No. 224.) Both ABMK and ABMI's corporate filings with the state of California from 2005-2006 list Henrik C. Slipsager as CEO, Linda S. Auwers as Secretary, and George B. Sundby as CFO. (Cummins Aff. Ex. 35-36, Docket No. 224.) The filings also list the same address for ABMI and ABMK. (*Id.*) ABMI's minute books show that ABMI's Chief Financial Officer and Chief Executive Officer appoint a small group of individuals to direct all of ABMI's subsidiaries, and that all subsidiaries use the same governing instruments. (Cummins Aff. Ex. 37, App. 2505-10, 2520-23, Docket No. 224)

By contrast, ABMI's officers stated that ABMK has its own management and Human Resources departments that are separate from ABMI. (*See, e.g.*, Southard Aff. ¶¶ 4-5, Docket No. 175). Jeffory Southard states that each branch of ABMI, including ABMK, has its own Human Resources Director. (Southard Aff. ¶¶ 4-5, Docket No. 175.) Southard also notes that ABMK makes all decisions regarding its employees in Minnesota, and that ABMI takes no part in these decisions. (*Id.*)

Plaintiffs also argue that the use of ABMI's name on documents related to plaintiffs' employment demonstrates that ABMI shared management with ABMK. (Cummins Aff. Exs. 4, 10-12, 14, 15, 46, Docket No. 224.) For example, a state court proceeding regarding original plaintiff Hernandez lists "ABM Industries, Inc." as her employer, (Cummins Aff. Ex. 4, Docket No. 223), and plaintiffs' pay stubs list "ABM Janitorial Services" as their employer, (*id.* Ex. 5). Other documents identify ABMI as the employer of plaintiffs' alleged harassers. (*See id.* Exs. 10-12, 15.) Defendants contend that such uses of ABMI's name do not demonstrate that ABMI was in fact operating or issuing those documents, and that uses of ABMI's name usually reference American Building Maintenance Janitorial Services ("ABMJS"), which is a subsidiary of ABMI. (Defs.' Resp. to Pls.' Mot. for Summ. J. at 12, Docket No. 237.)

Viewing the facts in a light most favorable to defendants, the Court finds that a reasonable fact-finder could conclude that ABMI and ABMK do not share common management.

### 3.    Centralized Control of Labor Relations

The Court also considers "the extent to which there is a centralized source of authority for development of personnel policy, maintenance of personal records, human resources, and employment decisions." *Sandoval II*, 578 F.3d at 793.

Defendants argue that this factor is the most important, and that to demonstrate centralized control, plaintiffs must adduce evidence that ABMI controls the "day-to-day employment decisions" of ABMK. (Defs.' Resp. to Pls.' Mot. for Summ. J. at 10, Docket No. 237 (citing *Romano v. U-Haul Int'l*, 233 F.3d 655, 666 (1st Cir. 2000)).) The Eighth Circuit has not held, however, that plaintiffs must show a parent company controlled "day-to-day employment decisions" to establish centralized control of labor relations. *Cf. Sandoval II*, 578 F.3d at 796. But even under the more general standard, there is a genuine issue of material fact as to whether ABMI was the centralized source of authority for labor relations decisions.

Plaintiffs claim that ABMI handles hiring, employee legal claims, information systems, collective bargaining, and the administration of the employee benefits program for ABMK. (Cummins Aff. Exs. 4, 7, 12; Ex. 14, App. 2306-22; Exs. 16-33; Ex. 34 ¶ 1.4-1.7, 1.9; Ex. 48; Ex. 50 at 33; Ex. 58 at 96-97, 105-07; Ex. 62, at 66-70, 137-45, Docket No. 224)   A collective bargaining agreement lists "American Building Maintenance" as a participating company, (*id.* Ex. 7), "ABM Industries Incorporated" is at the bottom of every page in the "Participant's Workbook" accompanying a sexual harassment "Field Guide", (*id.* Ex. 14), and insurance forms list "ABM Industries Incorporated" as plaintiff Hernandez's employer, (*id.* Ex. 16). There is also evidence that

ABMI directly managed certain employee functions relating to sexual harassment training. (*See, e.g.*, *id.* Exs. 20-24).

Defendants cite ABMK and ABMI managers' depositions to show that ABMK has its own independent Human Resources Department, through which it makes all decisions regarding employees, keeps the payroll, corresponds with the Minnesota Department of Employment and Economic Development and the Minnesota Department of Revenue, and participates in collective bargaining agreements. (Robbins Aff. Docket No. 238, Southard Dep. Tr. 242-243; Mrachek Aff. Exs. 3, 18, 24, Docket No. 169.) Defendants note that ABMK has its own job application, affirmative action program, field guide for personnel, and policies for unlawful harassment, safety, sexual harassment, and employee vehicle safety. (Mrachek Aff. Exs. 4-5, 7-8, 27-30, Docket No. 169; Robbins Aff. Docket No. 238, Mork Dep. Tr. 59-62, 130-32, 279-80.)

With regard to sexual harassment claims, plaintiffs submit evidence of communication between ABMK's Human Resources Contact and an ABM Corporate Human Resources Contact to show that ABMI "actively participates" in investigating sexual harassment reports at ABMK. (Cummins Aff. Ex. 29, Docket No. 224.) On the other hand, ABMI's General Counsel states that ABMK performs the investigations and that ABMI is not involved unless ABMK seeks advice from ABMI. (Miller Aff. ¶ 9, Docket No. 178.) ABMK's Human Resources Contact states that ABMK performs its own sexual harassment trainings. (Mork Dep. Tr. 61-64, 67-70, 76.)

Viewing the facts in a light most favorable to defendants, a reasonable trier of fact could conclude that ABMK controls its own employment policies, procedures, practices,

and investigations of sexual harassment reports. Thus, there are genuine issues of material fact as to whether ABMI provides a centralized source of authority for labor relations matters.

### 4. Common Ownership

In evaluating the degree of common ownership, the Court considers whether one company owns the majority or all of shares of the other company and whether the entities share common officers or directors. *Sandoval II*, 578 F.3d at 793.

The parties do not dispute that ABMI owns all shares of ABMK's stock. (Miller Aff. ¶ 3-4, Docket No. 178; Cummins Aff. Ex. 37, Docket No. 224.) The parties dispute, however, whether ABMI manages ABMK's finances. Plaintiffs claim that ABMI handles ABMK's treasury, employee benefits, insurance and accounting functions, (Cummins Aff. Ex. 37, Docket No. 224), while ABMI claims that its finances are not "commingled" with ABMK's finances, (Miller Aff. ¶ 12, Docket No. 178). Even viewing those facts in a light most favorable to defendants, the Court is not persuaded that there is a genuine fact dispute regarding the degree of common ownership in these circumstances. The existence of this factor, alone, does not entitle plaintiffs to summary judgment.

For the reasons set forth above, the Court denies plaintiffs' motion for summary judgment regarding whether ABMI and ABMK are an integrated enterprise.

## III.  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants filed a motion for summary judgment on the original plaintiffs' claims for sexual harassment, sex discrimination, and retaliation. Defendants also moved for summary judgment on Laureano's and Giron's hostile work environment claims, which the Eighth Circuit remanded.

The Court first considers plaintiffs' *quid pro quo* sexual harassment and hostile work environment claims. The Court discusses common facts supporting those claims and then turns to the merits of the parties' arguments. Second, the Court considers defendants' motion as it relates to plaintiffs' retaliation claims. Third, the Court addresses defendants' motion for summary judgment on plaintiffs' sex discrimination claims.

### A.  Sexual Harassment Claims

#### 1.  Background

Plaintiffs are all ABMK employees and work at various ABMK worksites as cleaners. ABMK has at least 2,800 worksites in the Minneapolis branch, and 300 accounts. (Ketchum Dep. Tr. 48, 96.) As discussed in *Sandoval I*, ABMK has implemented an extensive sexual harassment policy and has taken measures to apprise its employees of that policy through a variety of media: The ABM Janitorial Services Employee Handbook ("Employee Handbook"), The ABM Janitorial Services General Work Rules ("Work Rules"), and the Unlawful Harassment Policy. 552 F. Supp. 2d at 899-900. ABMK also provided employees with access to a "Harassment Hotline," which

has a toll-free number that "allows ANY employee to report any allegation of sexual harassment, discrimination, retaliation, theft, or any safety concern that occurs in the workplace or any harassment by a third party." *Id.* at 900 (internal quotation marks and emphasis omitted). The Court incorporates by reference *Sandoval I*'s discussion of ABMK's sexual harassment policies and training. *Id.* at 899-900; *cf. Sandoval II*, 578 F.3d at 801 (noting ABMK's "extensive anti-harassment policy and procedures").

### a. Francisca Sandoval

Francisca Sandoval claims that her on-site supervisor at ABMK's Valspar worksite, Daniel Gonzalez, sexually harassed her beginning in November 2004. In one instance, Sandoval testified that Gonzalez approached her in a conference room at a cleaning site and told Sandoval he loved her. (Sandoval Dep. Tr. 225.) Gonzalez then attempted to hug her and put his hand inside her shirt. (*Id.* 225-26.) When Sandoval attempted to run away, Gonzalez caught up with her and again put his hand inside her shirt and touched her breast. (*Id.*) In another incident, Sandoval testified that Gonzalez approached her at the Valspar worksite. Sandoval testified:

> [Gonzalez] pushed me on the bed as well. I tried to get up. He also threw himself on top of me. I pushed him. I told him to get off of me. He wouldn't listen to me. He wanted to kiss me. The only thing I could do was to move my head and to try to get him off of me. I tried to get loose from him.

(*Id.* 246.) Sandoval testified that between November 2004 and December 2005, Gonzalez told Sandoval he loved her three to five times. (*Id.* 215-17.) Sandoval testified that Gonzalez made comments about buying lingerie for her, looked at her in a manner

she thought was inappropriate six times, made sexual comments to her approximately ten times, and tried to kiss her "once [or] twice a week." (*Id.* 263-64, 334.) Sandoval testified that she did not immediately report the sexual harassment because she was afraid and embarrassed, did not think anyone would believe her, and did not want her husband to find out. (*Id.* 235-37.)

On August 12, 2005, Sandoval first reported Gonzalez's alleged harassment to ABMK. (*Id.* 276-77.) Sandoval, her husband, and ABMK Human Resources Director Julie Mork met at ABMK's offices and told Mork about some of the incidents of harassment. (*Id.* 282-84.) Sandoval did not disclose all of the incidents of harassment, however, because her husband was in the room. (*Id.*) After the meeting, ABMK immediately suspended Gonzalez for three days and began an investigation into his conduct. (Mork Decl. ¶¶ 15-18, Docket No. 179; Cummins Aff. Ex. 52, Docket No. 233.) ABMK was unable to substantiate Sandoval's harassment allegations, in part because ABMK's records showed that Gonzalez was not working on a date on which Gonzalez allegedly harassed her. (Mork Decl. ¶ 15, Docket No. 179.) On August 17, 2005, at Sandoval's request, ABMK transferred Sandoval to a different worksite. (*Id.* ¶ 17.) Sandoval testified she has not experienced any harassment, retaliation, or discrimination since her transfer. (Sandoval Dep. Tr. 299-301.)

### b.    Ines Hernandez

Ines Hernandez's sexual harassment allegations arise out of incidents that took place in 2004 and 2005 at ABMK's Park Nicollet worksite. Hernandez testified that in

July 2004, Felix Olivar approached her and told her about a burn on his genitals, and Hernandez believed that Olivar was going to attempt to expose himself to her. (Hernandez Dep. Tr. 206-07.)  Hernandez testified that on one occasion in August 2004, while Hernandez was vacuuming her assigned floor, Olivar slapped her on the buttocks. (*Id*. 191)  After she told him to stop, he laughed and left.  (*Id*.)  Hernandez testified that Olivar slapped her on the buttocks on a second occasion during August or September of 2004.  (*Id*. 194.)  Hernandez testified that in September 2004, Olivar joined her in an elevator she was riding to go to a floor where she would be cleaning,.  (*Id*. 198.)  Hernandez states that Olivar slapped her between her legs "almost groping [her] with his slap down there," and started laughing.  (*Id*.)  Hernandez told him to stop, but did not tell anyone about the incident that night because she was embarrassed.  (*Id*.)

After the encounter with Olivar in the elevator, Hernandez met with Osvaldo Arce, a project manager at the Park Nicollet worksite, and Olivar to report Olivar's behavior. (*Id*. 234-35; McCoy Aff. ¶ 4, Docket No. 174.)  Arce told Hernandez that she was "misinterpreting things," but later said that Olivar's actions were "rude."  (Hernandez Dep. Tr. 234-37.)  Arce told Hernandez he would talk to Olivar separately, but he was not going to file a report.  (*Id*. 239.)

Hernandez also testified that Olivar made sexual comments to her approximately once a week.  (*Id*. 458.)  For example, Olivar told her that her husband was "so lucky he gets to enjoy [her] as much as he wants," which Hernandez understood to mean that her "husband was lucky because he was having sex with [her]."  (*Id*. 214-15, 231.) Hernandez testified that Olivar stated her husband would "have something to grab,"

which she interpreted to mean that she "ha[d] a big ass." (*Id*. 216.) Hernandez also testified that Olivar told her that "[her] husband was going to sleep warm," which she understood to mean that Olivar wanted to be in her husband's place. (*Id*. 217-18.)

Hernandez also complains of harassment by other ABMK employees. She testified that an employee named "Reyes" told her approximately ten times that "he liked the way [she] dressed and that he liked [her] body." (*Id*. 275.) Hernandez testified that Reyes grabbed her hand and would not let go for five or ten minutes, though she tried to pull away. (*Id*. 272-74.) On another occasion Reyes would not let her through a doorway for about twenty minutes. (*Id*.) Hernandez testified that in July 2004, she complained to Arce that another employee, Eric Ortiz, gave her multiple gifts, which made Hernandez think her co-workers were "betting" or vying for her attention. (*Id*. 296-97, 301.) Hernandez testified that in November or December 2004, an employee named "Cesar" "made a sexual advance," which she reported to Arce. (*Id*. 288-89.)

In April 2005, Hernandez met with ABMK Human Resources Director Mork, Park Nicollet account manager Michelle McCoy, and two union leaders. (*Id*. 463; Morillo-Alicea Aff. ¶¶ 2-3, Cummins Aff. Ex. 50, Docket No. 183.) At the meeting, Hernandez reported Olivar's behavior. (Hernandez Dep. Tr. 239-40.) ABMK assured Hernandez that she would no longer have contact with Olivar, and that they would begin an investigation. (Morillo-Alicea Aff. ¶ 2, Cummins Aff. Ex. 50, Docket No. 183.) ABMK suspended Olivar for three days while they conducted the investigation. (Hernandez Dep. Tr. 246-47; Arce Dep. Tr. 119-20.) On May 11, Mork notified Olivar that although ABMK's investigation had been inconclusive, ABMK was transferring

Olivar to a different building to avoid further problems.  (Cummins Aff. Ex. 129, Docket No. 233.)  ABMK transferred Olivar to another building, (Arce Dep. Tr. 118-19), and in June 2005, ABMK transferred Hernandez to a position at a different location with similar pay.  (Hernandez Dep. Tr. 264 & Dep. Ex. 2.)

### c.      Miriam Pacheco

Pacheco began working for ABMK at the Meridian Crossings worksite in August 2002.  (Pacheco Dep. Tr. 177.)  Pacheco testified that in September 2002, her on-site supervisor Miguel Vidal began pressuring Pacheco to have sex with him, offering her money in exchange for sexual favors and threatening to fire her if she refused.  (*Id*. 172-75, 178.)  Pacheco initially refused Vidal's advances.  (*Id*. 178.)  Pacheco testified that on one occasion, Vidal asked Pacheco to join him in the conference room, began to talk to her romantically, and threatened that she would lose her job if she would not have sex with him.  (*Id*. 182-84.)  Pacheco refused, but did not physically resist when Vidal had sex with her because she was afraid of him.  (*Id*.)  Pacheco did not tell anyone about the incident, and did not tell Meridian Crossings project manager Scott Martin because she was afraid she would get in trouble or lose her job.  (*Id*. 188-89, 194.)  Pacheco testified that a few weeks later, Vidal took her into the conference room and had sex with her again, (*id*. 195), and that they had sex a third time in the last week of September 2002, (*id*. 201-02).  After the third time, Pacheco told Vidal that she would not have sex with him anymore and that, "if he wanted to fire [her], that he could."  (*Id.* 202.)  Pacheco

testified that after the final incident Vidal stopped pressuring her to have sex with him. (*Id.* 210.)

Pacheco continued working at ABMK with Vidal through April 2003, when she left ABMK to give birth. (*Id.* 250-52.) In July 2004, Pacheco reapplied to ABMK, and requested an assignment to the Meridian Crossings worksite. (*Id*. 234-37, 269.) Pacheco testified that in 2005, Vidal again made suggestive comments about her breasts and told Pacheco he "wanted" her. (*Id*. 336-42, 396-98.) Pacheco did not report Vidal's behavior in part because she was friends with Vidal's wife and did not want ABMK to fire Vidal. (Pacheco Dep. Tr. 189-90, 367-70.)

Pacheco testified that on August 22, 2005, Vidal asked her for sex, and on August 23 she reported the incident to the union. (*Id*. 264-65, 398-99, 418-28.) On September 26, 2005, Pacheco filed an official complaint with ABMK management. (*Id*. 420-21.) On October 10, 2005, Mork notified Pacheco by letter that ABMK had concluded its investigation of her claims against Vidal and suspended Vidal for three days, but noted that the findings of the investigation were inconclusive. (Cummins Aff. Ex. 271, Docket No. 183.) ABMK placed Vidal on a 60-day probation and transferred him to work at a St. Cloud worksite. (Vidal Dep. Tr. 72.). Pacheco did not have contact with Vidal after ABMK transferred him. (Pacheco Dep. Tr. 436-37, 449.)[2]

---

[2] Plaintiffs assert that Enrique Amigon, Vidal's brother, made sexual advances toward Pacheco and sang sexually offensive songs around her and other female janitors. (Cummins Aff. Ex. 131, Docket No. 233.) On August 16, 2006, after plaintiffs filed their original complaint, Pacheco made an official complaint to ABMK. (*Id.*) On August 21, 2006, Mork informed

(Footnote continued on next page.)

### d. Eva Reyes

Reyes began working as a cleaner for ABMK at the airport worksite in approximately March 2001. Reyes claims that at the end of 2003, project manager Joe Lozano began to joke about spanking her on the buttocks approximately four times a week. (Reyes Dep. Tr. 328, 407, 590-91.) Reyes testified that she believed Lozano spread a rumor that she had invited Lozano to her apartment when her husband was not there. (*Id.* 294-95.) Reyes also testified that Lozano told her that one of her co-workers was sexually promiscuous. (*Id.* 281, 414.)

Reyes also claims that Juan Flores, an ABMK foreperson, made comments to her that he and Lozano used Viagra. (*Id.* 414.) Reyes testified that she had heard from a co-worker that Flores had told people that she was "going out with a black man," (*id.* 460), and that Flores talked about a co-workers' sexual relations with male ABMK employees, (*id.* 594).

Reyes first notified ABMK of the alleged harassment by Lozano and Flores when she filed a Charge of Discrimination in August 2005. (Reyes Dep., Ex. 58, Robbins Aff. Ex. 5, Docket No. 228; Mork Aff. ¶ 31, Docket No. 179.) ABMK immediately began an investigation, but concluded that Reyes' claims could not be substantiated. (Mork Decl. ¶¶ 31-32, Docket No. 179.) Regardless, ABMK counseled both Lozano and Flores

_____

(Footnote continued.)

Pacheco that the results of its investigation were inconclusive, but that "[i]n response to [her] complaint, [Amigon] . . . was immediately removed from the Meridian Crossings account." (*Id.*)

regarding the company's sexual harassment policies.  (*Id.*)  Lozano's employment with ABMK ended shortly thereafter.  (*Id.*)

### e.  Arminda Gomez

Gomez alleges that Joe Lozano sexually harassed her while she was working at ABMK's airport worksite.  Gomez testified that Lozano told her almost daily that she had a beautiful smile and beautiful hair, often asked her if she was married or had children, and asked her where she bought her pants and how they were fitting.  (Gomez Dep. Tr. 72-74, 83-93, 139-40.)  Gomez testified that Lozano once claimed she had promised to have sex with him and told her he was "ready for [her]," but Lozano became angry when Gomez indicated she was not interested.  (*Id.* 73-74, 166)  Gomez also claims that Lozano called her and her aunt lesbians.  (*Id.* 74, 93-94, 216, 218.)

Initially, Gomez did not notify ABMK about Lozano's conduct.  (Gomez Dep. Tr. 92, 107, 136-38.)  In 2006, members of ABMK's Human Resources Department visited workers at the airport, but Gomez did not inform them that she had any concerns.  (Mork Decl. ¶¶ 27-28, Docket No. 179.)  ABMK first learned of Gomez's harassment allegations when she filed a Charge of Discrimination.  (*Id.*)  Although ABMK investigated and found no evidence corroborating Gomez's allegation, defendants counseled Lozano about his conduct.  (*Id.*)  Lozano's employment with ABMK ended approximately a month later.  (Mork Decl. ¶ 30, Docket No. 179.)  Gomez testified that she has not experienced any behavior she would consider harassment since her report to ABMK.  (Gomez Dep. Tr. 185-87.)

###### f.    Nidia Guerrero

Guerrero's allegations of sexual harassment arise out of her interactions between 2003 and 2005 with Jesus Analco, an ABMK "zone manager" at the Medtronic worksite. Guerrero claims that when she began working for ABMK, Analco "was very kind with [her] . . . more so than with other people or the rest of the people" at her worksite. (Guerrero Dep. Tr. 143.)  Guerrero testified that when Analco became more comfortable, her started telling her that she looked good or looked pretty, that he liked the way she dressed, and that he liked her.  (*Id.* 143, 281.)  Guerrero claims that Analco made those comments "five times on a daily basis."  (*Id.* 282.)  Guerrero also testified that Analco touched her in an offensive manner.  For example, Guerrero testified that five to ten times a week, Analco would sneak up behind Guerrero and hug her while rubbing his genitals against her.  (*Id.* 278, 316.)  Guerrero claims that Analco frequently attempted to kiss her and touch her shoulders or hands.  (*Id.* 278-79.)  Guerrero claims that at one point when Analco and Guerrero were in Analco's car, Analco locked the doors and "confessed his love" to her.  (*Id.* 282.)

In October 2005, ABMK terminated Guerrero's employment as a result of her failure to complete Leave of Absence paperwork in preparation for taking leave from work lasting longer than three days.  (Bonier Aff. ¶ 6, Docket No. 172; Guerrero Dep. Tr. 197-99.)  Guerrero did not report Analco's alleged conduct while employed by ABMK.  (Guerrero Dep. Tr. 133-34, 201.)  ABMK first became aware of Guerrero's allegations five months after ABMK terminated her employment, when Guerrero filed an

EEOC Charge of Discrimination on March 21, 2006. (Mork Decl. ¶ 18, Docket No. 179.) In response to the Charge, ABMK wrote to Guerrero requesting an opportunity to interview her, but Guerrero refused to cooperate. (Mork Decl. ¶ 18, Docket No. 179.) Regardless, ABMK investigated and determined there was no evidence to corroborate Guerrero's claims. (*Id.*) After plaintiffs filed their complaint, plaintiffs provided affidavits from three other individuals claiming the Analco had harassed them. (*Id.* ¶ 19.) After investigating those claims, ABMK offered Analco a transfer to a lower-paying position. (*Id.*) Analco refused, and ABMK terminated his employment. (*Id.*)

### g.    Lucila Marquez

Marquez claims that project managers Saul Ramirez and his brother Ruben Ramirez sexually harassed Marquez while she was working at ABMK's Prairie Lakes Center worksite. Marquez claims that beginning in approximately September 2005, Saul Ramirez began harassing her. Marquez testified that Saul Ramirez propositioned her for sex on multiple occasions and made sexually suggestive comments to her. (Marquez Dep. Tr. 202, 207-08, 221, 227-28 356-57.) Marquez claimed that in one instance, Saul Ramirez "found [her] in the bathroom" and asked her if she would like to have sex with him. (*Id.* 356-57.) Marquez claims that in another instance, Saul Ramirez "touch[ed] himself" and bragged about his ability to sexually satisfy another woman. (*Id.* 227-30.)

Marquez told Ruben Ramirez that Saul Ramirez "was always bothering [her] and telling [her] sexual stuff." (*Id.* 248.) Ruben Ramirez responded by telling Marquez not

to pay attention to Saul Ramirez because "he was crazy." (*Id.*) Marquez testified that Ruben Ramirez also asked her to go out with him or to be his girlfriend. (*Id.* 235-37.)

Marquez did not notify ABMK about the alleged harassment against Saul Ramirez until she contacted the union in February 2006 and the EEOC filed a Charge of Discrimination in March 2006. (Mork Decl. ¶ 20, Docket No. 179; Marquez Dep. Tr. 259-61.) ABMK immediately began an investigation and suspended Saul Ramirez for three days without pay, transferred him to a new worksite, and demoted him. (Mork Decl. ¶ 20, Docket No. 179; Mrachek Aff. Ex. 78, Docket No. 169.) After receiving additional complaints from other co-workers about Saul Ramirez, ABMK terminated his employment. (Mrachek Aff. Ex. 80, Docket No. 169.) ABMK also reprimanded Ruben Ramirez for failing to report what Marquez said about Saul Ramirez. (Mrachek Aff. Ex. 79, Docket No. 169.)

### h.    Maria Perez

Maria Perez alleges that Saul Perez and Selso Romero, lead cleaners, and Doug Hussa, a project manager, sexually harassed her while she was working at ABMK's United Health Group worksite. Maria Perez claimed that on one occasion in October 2003, Saul Perez grabbed her from behind, thrust his genitals against her buttocks, and groped her breasts and genital area. (Maria Perez Dep. Tr. 58-62.) Maria Perez immediately reported the incident to ABMK. (*Id.* 61-63, 67-75.) ABMK contacted her the day after it was notified of the incident. (Mork Decl. ¶ 26, Docket No. 179.) ABMK immediately suspended Saul Perez pending an investigation, and subsequently terminated

his employment as a result of the incident.  (Mrachek Aff. Ex. 58, Docket No. 169.) Maria Perez testified she had no complaints about how ABMK responded "because [Saul Perez] was fired."  (Maria Perez Dep. Tr. 81.)

Maria Perez claims that Saul Perez's replacement, Selso Romero, also sexually harassed her.  Maria Perez testified that on one occasion, Romero walked into a bathroom while she was using the bathroom.  (Maria Perez Dep. Tr. 86.)  Maria Perez testified that she could see Romero's shoes from under the bathroom stall and told him "I already know that it's you, Selso."  (*Id.*)  She told him to leave the bathroom, or she would tell Hussa.  (*Id.*)  Romero said he was checking towels in the bathroom, then left the bathroom after he did so.  (*Id.* 87)  Maria Perez claims that after the bathroom incident, Romero asked her out, but she declined.  (*Id.* 102-03.)  Maria Perez later found a CD with a picture of a naked woman on the cover in her purse.  (*Id.* 122-23.)  Although she could not say with certainty that someone from ABMK had put the CD in her purse, she gave the CD to Hussa.  (*Id.*)  Hussa contacted ABMK's Human Resources department about the incident the next day.  (Hussa Dep. Tr. 160.)  When Maria Perez asked Hussa to return the CD to her so that she could give it to Human Resources, Hussa stated that he had destroyed it.  (Mork Dep. Tr. 267-68.)  Maria Perez testified that after Saul Perez's employment was terminated and after she gave the CD to Hussa, she did not experience harassment again.  (*Id.* 136.)

### i.      Estela Laureano and Marlene Giron

The Court incorporates by reference *Sandoval I*'s discussion of facts relating to Laureano and Giron's sexual harassment claims.  *Sandoval I*, 552 F. Supp. 2d at 903-06.

* * *

Plaintiffs bring *quid pro quo* and hostile work environment sexual harassment claims.  "Both *quid pro quo* and hostile work environment sexual harassment claims are grounded in the same legal theory under Title VII, the former involving an explicit, and the latter a constructive, change in conditions of employment."  *Henthorn v. Capitol Commc'ns, Inc.*, 359 F.3d 1021, 1026 (8th Cir. 2004).  The Court first addresses plaintiffs' *quid pro quo* sexual harassment claims and concludes that the original plaintiffs' alleged harassers did not have supervisory authority for the purposes of Title VII and the MHRA.  Defendants therefore are not vicariously liable for the alleged harassers' actions under a theory of *quid pro quo* sexual harassment.  The Court then turns to plaintiffs' hostile work environment claims.  Plaintiffs have not adduced adequate evidence demonstrating that ABMK had actual or constructive notice of plaintiffs' allegedly hostile work environments and failed to take prompt and effective remedial action.  For the reasons that follow, the Court grants defendants' motion for summary judgment on plaintiffs' sexual harassment claims.

### 2.      *Quid Pro Quo* **Sexual Harassment**

Plaintiffs allege that ABMK's policies and practices constitute *quid pro quo* sexual harassment in violation of 42 U.S.C. § 2000e-2(a)(1) and the MHRA, *see* Minn.

Stat. § 363A.08 subd. 2, "by making submission to unwelcome sexual advances and other sexual conduct and statements among the terms and conditions of employment and by using submission to, or rejection of, such sexual conduct and statements as a factor in Defendant[s'] decisions about employment opportunities for Plaintiffs." (Am. Compl. ¶ 295, Docket No. 25.) To establish a claim for *quid pro quo* sexual harassment a plaintiff

> must show that (1) she was a member of a protected class; (2) she was subjected to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors; (3) the harassment was based on sex; and (4) her submission to the unwelcome advances was an express or implied condition for receiving job benefits or her refusal to submit resulted in a tangible job detriment.

*Cram v. Lamson & Sessions Co.*, 49 F.3d 466, 473 (8th Cir. 1995). "Sexual harassment is quid pro quo if a tangible employment action follows the employee's refusals to submit to a supervisor's sexual demands." *Henthorn*, 359 F.3d at 1026-27 (citations omitted). For the purposes of Title VII, a supervisor is an individual who has the power "to take tangible employment action against the victim, such as the authority to hire, fire, promote, or reassign to significantly different duties." *Joens v. John Morrell & Co.*, 354 F.3d 938, 940 (8th Cir. 2004). An employer is not liable for *quid pro quo* sexual harassment based on the actions of an individual with apparent authority, but who is not a supervisor. *See Todd v. Ortho Biotech, Inc.*, 175 F.3d 595, 598 (8th Cir. 1999); *see also Weyers v. Lear Operations Corp.*, 359 F.3d 1049, 1057 n.7 (8th Cir. 2004). That is, the alleged harasser must have "**actual authority** to make a significant change in employee

status or make economic decisions affecting employees." *Sandoval I*, 552 F. Supp. 2d at 895 (emphasis added).

In *Sandoval I*, the district court concluded that the timely plaintiffs' accused harassers were not supervisors for Title VII purposes, and granted AMBK's motion for summary judgment on Garcia, Laureano, and Giron's *quid pro quo* sexual harassment claims. *Sandoval I*, 552 F. Supp. 2d at 893-99. The Eighth Circuit affirmed, holding that the district court "properly concluded [that Garcia, Laureano, and Giron's] supervisors were not authorized to take adverse employment actions against them, and thus ABMK was not liable under a theory of quid pro quo harassment." *Sandoval II*, 578 F.3d at 801.

On remand, defendants argue that the original plaintiffs' claims for *quid pro quo* sexual harassment cannot survive summary judgment because their alleged harassers did not have the authority to take tangible employment action against plaintiffs and therefore were not supervisors under Title VII. The Court agrees. The record demonstrates that the original plaintiffs' accused harassers did not have supervisory authority, and summary judgment for ABMK is appropriate on the original plaintiffs' *quid pro quo* sexual harassment claims.

### a. Francisca Sandoval

Sandoval alleges that her on-site supervisor at the Valspar site, Daniel Gonzalez, made unwelcome sexual advances toward her, including pushing her onto a bed and attempting to kiss her. Gonzalez was a non-exempt "supervisor" and "project manager." (Balfe Aff. ¶ 8, Docket No. 170; *see also* Cummins Aff. Ex. 133, Docket No. 233.) With

regard to his work duties, Gonzalez testified he was responsible for cleaning buildings and supervising other employees, including assigning cleaners to different areas of the facility, but that he could not determine which days of the week employees worked or what hours they were going to work. (Gonzalez Dep. Tr. 39-42.) Gonzales testified that he could issue warnings if an employee was late to work, but Gonzales' manager made decisions about suspension or other disciplinary decisions. (Gonzales Dep. Tr. 40-41, 51.) Mike Balfe, an operations manager for ABMK, stated that Gonzalez did not have authority to take disciplinary action resulting in an adverse employment action such as a demotion, reduction in pay, or termination. (Balfe Aff. ¶¶ 8-9, Docket No. 170.)

Gonzalez's testimony suggests that he may have had the authority to hire an employee. During Gonzalez's deposition, plaintiffs' counsel produced a document describing the duties of a project manager. Addressing each bullet point in the list of possible duties, plaintiffs' counsel asked Gonzalez if he "hires, supervises, motivates, disciplines, and directs all staff personally or through subordinate supervisors," to which Gonzales responded, "Yes." (Gonzales Dep. Tr. 36 ("Q: The next bullet point is: hires, supervises, motivates, disciplines, and directs all staff personally or through subordinate supervisors. Is that a duty or responsibility of yours? A. Yes.").) By contrast, defendants cite a document titled "Position Description," which lists a project manager's duties as "[m]anage the supervisors and be responsible for the ABM operations at a specific site, direct and supervise scheduling of work load adjustment with the Supervisor, Foremen utility crew and janitors . . . Supervision – carry out disciplinary action as needed." (Mrachek Aff. Ex. 14, Docket No. 169.) ABMK Human Resources

Director Julie Mork stated that ABMK has never used the position description used by plaintiffs' counsel at Gonzalez's deposition. (Mork Decl. ¶ 34, Docket No. 179.) Balfe also noted he had never seen the job description provided by plaintiffs. (Balfe Aff. ¶ 15, Docket No. 170.)

Regardless of whether there is appropriate foundation for the project manager position description provided by plaintiffs, the Court concludes that Gonzalez's deposition testimony does not create a genuine issue of material fact that Gonzalez was a supervisor for the purposes of Title VII and the MHRA. Gonzalez's testimony amounts to no more than a "scintilla" of evidence tending to show he was a supervisor. *See Liberty Lobby*, 477 U.S. at 252. Rather, the evidence demonstrates that Gonzalez's work duties were substantially limited to performing his own work and supervising other employees' cleaning work. *See Merritt v. Albemarle Corp.*, 496 F.3d 880, 883 (8th Cir. 2007) ("The fact that an alleged harasser may have been a team leader with the authority to assign employees to particular tasks will not be enough to make that person a supervisor." (internal quotation marks omitted)). Gonzalez could not discipline, demote, or fire employees. To the extent Gonzales testified that part of his job duties was to "hire" staff, in the Court's view, a reasonable trier of fact could not find from the evidence presented that Gonzalez was a supervisor under Title VII. The Court grants defendants' motion for summary judgment on Sandoval's *quid pro quo* sexual harassment claim. *Cf. Sandoval I*, 552 F. Supp. 2d at 897-98 (concluding that Francisco Martinez, a "project manager," was not a supervisor).

### b. Ines Hernandez[3]

Hernandez alleges that Felix Olivar sexually harassed her and that she reported Olivar's behavior to Osvaldo Arce, a project manager. (Hernandez Dep. Tr. 191-221.) Olivar was responsible for passing out keys, turning off lights, and securing buildings at the end of a shift. (McCoy Aff. ¶ 6, Docket No. 174; Olivar Dep. Tr. 68.) Olivar testified that if another cleaner did not do a job properly, he instructed the cleaner to "clean a little better." (Olivar Dep. Tr. 44.) Olivar stated that he never gave an employee a "verbal warning." (*Id.* 45.) Michelle McCoy, the Prairie Lakes Center worksite account manager, stated that Olivar did not have the authority to hire, fire, discipline, or reassign an employee to significantly different duties. (McCoy Aff. ¶¶ 2, 6-7, Docket No. 174; *see also* Olivar Dep. Tr. 44-45, 68, 70, 83.)

Arce, a "non-exempt project manager," was responsible for inspecting other employees' cleaning work. (McCoy Aff. ¶ 4, Docket No. 174.) If Arce determined that an assignment was not completed properly, he could discuss the issue with the assigned cleaner, do it himself, or notify his supervisor. (*Id.*) Arce, however, did not have authority to "issue disciplinary action that could result in adverse employment action such as a demotion or termination or reduction in pay or hours." (*Id.* ¶¶ 4-5.)

Given the above facts, no reasonable fact-finder could find that Olivar or Arce had actual authority to take tangible employment action against Hernandez or any other

---

[3] Defendants argue that Hernandez's sexual harassment and sex discrimination claims are time-barred. Because the Court concludes that Hernandez's sexual harassment and sex discrimination claims fail on the merits, the Court does not address defendants' timeliness arguments.

employee. Plaintiffs have produced no evidence that Olivar or Arce had authority to hire, fire, promote, or reassign employees to significantly different duties. As a result, Olivar and Arce were not supervisors for the purposes of Hernandez's *quid pro quo* sexual harassment claim and the Court grants defendants' motion for summary judgment on that claim.

### c.      Miriam Pacheco

Pacheco claims that Miguel Vidal, a non-exempt "foreperson" at the Meridian Crossings worksite, sexually harassed her. Vidal had duties similar to "a utility worker or a general cleaner." (Balfe Aff. ¶¶ 4-5, Docket No. 170.) Although Vidal was assigned to inspect the work of others, he did not have authority to issue disciplinary action that could result in adverse employment actions. (*Id.*) Vidal testified that if he had an issue with a cleaner's performance, he "would report it to a project manager," but that he did not have the power to fire cleaners or impose any other disciplinary actions. (Vidal Dep. Tr. 118.) Based on those facts, a reasonable trier of fact could not find that Vidal was a supervisor for the purposes of Title VII or the MHRA, and the Court accordingly grants defendants' motion for summary judgment on Pacheco's *quid pro quo* sexual harassment claim.

### d.      Eva Reyes

Reyes alleges that Joe Lozano sexually harassed her at ABMK's airport worksite. Reyes alleges that another supervisor, Juan Flores, made inappropriate remarks about her. Lozano was a "non-exempt project manager" at the airport, and he was assigned duties of

a general cleaner, but was also responsible for inspecting the work of others. (Hunter Aff. ¶ 3, Docket No. 173.) If Lozano determined that a cleaner did not complete a job, he could ask the cleaner to re-clean, do the work himself, or notify his supervisor. (*Id.*) Lozano did not have the authority to take disciplinary action or otherwise impose employment action such as a demotion, termination, or reduction in pay or hours. (*Id.*) Flores was a "foreperson" at the airport during the time period relevant to Reyes' claims. (*Id.* ¶ 5.) Flores was responsible for cleaning and also assisted Lozano with the inspection of other cleaners' work. (*Id.*) Thomas Hunter, an ABMK operations manager at the airport, stated that like Lozano, Flores did not have the authority to hire, fire, demote, promote or take any other significant adverse employment action against those he "supervised." (*Id.*)

On the above set of facts, the Court concludes that no reasonable fact-finder could find that Lozano or Flores were supervisors for the purposes of Title VII or the MHRA. Accordingly, the Court grants defendants' motion for summary judgment on Reyes' *quid pro quo* sexual harassment claim.

### e. Arminda Gomez

Gomez also alleges that Joe Lozano sexually harassed her at ABMK's airport worksite. For the reasons discussed above regarding Reyes' *quid pro quo* sexual harassment claim, a reasonable fact-finder could not find that Lozano had supervisory authority, and the Court grants defendants' motion for summary judgment on Gomez's *quid pro quo* sexual harassment claim.

### f.    Nidia Guerrero

Guerrero alleges that Jesus Analco sexually harassed her at ABMK's Medtronic worksite.  Analco was a "zone manager" responsible for cleaning the "clean rooms" at Medtronic, which requires special training, and for inspecting other areas to ensure that they were properly cleaned.  (Bonier Aff. ¶ 3, Docket No. 172; Analco Dep. Tr. 43-44.) If Analco determined that an area was not properly cleaned he could discuss the deficiency with the cleaner, clean the area himself, or notify his supervisor.  (Bonier Aff. ¶ 4, Docket No. 172.)  Analco testified that he did not handle scheduling issues or workload changes for the employees he supervised.  (Analco Dep. Tr. 84.)  Analco did not have the authority to hire, fire, promote, or demote cleaners; to adjust an employee's schedule or pay rate or benefits; or to make economic decisions affecting the terms or conditions of any employee's employment.  (Bonier Aff. ¶ 3, Docket No. 172; Analco Dep. Tr. 99-105.)

Even viewing the facts in a light most favorable to plaintiffs, a reasonable fact-finder could not find that Analco was a supervisor for the purposes of Title VII or the MHRA.  Accordingly, the Court grants defendants' motion for summary judgment on Guerrero's *quid pro quo* sexual harassment claim.

### g.    Lucila Marquez

Marquez alleges that Saul Ramirez and his brother, Ruben Ramirez, sexually harassed Marquez at ABMK's Prairie Lakes Center worksite.  Saul Ramirez had duties similar to a utility worker or general cleaner, but was also responsible for inspecting the

work of other cleaners.  (Wheeler Aff. ¶ 2, Docket No. 177.)  If Saul Ramirez determined that a cleaner did not clean properly, he could complete the job himself or report the deficiency to his supervisor, Dick Nylander.  (*Id.*)  Saul Ramirez did not have the authority to hire, fire, promote, demote, or impose any tangible employment action on employees.  (*Id.* ¶¶ 2-3.)  Ruben Ramirez was a "lead" who was responsible in part for managing a small budget relating to costs for the cleaning project to which he was assigned, for assigning some cleaning projects to certain cleaners, and for inspecting their work.  (Ruben Ramirez Dep. Tr. 63-82, 132-33.)  Ruben Ramirez testified that he could not give part-time employees extra hours without first consulting his supervisor, and that he did not have the authority to suspend, terminate, or impose any other disciplinary action on employees.  (*Id.* 69, 132-33.)

Based on those facts, a reasonable fact-finder could not find that Saul Ramirez or Ruben Ramirez were supervisors for the purposes of Title VII and the MHRA and the Court grants defendants' motion for summary judgment on Marquez's claims.

### h.     Maria Perez

Maria Perez alleges that Saul Perez, Selso Romero, and Douglas Hussa sexually harassed her while she was working at ABMK's United Health Group worksite.  United Health Group account manager Jason Bergdahl stated that Saul Perez and Selso Romero were both "lead cleaners" who did not have authority to "hire, fire, demote, promote, discipline, reassign an employee to significantly different duties," or otherwise take

adverse employment action against other employees. (Bergdahl Aff. ¶¶ 5-6, Docket No. 171.)

Hussa was a project manager. (Bergdahl Aff. ¶ 4, Docket No. 171.) Hussa occasionally conducted safety or sexual harassment trainings with the employees that he supervised. (Huss Dep. Tr. 26, 37.) Hussa testified that when he believed an employee should be disciplined, he would make a recommendation to his supervisor. (*Id.* at 57-58.) Hussa testified that he occasionally granted employees' requests to come to work a half hour late or a half hour early and that he occasionally granted employees the opportunity to work overtime to compensate for staffing shortages. (*Id.* 61-62, 71.) Hussa stated, however, that he did not have the ability to terminate employees. (*Id.* at 75.)

Given those facts, a reasonable fact-finder could not find that Saul Perez, Selso Romero, or Douglas Hussa had supervisory authority under Title VII and the MHRA. In particular, Hussa's broader discretion in giving employees extra hours to make up for staffing shortages or in granting employees' requests for minor scheduling changes do not constitute a power to reassign employees to significantly greater duties or take other tangible employment action. The Court thus grants defendants' motion for summary judgment on Maria Perez's *quid pro quo* sexual harassment claims.

\* \* \*

In sum, plaintiffs have not adduced evidence creating a genuine fact dispute that plaintiffs' accused harassers had authority to take tangible employments action against them, and no reasonable fact-finder could find that the harassers were supervisors for the

purposes of Title VII and the MHRA.[4]  As a result, the Court grants defendants' motion

for summary judgment on the original plaintiffs' *quid pro quo* sexual harassment claims.[5]

### 3.    Hostile Work Environment

Plaintiffs allege that ABMK's policies and practices create and maintain a hostile

work environment by subjecting plaintiffs "to unwelcome conduct and statements based

on sex that are objectively and subjectively offensive and are so severe and pervasive as

to alter materially the terms and conditions of employment."  (Am. Compl. ¶ 296, Docket

---

[4] Defendants argue that they are entitled to the *Ellerth/Faragher* affirmative defense under *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).  Because the Court concludes that plaintiffs' alleged harassers were not supervisors under Title VII or the MHRA, the Court does not address the parties' arguments relating to the *Ellerth/Farragher* affirmative defense.  *Cf. Gordon v. Shafer Contracting Co.*, 469 F.3d 1191, 1195 (8th Cir.  2006) ("Shafer is vicariously liable for harassment by its **supervisory personnel** unless it can establish that (1) Shafer exercised reasonable care to prevent and promptly correct any harassing behavior; and (2) Gordon unreasonably failed to take advantage of the preventive or corrective opportunities provided by Shafer." (emphasis added)).

[5] In the Court's view, defendants' motion for summary judgment on plaintiffs' *quid pro quo* sexual harassment claims does not present a particularly close call, especially in light of the district court's analysis of similar circumstances in *Sandoval I, see* 552 F. Supp. 2d at 893-98, and the Eighth Circuit's decision affirming the district court's conclusions, *see Sandoval II*, 578 F.3d at 800.  The Court has thoroughly reviewed the record and independently assessed the merits of the original plaintiffs' claims, but notes that plaintiffs' briefing offers little direction in pointing the Court to evidence demonstrating fact disputes pertinent to the alleged harassers' supervisory authority.  Plaintiffs' post-remand briefing does not address these arguments, instead referring the Court to plaintiffs' pre-remand opposition brief.  (*See* Pls.' Mem. in Opp'n to Mot. for Summ. J. at 46, Docket No. 232.)  That brief asserts that "[t]he deposition testimony of Plaintiffs' sexual harassers and the business records corresponding to those employees further confirms that they have supervisory authority."  (Pls.' Mem. in Opp'n to Mot. for Summ. J. at 70, Docket No. 182.)  Plaintiffs then provide a string cite of almost incomprehensible numbers – an amalgam of exhibits numbers and page numbers – without distinguishing which citations apply to the individual plaintiffs.  (*See id.*)  Plaintiffs' rely on a similar citation strategy in discussing whether ABMK took tangible employment action against plaintiffs, (*id.* at 64), and in addressing other key fact issues at summary judgment.

No. 25.) Plaintiffs contend that ABMK had actual or constructive notice of the harassment. (*Id.*)

Plaintiffs may prove sexual harassment by demonstrating that inappropriate conduct creates a "hostile work environment." *See* 29 C.F.R. § 1604.11(a)(3). Plaintiffs must establish that "1) they are members of a protected group, 2) they were subjected to unwelcome sexual harassment, 3) the harassment was based on sex, and 4) the harassment affected a term, condition or privilege of their employment." *Sandoval II*, 578 F.3d at 801. "To establish a prima facie case of hostile work environment sexual harassment by non-supervisory co-workers, [plaintiffs] must also establish [defendants] knew or should have known of the harassment and failed to take prompt remedial action." *Id.*; *see also Gordon v. Shafer Contracting Co., Inc.*, 469 F.3d 1191, 1195 (8th Cir. 2006); *Meriwether v. Caraustar Packaging Co.*, 326 F.3d 990, 993 (8th Cir. 2003). As stated by the Eighth Circuit:

> The fourth element involves both objective and subjective components. The harassment must be severe or pervasive enough to create an objectively hostile or abusive work environment and the victim must subjectively believe her working conditions have been altered. There is no bright line between sexual harassment and merely unpleasant conduct. . . . Accordingly, we view the 'totality of the circumstances' in determining whether there is a hostile work environment. The factors we look to include the frequency of the behavior, its severity, whether physical threats are involved, and whether the behavior interferes with a plaintiff's performance on the job.

*Sandoval II*, 578 F.3d at 801 (alteration in original) (citations and some internal quotation marks omitted). To establish a hostile work environment claim, plaintiffs must demonstrate that their "workplace is permeated with discriminatory intimidation, ridicule,

and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citation and internal quotation marks omitted).

Under Title VII, which "adopts ordinary tort principles of negligence in evaluating liability for sexual harassment," an employer may be negligent if it had actual or constructive notice of the harassment. *Sandoval II*, 578 F.3d at 801. "An employer has actual notice of harassment when sufficient information either comes to the attention of someone who has the power to terminate the harassment, or it comes to someone who can reasonably be expected to report or refer a complaint to someone who can put an end to it." *Id.* at 802. That is, in sexual harassment claims, a plaintiff may establish actual notice by showing that "management **knew** of the harassment." *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1259 (11th Cir. 2003) (emphasis added).

"Constructive notice is established when the harassment [is] so severe and pervasive that management reasonably should have known of it." *Sandoval II*, 578 F.3d at 802 (alteration omitted) (internal quotation marks omitted). There may be constructive notice (1) "where an employee provides management level personnel with enough information to raise a probability of sexual harassment in the mind of a reasonable employer" or (2) "where the harassment is so pervasive and open that a reasonable employer would have had to be aware of it." *Id.*; *see also id.* ("[A]n employer may be charged with constructive knowledge of previous sexual harassment . . . if the harassment was so broad in scope, and so permeated the workplace, that it must

have come to the attention of someone authorized to do something about it." (alterations in original) (internal quotation marks and emphasis omitted)).

Defendants argue that five plaintiffs – Hernandez, Pacheco, Reyes, Gomez, and Perez – cannot establish that the alleged harassment they suffered was severe and pervasive; that is, that the harassment created an objectively hostile work environment. (*See generally* Defs.' Supplemental Mem. in Supp. of Mot. for Summ. J. at 3-11, Docket No. 227.) As discussed below, however, the Court finds that defendants are entitled to summary judgment because plaintiffs have not adduced sufficient evidence that ABMK knew or should have known of plaintiffs' harassment and failed to respond in a timely and effective manner. As a consequence, the Court does not reach the question of whether Hernandez, Pacheco, Reyes, Gomez, and Perez have established severe or pervasive harassment.

### a. ABMK's Actual and Constructive Notice

#### i. Francisca Sandoval

##### 1. Actual Notice

It is undisputed that Sandoval first reported Gonzalez's alleged harassment to ABMK on August 12, 2005. ABMK immediately commenced an investigation, suspended Gonzalez for three days while the investigation was pending, and transferred Sandoval to a new worksite at her request. Sandoval testified she has not experienced any harassment since that time.

Plaintiffs argue there are three reasons why ABMK's remedial action after learning of plaintiffs' sexual harassment allegations were ineffective.[6] First, plaintiffs argue that a jury should evaluate whether defendants took prompt and effective remedial action. (Pls.' Mem. in Opp'n to Mot. for Summ. J. at 36, Docket No. 232.) Second, plaintiffs argue that ABMK's sexual harassment policy is flawed because it "imposes a higher standard to validate sex harassment . . . than is necessary to obtain a criminal conviction." (*Id.* at 38.) Third, plaintiffs argue that "[t]o the extent ABMI took any action on sex harassment reports, it was inadequate because ABMI used an incompetent investigator, ignored or destroyed evidence of sex harassment, and took adverse action against the complainants rather than the sex harassers." (*Id.* at 43.) The Court addresses those arguments in turn.

First, although the question of whether defendants took appropriate action upon learning of plaintiffs' complaint may be a fact question, *see Phillips v. Taco Bell Corp.*, 156 F.3d 884, 889 (8th Cir. 1998), the Court may still conclude from the record that there is no dispute of fact that ABMK's response was prompt and effective. With respect to Sandoval, after she reported Gonzalez's conduct to ABMK through the channels established in ABMK's sexual harassment policies, ABMK immediately began an investigation, suspended Gonzalez, and transferred Sandoval to a different worksite at her request. Sandoval has not suffered any additional harassment since ABMK responded to

---

[6] The Court's analysis of plaintiffs' general arguments that ABMK did not timely and effectively respond to plaintiffs' sexual harassment claims applies with equal weight to each plaintiff's claim.

her complaint. Based on those facts, a reasonable fact-finder could not find that ABMK's response was untimely or ineffective, and summary judgment is warranted.

Second, the Court is not persuaded by plaintiffs' argument that ABMK's sexual harassment policy is inadequate. The district court in *Sandoval I* addressed this issue. On appeal, the Eighth Circuit concluded that ABMK's sexual harassment policies were extensive and that ABMK's sexual harassment procedures, when accessed, ended the timely plaintiffs' alleged sexual harassment. *Sandoval II*, 578 F.3d at 801; *id.* ("ABMK exercised reasonable care to prevent sexually harassing behavior by establishing an anti-harassment policy and reporting procedures[.]"). Based on the facts in the record before the Court and the reasoning of the courts that have addressed this issue, the Court finds that ABMK's sexual harassment policy and procedures were not deficient or flawed.

Third, plaintiffs' argument that incompetent investigators, Hussa's destruction of a CD in Maria Perez's case, and adverse actions against complainants rendered ABMK's remedial action ineffective is not persuasive. Indeed, those assertions are either not supported by the record or have no bearing on whether ABMK responded to notice of complaints in a timely and effective manner. The record demonstrates that even when ABMK's investigations resulted in "inconclusive" results, ABMK sought to counsel the accused harassers or took other appropriate employment actions. Hussa's apparent destruction of a CD in the context of Maria Perez's allegations is not probative of whether ABMK took timely and effective remedial action, because Hussa was not involved in the investigation of Maria Perez's sexual harassment claims. Finally, as discussed below, the record does not support a finding that ABMK took adverse

employment actions against plaintiffs as a result of their complaints to ABMK about sexual harassment.

In sum, there is no genuine dispute of fact that when ABMK received actual notice of Sandoval's alleged harassment, it took prompt and effective remedial action.

## 2. Constructive Notice

Plaintiffs contend that ABMK should have reasonably anticipated plaintiffs' harassment based on reports of extensive sexual harassment by ABMK's on-site supervisors.

In reversing *Sandoval I* on Laureano and Giron's hostile work environment claims, the Eighth Circuit "conclude[d] that the district court erred in disregarding the evidence of widespread sexual harassment." *Sandoval II*, 578 F.3d at 803. The Eighth Circuit stated:

> Here, the district court refused to consider evidence of other sexual harassment claims, concluding it was barred by Eighth Circuit precedent limiting a plaintiff's evidence in sexual harassment/hostile workplace cases to instances of harassment of which a plaintiff is aware. A plaintiff, however, is not limited to offering such evidence only to prove the subjective component of a sexual harassment claim. Irrespective of whether a plaintiff was aware of the other incidents, the evidence is highly probative of the type of workplace environment she was subjected to, and whether a reasonable employer should have discovered the sexual harassment.

*Id.* at 802.

The Eighth Circuit thus remanded Laureano and Giron's hostile work environment claims "with instructions to determine whether evidence of widespread sexual harassment was sufficient to put ABMK on constructive notice" of sexual harassment in the

workplace. *Id.* at 801; *see id.* at 804 (Gruender, J., concurring in part and dissenting in part) (noting that the majority "[did] not find that this evidence created a material question of fact with respect to whether ABMK had constructive notice of the harassment, only that the district court erred by disregarding this evidence.").

Plaintiffs argue that ABMK had constructive notice of plaintiffs' sex harassment claims because the evidence demonstrates that (1) "More than 80 of Plaintiffs' coworkers reported to ABMI similar sex harassment by Plaintiffs' sex harassers and other first-line supervisors shortly before and during the sex harassment of Plaintiffs;" and (2) "ABMI's senior managers in Minnesota admitted that they knew about the sex harassment problem while plaintiffs endured it from 2002 onward." (Pls.' Mem. in Opp'n to Mot. for Summ. J. at 14, 29-30, 36, Docket No. 232.) The Court first considers whether the evidence of other co-workers' complaints establish that the sexual harassment was so pervasive and open that ABMK should have been aware of it. The Court then addresses whether ABMK senior management was provided with sufficient information to raise a probability of sexual harassment in the mind of a reasonable employer. After reviewing the record relevant to plaintiffs' constructive notice claims, the Court finds that plaintiffs have not adduced sufficient evidence to support a finding that ABMK had constructive knowledge of plaintiffs' harassment.

<u>"Verified 'First Report[s]' of Sex Harassment By An Employee In Plaintiffs' Workplace"</u>

To demonstrate that ABMK had constructive notice of sexual harassment, plaintiffs introduce evidence that "over 80 of [] Plaintiffs' coworkers in the 7-County

Twin Cities metropolitan area reported similar treatment by Plaintiffs' sex harassers or other first-line supervisors."  (Pls.' Mem. in Opp'n to Mot. for Summ. J. at 14, Docket No. 232 (citing Cummins Aff. Ex. 135, Docket No. 233).)  Defendants argue that plaintiffs' evidence is not probative because it "includes an assortment of hearsay, speculation, and rumors; conduct that does not amount to harassment; conduct unrelated to Plaintiffs, their alleged harassers, and their worksites; and unreported or unverified allegations involving unknown victims or perpetrators."  (Defs.' Supplemental Mem. in Supp. of Mot. for Summ. J. at 14, Docket No. 232.)

"When judging the severity and pervasiveness of workplace sexual harassment, . . . harassment directed toward other female employees is relevant and must be considered."  *Sandoval II*, 578 F.3d at 802.  Plaintiffs submit a chart detailing 87 "first reports" of sexual harassment from other ABMK employees to show that sexual harassment was open and pervasive.  (Cummins Aff. Ex. 135, Docket No. 233.)  A closer examination of the reports reveals that the relevant number of reports is much lower.  Of the 87 complaints, 17 were "first report[ed]" **after** plaintiffs instituted this action on May 12, 2006.  (Cummins Aff. Ex. 135, sub-exs. 71-87.)  Those complaints are not relevant to whether ABMK reasonably should have known of plaintiffs' alleged harassment.  *See Sandoval II*, 578 F.3d at 802.  Of the 70 remaining complaints, 3 rely on the same termination report for Saul Perez and address the same "unknown female" complainant, and the Court considers those complaints as a single complaint.  (*See* Cummins Aff. Ex. 135, sub-exs. 34-36.).

The remaining 68 "first reports" do not establish that ABMK had constructive notice.[7]  ABMK has at least 2,800 worksites in the Minneapolis branch, and 300 accounts.[8]  (Ketchum Dep. Tr. 48, 96.)  Here, the substantial majority of the relevant complaints come from other or unidentified worksites.  Many of the allegations do not identify the worksites where the alleged harassment occurred or identify the accused harasser.  Approximately 35 complaints are by employees who worked at worksites other than the plaintiffs' worksites.

Plaintiffs do not provide any legal support for their argument that reports from other harassment victims by other employees at different worksites is probative of whether ABMK had constructive notice that sexual harassment was pervasive and open in an individual plaintiff's work environment.  Rather, "whether a working environment is hostile depends upon facts relative to **that environment**." *Lang v. Kansas City Power & Light Co.*, 199 F.R.D. 640, 647 (W.D. Mo. 2001) (emphasis added); *see also Kimzey v. Wal-Mart Stores, Inc.*, 107 F.3d 568, 573 (8th Cir. 1997) ("A **workplace** permeated with discriminatory intimidation, ridicule, and insult is sufficiently severe to establish a hostile work environment." (emphasis added) (internal quotation marks omitted)).  Thus, the

_____

[7]  The Court also notes that of the 68 remaining complaints that **may** have some probative value in the constructive notice analysis, 11 complaints are from plaintiffs.  (Cummins Aff. Ex. 135, sub-exs. 19, 26, 28, 29, 37, 38, 41, 47, 60, 64, 66.)  Although the earlier plaintiffs' complaints could have some bearing on whether ABMK had constructive notice of later plaintiffs' harassment, the converse is not also true.  Moreover, plaintiff Azucena Garcia's sex harassment claims have been dismissed.  (*See id.* sub-ex. 65.)

[8]  Defendants assert that ABMK has 3,200 sites for 380 customers in Minnesota, (*see* Defs.' Supplemental Mem. in Supp. of Mot. for Summ. J. at 20, Docket No. 227.)

Court's analysis focuses on whether an individual plaintiff's work **environment** – here, plaintiffs' worksites – was objectively hostile or whether ABMK should have known of harassment at those worksites because the harassment was open and pervasive. *Cf. Sandoval II*, 578 F.3d at 805 (Gruender, J., concurring in part and dissenting in part) (noting that an opposite conclusion would mean that "an employer could be held to have constructive notice of sexual harassment in a warehouse in Missouri based on complaints of sexual harassment in its headquarters in Florida. [That is,] the employer that had notice of harassment at its headquarters "should have anticipated" harassment at its warehouse."). The cases to which the Eighth Circuit cites in *Sandoval II*, *Hall v. Gus Constr. Co.*, 842 F.2d 1010, 1014-15 (8th Cir. 1988), and *Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 793-94 (8th Cir. 2004), do not support plaintiffs' assumption that evidence of harassment by one victim at one worksite is probative of whether an employer has constructive notice of another victim's harassment at a different worksite. In *Hall*, the Eighth Circuit concluded that the testimony of three female plaintiffs could support each other's claims of an objectively hostile work environment where all three women worked on the same construction crew at various road construction sites. *Hall*, 842 F.2d at 1012. In *ConAgra*, the Eighth Circuit concluded that the district court did not err in admitting evidence at trial from other employees at the **same factory** at which the plaintiff worked to determine whether harassment was severe and pervasive. 378 F.3d at 793-94

Even if the Court could find that evidence of alleged harassment of other victims by different employees at a different location is relevant to whether ABMK had

constructive notice, many of plaintiffs' cited "first reports" are not probative.  A number

of the "first reports" of harassment are contained in affidavits first filed in this litigation

and are based on inadmissible hearsay, which the Court does not consider at summary

judgment.  *See* Fed. R. Civ. P. 56(e) ("A supporting or opposing affidavit must be made

on personal knowledge, set out facts that would be admissible in evidence, and show that

the affiant is competent to testify on the matters stated."); *Brooks v. Tri-Sys., Inc.*, 425

F.3d 1109, 1111 (8th Cir. 2005) ("When an affidavit contains an out-of-court statement

offered to prove the truth of the statement that is inadmissible hearsay, the statement may

not be used to support or defeat a motion for summary judgment."); (*see* Cummins Aff.

Ex. 135, sub-exs. 10-13, 52, 68 ("I heard another coworker complain to management

about sexual harassment by her supervisor."), Docket No. 233.)  Other reports address

conduct that likely does not constitute sexual harassment.  (*see* Cummins Aff. 135, sub-

exs. 4 (documenting a third-party report of comments made to employee "who has not

stated or appeared to have been upset" by the comments), 27 (discussing an employee's

discomfort with "exchang[ing] Xmas gifts"), 31 (documenting a letter to an employee in

which the accused harasser stated, "I should have you in my arms to kiss your lips and

more.  I hope this does not make you feel uncomfortable. . . . If you are not interested I

would understand and would not be uncomfortable."), Docket No. 233.)  Moreover, some

of the complainants do not indicate that they reported the alleged harassment to ABMK

in accordance with ABMK sexual harassment policies.  (*See, e.g.*, *id.* sub-exs. 4, 59, 68.)

The Court does not, however, ignore plaintiffs' evidence out of hand.  Instead, the

Court considers the evidence proffered by plaintiffs with respect to each plaintiff's

individual worksites.  With respect to Sandoval, who worked at ABMK's Valspar worksite, plaintiffs do not adduce any evidence that harassment was so open and pervasive that ABMK reasonably should have known of the harassment at that worksite. In addition, plaintiffs do not point to any evidence that Gonzalez was the subject of any other harassment claims.  As a result, plaintiffs' submission of "verified first reports" of sexual harassment by other employees does not support a finding that ABMK had constructive notice of Sandoval's harassment.

Senior Executives' "Admissions"

Plaintiffs also argue that "ABMI's highest-ranking executive in Minnesota testified that each of his district managers and the HR Director alerted him to the sex harassment problem in 2002."  (Pls.' Mem. in Opp'n to Mot. for Summ. J. at 28, Docket No. 232.)  Plaintiffs excerpt a portion of Charles Ketchum's deposition testimony:

> Q.    [W]hen [the HR Director] told you that there was a problem with the number of sex harassment complaints, did you communicate that to [the Regional Manager]?
> A.    No.
> Q.    Did you tell any one else about [the HR Director's] concerns?
> A.    No.
> Q.    You kept that to yourself?
> A.    Correct.

(Ketchum Dep. Tr. 173.)  Ketchum, however, characterized the issue as an "increase in complaints" and indicated that he "would have talked to district managers" about the increase in the complaints.  (Ketchum Dep. Tr. 174-75.)  In addition, Ketchum's testimony about the general increase in sexual harassment complaints does not establish

that "the harassment was so broad in scope, and so permeated the [plaintiffs'] workplace[s], that it must have come to the attention of someone authorized to do something about it." *Sandoval II*, 578 F.3d at 802 (internal quotation marks and emphasis omitted).

In sum, plaintiffs have not adduced sufficient evidence to demonstrate that ABMK may be liable for Sandoval's sex harassment claim because they should have known that sexual harassment was rampant in her work environment and failed to take prompt and effective remedial action. The Court grants defendants' motion for summary judgment on Sandoval's hostile work environment claim.

### ii.     Ines Hernandez

Hernandez testified that she first reported Olivar's conduct to Arce in September 2004. As the Court concludes above, however, Arce did not have supervisory authority and ABMK will not be deemed to have actual knowledge of Olivar's actions in September 2004. *See Sandoval I*, 552 F. Supp. 2d at 909. After Hernandez first reported Olivar's conduct to the union in April 2005, Hernandez, Mork, McCoy, and two union members met to discuss the allegations. ABMK immediately suspended Olivar for three days while it conducted an investigation into Hernandez's claims. Although the investigation's results were "inconclusive," ABMK transferred Olivar to a different building and transferred Hernandez to a different location with the same pay. Based on those facts, a reasonable trier of fact could not find that ABMK failed to institute prompt and effective remedial measures when Hernandez reported Olivar's conduct to ABMK.

With respect to constructive notice, plaintiffs submit evidence of two reports from employees who worked at the Park Nicollet worksite with Hernandez. Azucena Alatriste claimed that from January 2001 until she was discharged on April 8, 2005, her on-site supervisor, Ruperto Flores, invited her to go out with him, tried to hug her, and promised her wage increases if she agreed to his sexual advances. (Cummins Aff. Ex. 135, sub-ex. 6, Docket No. 233.) In an administrative Charge of Discrimination signed on May 20, 2005, Alatriste stated that she did not report Flores' conduct because she was afraid of losing her job. (*Id.*) Irma Vasquez complained to ABMK on February 26, 2006, that an individual named Jose Rodriguez harassed her at the Park Nicollet worksite. (*Id.* sub-ex. 69.) Plaintiffs' proffered evidence in support of that complaint – a letter from Mork to Vasquez – does not identify the conduct of which Vasquez complained. (*See id.*)

Based on the record, the Court finds that plaintiffs have not adduced sufficient evidence to establish that ABMK should have reasonably anticipated the harassment of which Hernandez complains at the Park Nicollet worksite. Alatriste did not report Flores' conduct until after she was discharged in May 2005, approximately three months after Hernandez formally reported Olivar's conduct to ABMK. Vasquez did not report Rodriquez's alleged conduct until February 26, 2006, just months before plaintiffs filed this action and well after Hernandez first met with ABMK to discuss Olivar's conduct. The Court therefore finds that Alatriste and Vasquez's reports could not establish that ABMK had constructive notice because ABMK could not have been aware of the reported conduct at the time of Hernandez's alleged harassment.

Based on those facts, plaintiffs have not adduced sufficient evidence that ABMK knew or should have known of Hernandez's harassment claims and failed to respond appropriately. The Court grants defendants' motion for summary judgment on Hernandez's hostile work environment claims.

### iii.    Miriam Pacheco

It is undisputed that when Pacheco made a complaint to ABMK about Vidal's conduct on September 26, 2005, ABMK immediately commenced an investigation. ABMK suspended Vidal for three days during the investigation, which rendered "inconclusive" results. Regardless, ABMK placed Vidal on a 60-day probation and transferred him to a worksite in St. Cloud. Pacheco had no further contact with Vidal after his transfer. Further, immediately after Pacheco complained of harassment by Vidal's brother, Enrique Amigon, ABMK conducted an investigation into Amigon's conduct and transferred him from the Meridian Crossings worksite. Based on those facts, a reasonable fact-finder could not find that when ABMK received actual notice of Pacheco's claims, it failed to respond with prompt and effective remedial action.

Plaintiffs also have not demonstrated that ABMK should have known of Pacheco's harassment before she reported it to ABMK. The only evidence produced by plaintiffs relevant to the Meridian Crossings environment, Miguel Vidal, or Vidal's brother is an affidavit by Julietta Gonzales. Gonzales states that a female co-worker complained to her that Miguel Vidal "gave her a card" and that "she did not want this sexual attention from [him]." (Cummins Aff. Ex. 135, sub-ex. 70, Docket No. 233.)

Gonzales also states that Vidal's brother sang sexually offensive songs at work, which made her feel uncomfortable. (*Id.*) Gonzales signed the affidavit on August 7, 2006. (*Id.*) Gonzales' affidavit is not probative of ABMK's constructive notice. Gonzales' statement about a female co-worker's experience with Vidal is hearsay and there is no evidence that the co-worker reported Vidal's conduct. There is no indication that Gonzales reported the harassers' conduct and her "first report" of that harassment occurred months after plaintiffs' filed their complaint. In addition, the harassment to which Gonzales attests does not demonstrate that the harassment was so broad in scope and so permeated the Meridian Crossings worksite that it must have come to the attention of ABMK management personnel authorized to do something about it. For those reasons, plaintiffs have not adduced evidence that ABMK had constructive notice of Pacheco's harassment and failed to respond appropriately. Accordingly, the Court grants defendants' motion for summary judgment on that claim.

### iv.    Eva Reyes

Reyes first notified ABMK of harassment by Lozano and Flores when she filed a Charge of Discrimination in August 2005. ABMK investigated both Lozano and Flores, and although it determined that Reyes' claims could not be substantiated, ABMK counseled Lozano and Flores. Lozano's employment ended shortly thereafter. Plaintiffs do not point to any evidence suggesting that Reyes faced any harassment after she filed her Charge of Discrimination and after ABMK conducted its investigation. As a result,

there is no genuine fact dispute regarding whether ABMK timely and effectively responded to Reyes' allegations when it received actual notice of the harassment.

In addition, plaintiffs have not adduced evidence that harassment at the airport worksite was so open and pervasive as to support a finding that ABMK should have known of Reyes' harassment. Plaintiffs submit evidence that Reyes, plaintiff Arminda Gomez, Guillermina Flores-Ruiz, Maria Ovalle, Xia Thao, Ana Oyoa, Ofelia Pena, and Gladis Hernandez suffered harassment at ABMK's airport worksite or were harassed by Joe Lozano. (Cummins Aff. Ex. 135, sub-exs. 9, 19, 45, 56, 74, 78, 80, Docket No. 233.)

Flores-Ruiz, Ovalle, and Thao's complaints are not relevant to ABMK's constructive notice of sexual harassment at the airport worksite because the complainants did not make their "first reports" until after plaintiffs filed this action. (*Id.* sub-ex. 74, 78, 80.) As a result, their reports, assuming they support a finding of open and pervasive harassment at the airport worksite, are not probative of whether ABMK should have known of Reyes' harassment.

The remaining evidence does not support the proposition that ABMK had constructive notice. Oyoa states in an affidavit that Lozano talked about her and other female employees "in offensive and sexual ways at work." (*Id.* sub-ex. 9.) Oyoa states that she "complained about Mr. Lozano's harassment in approximately 2002 [and Lozano] threatened to fire her and scrutinized [her] work more closely than the work of others." (*Id.*) Oyoa does not explain to whom she reported the alleged conduct, and it is therefore unclear whether ABMK was aware of the harassment. Plaintiffs also submit evidence that Lozano harassed Ofelia Pena. (*Id.* sub-ex. 56.) In a form entitled

"Supplemental Information for Sexual Harassment Complaints," Pena states in Spanish that Lozano harassed her and other co-workers at the airport, but that the harassment ceased after she filed a complaint with her employer. (*Id.*) Finally, in an unsigned, undated, and unnotarized Charge of Discrimination,[9] Gladis Hernandez claimed that Lozano solicited her for sex, falsely accused her of having sex with her co-workers, and called her a "slut." (Cummins Aff. Ex. 135, sub-ex. 45, Docket No. 233.) Gladis Hernandez also stated that Juan Flores accused her of having sex with her co-workers for money. (*Id.*) The Charge of Discrimination states that ABMK was informed of Lozano's conduct on October 7, 2004. (*Id.*)

The vague evidence offered by plaintiffs in Oyoa's affidavit and Pena's complaint is insufficient to clear the high threshold of establishing that harassment was so severe and pervasive that ABMK reasonably should have known of it. A reasonable trier of fact could not find that ABMK knew or should have known of Reyes' harassment at the ABMK airport worksite, and the Court accordingly grants defendants' motion for summary judgment on Reyes' hostile work environment claim.

### v. Arminda Gomez

ABMK did not become aware of Gomez's alleged harassment until she filed a Charge of Discrimination. Although ABMK immediately began investigating the

---

[9] Hernandez's Charge of Discrimination is also different from all other Charges or Complaints of Discrimination submitted by plaintiffs in that the Department of Human Rights does not indicate a case number, an acknowledgement, a date filed, or a date docketed. (*Compare* Cummins Aff. Ex. 135, sub-ex. 45, Docket No. 233 *with id.* sub-exs. 1, 6, 40.)

allegations, the results of the investigation were inconclusive. ABMK counseled Lozano, and Lozano's employment with ABMK ended soon after the investigation. Gomez stated that she has not experienced harassing behavior since she filed the Charge of Discrimination. Based on those facts, a reasonable fact-finder could not find that ABMK failed to respond appropriately after receiving actual notice of Gomez's harassment. Further, for the reasons discussed with respect to Reyes, a reasonable fact-finder could not find that harassment at the airport was so open and pervasive that a reasonable employer should have known of the harassment. For those reasons, the Court grants defendants' motion for summary judgment on Gomez's hostile work environment claims.

### vi.    Nidia Guerrero

ABMK terminated Guerrero's employment in October 2005 after Guerrero failed to complete necessary forms to take a leave of absence longer than three days. It is undisputed that ABMK first learned of Guerrero's harassment allegations when Guerrero filed a Charge of Discrimination on March 21, 2006. Although ABMK had terminated Guerrero's employment and Guerrero refused to cooperate in the investigation, ABMK investigated Guerrero's allegations of harassment by Analco. Plaintiffs later provided information to ABMK that three other individuals claimed Analco had harassed them or witnessed Analco harass others. After investigating those claims, ABMK attempted to transfer Analco to a lower-paying position, which Analco refused. ABMK responded by terminating Analco's employment. Given those undisputed facts, a reasonable trier of

fact could not find that once ABMK received actual notice of Guerrero's alleged harassment it failed to take prompt and effective remedial action.

With respect to constructive notice, plaintiffs introduce some evidence that other cleaners have complained of harassment at the Medtronic worksite where Guerrero worked, or of harassment by Analco. Kirsi Rodriguez states in an affidavit filed in this litigation that in approximately June 2004, Analco asked her and her co-workers out several times, told her that he found her sexually attractive, and held her hand in a way that made her feel uncomfortable. (Cummins Aff. Ex. 135, sub-ex. 43, Docket No. 233.) According to an ABMK conference report dated February 9, 2005, Sheila Sandblade complained to ABMK that Dave Olson harassed her at the Medtronic worksite, and ABMK placed Olson on a three-day unpaid suspension pending an investigation into the allegations, which could have resulted in Olson's "possible termination." (*Id.* sub-ex. 54.) In April 2003, Alondra Yanez claimed that an individual named Steve harassed her by sending her a love letter stating, "I find myself asking constantly how I should have you in my arms, to kiss your lips and more. I hope this does not make you feel uncomfortable. I just finished telling you how I feel. If you are not interested, I would understand and would not be uncomfortable." (*Id.* sub-ex. 31.) A Medtronic employee, Sara Johnson, emailed Mork to inform her that Johnson had completed an investigation into Yanez's complaint and that corrective action had been taken to prevent future, similar occurrences. (*Id.*) It is not clear from the record why Medtronic was involved or by whom "Steve" was employed.

Rodriguez offers no indication she reported Analco's conduct to anyone or through channels approved by ABMK's sexual harassment policies. Sandblade properly reported Olson's conduct, although it is unclear from the evidence the type of conduct she reported or the ultimate outcome of ABMK's investigation. Yanez's complaint is not probative because it is unclear if the accused harasser was related to ABMK or worked for ABMK, and because Yanez's complaint is based on a single incident involving a love letter. In the Court's view, a reasonable trier of fact could not find based on evidence, which involves incidents from April 2003, June 2004, and February 2005, that harassment at Medtronic's was so open and pervasive that ABMK had constructive notice of Guerrero's harassment and failed to respond.

In sum, there is no genuine fact dispute regarding Guerrero's hostile work environment claim, and the Court grants defendants' motion for summary judgment on that claim.

### vii.    Lucila Marquez

ABMK did not learn of Marquez's harassment claims against Saul Ramirez until she filed a Charge of Discrimination in March 2006. ABMK immediately commenced an investigation, suspended Ramirez without pay, transferred him to a new worksite, and demoted him. After ABMK received additional complaints about Saul Ramirez, ABMK terminated his employment. ABMK also reprimanded Ruben Ramirez for not reporting Marquez's complaint about Saul Ramirez. Based on those undisputed facts, a reasonable

trier of fact could not find that ABMK failed to take remedial actions after receiving actual notice of Marquez's harassment.

Plaintiffs argue there is evidence that other ABMK employees complained of harassment by Saul Ramirez, although the evidence does not show that the harassment occurred at Marquez's Prairie Lakes Center worksite. An unidentified female ABMK employee complained to ABMK that Saul Ramirez "ha[d] been leaving notes [for her] and asking her for dates after work." (Cummins Aff. Ex. 135, sub-ex. 52.) The letter documenting the complaint, however, states that the alleged harassment occurred at the "Valley Square" worksite. (*Id.*) Plaintiffs point to another incident at the Boston Scientific worksite involving a "blond woman" who Saul Ramirez allegedly sexually harassed, but the incident occurred after the conduct alleged by Marquez. (*Id.* sub-ex. 72.)

Plaintiffs' proffered evidence does not support a finding that ABMK had constructive notice of Marquez's harassment. Neither incident occurred at the Prairie Lakes Center worksite, and therefore the evidence is not relevant to whether harassment at the Prairie Lakes Center worksite was open and pervasive. The second incident occurred after plaintiffs filed this complaint, and thus it cannot support a finding that ABMK should have known of Marquez's harassment at the time it occurred. Accordingly, the Court grants defendants' motion for summary judgment on Marquez's hostile work environment claims.

### viii.    Maria Perez

Maria Perez immediately reported Saul Perez's harassment to ABMK. ABMK suspended Saul Perez for three days and commenced an investigation. ABMK terminated Saul Perez's employment at the end of its investigation. Maria Perez did not see Saul Perez after reporting his conduct to ABMK. Maria Perez testified that after she turned over the allegedly pornographic CD to Hussa, she did not experience any further sexual harassment. Plaintiffs have not pointed to any evidence suggesting that ABMK failed to timely and effectively respond to Maria Perez's complaint after ABMK received actual notice of harassment. Because Maria Perez immediately reported the conduct and ABMK took immediate and effective corrective action, plaintiffs cannot establish that ABMK knew or should have known of that harassment and failed to act.

With respect to her allegations against Romero, plaintiffs point to no evidence that Maria Perez reported Romero's conduct to ABMK management. Plaintiffs introduce evidence, however, that ABMK should have reasonably anticipated the harassment based on other complaints at the United Health Group worksite, where Maria Perez worked, and based on complaints against Romero and Hussa. In an affidavit filed in this litigation, Lucrecia Mares claims that in 2005, Romero told her and other female ABMK employees they were attractive and he wanted to go out with them. (Cummins Aff. Ex. 135, sub-ex. 50, Docket No. 233.) Mares also states that "her supervisor" would follow her around, look at her lustfully, and follow her into the bathroom without knocking. (*Id.*) Plaintiffs adduce no evidence that Mares reported Romero's conduct to ABMK, and the "first report" of that conduct is in an affidavit filed on August 15, 2006,

which could not have provided notice to ABMK of Maria Perez's harassment.  Plaintiffs also point to evidence of complaints about Hussa on October 10, 2006, (*see id.*, sub-ex. 76), but that evidence similarly cannot support a finding that harassment at the United Health Group worksite was so open and pervasive that ABMK must have been aware of it at the time of Romero or Hussa's conduct towards Maria Perez.

Accordingly, the Court grants defendants' motion for summary judgment on Maria Perez's hostile work environment claims.

### ix.      Estela Laureano and Marlene Giron

The Eighth Circuit reversed *Sandoval I* and remanded with specific instructions to consider whether ABMK had constructive notice of Laureano and Giron's harassment.  As the Court discussed with respect to Sandoval's and the other original plaintiffs' claims, the plaintiffs' submission of "nearly 100" similar complaints does not support a finding that ABMK had constructive notice of the original plaintiffs' hostile work environments.  The Court reaches the same conclusions with respect to Laureano and Giron's hostile work environment claims.

Plaintiffs do not adduce evidence that harassment at Laureano's Hennepin County Libraries worksite was open and pervasive.  Plaintiffs also do not adduce evidence that ABMK should have been aware of harassment at Giron's worksite at the Normandale Lake Office Park.  One female ABMK employee claims that Santos Blanco harassed her at the Normandale Lake Office Park worksite, but the conference report documenting that allegation was not filed until August 10, 2006.  (Cummins Aff. Ex. 135, sub-ex. 75,

Docket No. 233.)  The report therefore does not support a finding that harassment at Giron's worksite was so open and pervasive that ABMK reasonably should have been aware of Giron's harassment at the time it occurred.  Accordingly, and for the reasons set forth in further detail above, the Court grants defendants' motion for summary judgment on Laureano's and Giron's hostile work environment claims.

### B.      Retaliation

Plaintiffs allege that defendants have taken adverse employment action against plaintiffs in response to their complaints of sexual harassment and sex discrimination. (Am. Compl. ¶ 302, Docket No. 25.)

"Title VII prohibits retaliation against employees who allege, or participate in an investigation or proceeding alleging, a violation of Title VII by his or her employer." *Weger v. City of Ladue*, 500 F.3d 710, 726 (8th Cir. 2007) (citing 42 U.S.C. § 2000e-3(a)).  In applying the *McDonnell Douglas* burden-shifting framework, plaintiffs have the initial burden to establish a prima facie case.  *See Rothmeier v. Investment Advisers, Inc.*, 85 F.3d 1328, 1332 (8th Cir. 1996).  To establish a prima facie claim for retaliation, plaintiffs must show that "(1) they engaged in protected conduct; (2) reasonable employees would have found the challenged retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct."  *Weger*, 500 F.3d at 726.  "The materially adverse action prong is objective, requiring us to consider whether a reasonable employee in the plaintiff's position might have been dissuaded from making a discrimination claim because of the employer's retaliatory

actions." *Id.* (internal quotation marks omitted); *see also Jackson v. United Parcel Serv., Inc.*, 548 F.3d 1137, 1141-42 (8th Cir. 2008) (holding that to establish an adverse employment action, each plaintiff must show a "material employment disadvantage" (internal quotation marks omitted)).

Defendants argue that they are entitled to summary judgment on plaintiffs' retaliation claims because plaintiffs have not established that ABMK took material adverse actions against them for filing sexual harassment or sex discrimination complaints. The Court addresses each plaintiff's retaliation claim separately.

### 1. Francisca Sandoval

Plaintiffs argue that ABMK took materially adverse action against Sandoval by reducing her pay by 25%, denying her "promotion to full-time status and related employment benefits," constructively demoting her from her "utility position," and denying her family and medical leave. (Pls.' Mem. in Opp'n to Mot. for Summ. J. at 66, Docket No. 182.) Specifically, plaintiffs cite to Sandoval's paystubs, which show that on the pay period ending December 11, 2004, Sandoval earned $12.55 per hour; on the pay period ending December 25, 2004, Sandoval earned $10.52 per hour; and on the pay period ending January 28, 2005, Sandoval earned 9.55 per hour. (Cummins Aff. Ex. 101 at PABM 1062, PABM 1028, PAMB 1037, Docket No. 183.) Sandoval testified that her pay was reduced from "12, 10, 14" dollars an hour to $9.55 per hour and that Gonzalez

took away half an hour from her hours of work.[10]  (Sandoval Dep. Tr. 268-69.)  Sandoval also testified that when she sought a full-time position, Gonzalez instead gave full-time work to his wife and a man "because . . . he needed a man" working in the particular position.  (*Id.* 60.)  Sandoval claims that Gonzalez denied her request for three months of maternity leave starting May 2, 2003, and instead gave her only two months of maternity leave.  (*Id.* 122-24, 152.)

The tangible employment actions cited by plaintiffs, however, do not support Sandoval's retaliation claim.  Sandoval must establish that the materially adverse action is causally linked to her protected action, i.e., her filing of a sexual harassment complaint.[11]  Sandoval has not satisfied that requirement.  ABMK's alleged retaliatory actions all occurred **before** Sandoval first reported Gonzalez's harassment to ABMK on August 12, 2005.  (*See* Sandoval Dep. Tr. 276-77.)  After Sandoval reported Gonzalez's behavior, ABMK transferred Sandoval at her request to another worksite, and she did not work with Gonzalez again.  (*Id.* 299.)  After the transfer to a new worksite, Sandoval testified she received the same pay and has not faced any form of harassment, retaliation, or discrimination.  (*Id.* 299-300.)  Further, to the extent Sandoval alleges that Gonzalez

---

[10] Although the record does not reflect that ABMK constructively demoted Sandoval from her utility position, that claim is most closely related to Sandoval's claim that ABMK reduced her pay by 25%.

[11] Plaintiffs baldly assert that "[d]efendants have taken adverse action . . . soon after each Plaintiff reported sexual harassment, so temporal proximity exists here."  (Pls.' Mem. in Opp'n to Mot. for Summ. J. at 94, Docket No. 182); *see Bassett v. City of Minneapolis*, 211 F.3d 1097, 1105-06 (8th Cir. 2000).  But plaintiffs offer no support for that assertion and plaintiffs do not explain how the temporal proximity of the alleged materially adverse action to each plaintiff's complaint of sexual harassment supports a finding of retaliation.

retaliated against her, the Court has already determined that Gonzalez did not have supervisory authority under Title VII and the MHRA for the purposes of imposing liability on ABMK. The law only protects employees from retaliation by their employers and not "hostility or retaliation from co-workers, members of her community, and even friends." *Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002). Thus, Sandoval's retaliation claims as they pertain to Gonzalez's actions are without merit.

Viewing the record in a light most favorable to plaintiffs, a reasonable fact-finder could not find in favor of Sandoval on her retaliation claim. Accordingly, the Court grants defendants' motion for summary judgment on that claim.

### 2.    Ines Hernandez

Plaintiffs argue that ABMK took materially adverse action against Hernandez by denying her "promotion to utility," disregarding her medical restrictions, denying her family and medical leave, and constructively discharging her. (Pls.' Mem. in Opp'n to Mot. for Summ. J. at 66-67, Docket No. 182.) Hernandez testified that she "would have liked to work at utilities," but never specifically told anyone that. (Hernandez Dep. Tr. 166.) Instead, she "would just talk to Osvaldo [Arce] about it." (*Id.*) Hernandez testified that after she complained of sexual harassment, she was required to vacuum large conference rooms, which aggravated a back injury she previously incurred. (*Id.* 127-33.) Hernandez also testified that her request for leave due to a backache was

denied, and that she thought her leave request was denied because she had complained about sexual harassment.  (*Id.* 329-30.)

Hernandez's cited material adverse employment actions do not support her retaliation claims.  Hernandez's claim that she was denied a promotion to utilities is without merit.  The record does not reflect that Hernandez told ABMK she wanted to be promoted to utilities and, to the extent Hernandez "talked to [Arce] about it," Arce was not a supervisor and the Court will not consider his actions in reviewing Hernandez's retaliation claim.  *See Kipp*, 280 F.3d at 897.  Hernandez's claim that ABMK disregarded her medical restriction is also without support.  Hernandez's claim that she was required to vacuum large conference rooms – which had always been part of her job duties – is vague.  (*See generally* Hernandez Dep. Tr. 127-33.)  Moreover, Hernandez testified that after she was injured in March 2005, she was given light-duty work such as cleaning air ducts and borders.[12]  (*Id.* 126-27, 134-35, 141-42.)  Finally, the record does not support Hernandez's claim of "constructive discharge": Hernandez testified that she resigned from her employment with ABMK about a year after she initially complained to Arce about Olivar's behavior, and that she resigned because her back injury prevented her from continuing to work.  (*Id.* 108-09, 164.)

Viewing the record in a light most favorable to plaintiffs, a reasonable fact-finder could not find in favor of Hernandez on her retaliation claim because Hernandez has not

---

[12] Hernandez testified that after complaining to Arce about Olivar's behavior, Arce began to "overwork" her.  (Hernandez Dep. Tr. 126-48, 344-45.)  Hernandez testified, however, that her supervisors "overworked . . . most of the people that are working there."  (*Id.* 145-48.)

established that she suffered a materially adverse employment action as a result of making a complaint to ABMK about sexual harassment. Accordingly, the Court grants defendants' motion for summary judgment on that claim.

### 3. Miriam Pacheco

Plaintiffs argue that ABMK took materially adverse action against Pacheco by denying her "promotion to full-time status and related employment benefits" and constructively discharging her. (Pls.' Mem. in Opp'n to Mot. for Summ J. at 67, Docket No. 182.) There is no support in the record for Pacheco's retaliation claim. Pacheco is still employed by ABMK, (*see* Pacheco Dep. Tr. 513), and, therefore, Pacheco's "constructive discharge" claim is meritless. Plaintiffs also do not link Pacheco's vague claim that she was denied utilities work to her sexual harassment complaint, and plaintiffs do not adduce evidence that the denial of utilities work occurred after Pacheco complained of harassment. (*See generally id.* 505-09.) Accordingly, the Court grants defendants' motion for summary judgment on Pacheco's retaliation claim.

### 4. Eva Reyes

Plaintiffs argue that ABMK took materially adverse action against Reyes by denying her overtime work hours given to employees with less seniority and giving her an "undesirable reassignment." (Pls.' Mem. in Opp'n to Mot. for Summ. J. at 67, Docket No. 182.) In support of those assertions, plaintiffs cite their supplemental answers to defendants' interrogatories. (*See* Cummins. Aff. Ex. 88, Nos. 7, 13, Docket No. 183.) Plaintiffs' answers to interrogatories assert that ABMK "has continued to deny . . . Reyes

overtime evidently given to other employees with less seniority." (*Id.* No. 7 at 15.) Plaintiffs' assertion is vague and unsupported, and a reasonable trier of fact could not find, based on that statement, that ABMK retaliated against Reyes for making complaints to ABMK. The answers to interrogatories also do not indicate that ABMK gave Reyes an "undesirable reassignment." Because plaintiffs have not identified any evidence in the record supporting Reyes' retaliation claim, the Court grants defendants' motion for summary judgment on that claim.

### 5. Arminda Gomez

Plaintiffs argue that ABMK took materially adverse action against Gomez by discharging her, giving her an "undesirable reassignment," and obstructing her ability to take leave. (Pls.' Mem. in Opp'n to Mot. for Summ. J. at 67, Docket No. 182.) Plaintiffs have not adduced evidence linking Gomez's sexual harassment complaint to any materially adverse employment action. Gomez testified that as of the date of her deposition, she was still employed by ABMK. (Gomez Dep. Tr. 184-87.) Thus, the record contradicts Gomez's claim that she was discharged in retaliation for her complaints to ABMK. Gomez testified that ABMK increased her workload by transferring her to a different concourse at the airport, but Gomez testified that ABMK did so before she filed her sexual harassment charge. (*See id.* at 71-75.) In addition, minor increase in workload does not necessarily constitute an adverse employment action in a retaliation claim. *See Rice v. Snow*, No. 04-0279-CV-W-REL, 2006 WL 931922, at *20 (W.D. Mo. Apr. 11, 2006). Given these facts, a reasonable trier of fact could not find

in Gomez's favor on her retaliation claim, and the Court grants defendants' motion for summary judgment on that claim.

### 6.    Nidia Guerrero

Plaintiffs argue that ABMK took materially adverse action against Guerrero by discharging her.  (Pls.' Mem. in Opp'n to Mot. for Summ. J. at 67, Docket No. 182.) Guerrero's retaliation claim fails for two reasons.  First, Guerrero did not make a sexual harassment complaint to ABMK while she was employed with ABMK.  ABMK first learned of the alleged sexual harassment five months after it terminated Guerrero's employment.  (Guerrero Dep. Tr. 201; *see also* Robbins Aff. Ex. 7 at Ex. 23, Docket No. 228.)  Second, it is undisputed that ABMK terminated Guerrero's employment for legitimate, non-discriminatory reasons: Guerrero took time off for surgery without completing requisite Leave of Absence paperwork.  (Bonier Aff. ¶¶ 2-3, 6-7, Docket No. 172; Guerrero Dep. Tr. 137-43, 173-74, 197-98.)  Given those facts, a reasonable fact-finder could not find in favor or Guerrero on her retaliation claim, and the Court grants defendants' motion for summary judgment on that claim.

### 7.    Lucila Marquez

Plaintiffs argue that ABMK took materially adverse action against Marquez by denying her "promotion to full-time status and related employment benefits," reducing her hours, and obstructing her ability to take family and medical leave.  (Pls.' Mem. in Opp'n to Mot. for Summ. J. at 67, Docket No. 182.)  Marquez testified, however, that in her current employment with ABMK, her compensation, her responsibilities, and her

duties have not changed. (Marquez Dep. Tr. 107-08.) Moreover, plaintiffs have not adduced any evidence linking Marquez's complaint about sexual harassment to a materially adverse employment decision. Marquez claims she had trouble getting leave because her supervisor asked for a doctor's note for a doctor's appointment, but she ultimately obtained leave. (*Id.* 338-40.) Marquez testified that she believed she lost an hour of work when ABMK changed schedules for Marquez and her co-workers. (*Id.* 300-02.) Marquez could not explain how she had lost an hour in her work schedule, however, and ABMK records indicate that Marquez was scheduled for the same number of hours that she had always worked, although she was often absent. (Mork Decl. ¶ 25, Docket No. 179.) Because Marquez has not adduced evidence establishing a causal connection between her sexual harassment complaint to ABMK and any materially adverse employment action, the Court grants defendants' motion for summary judgment on Marquez's retaliation claim.

### 8. Maria Perez

Plaintiffs argue that ABMK took materially adverse action against Maria Perez by giving her an "undesirable reassignment" and obstructing her ability to take leave. (Pls.' Mem. in Opp'n to Mot. for Summ. J. at 67, Docket No. 182.) The portion of the record to which plaintiffs cite does not support Maria Perez's retaliation claim. Maria Perez testified that in October 2004, she asked Hussa for leave to attend her father's funeral in Mexico. (Perez Dep. Tr. 217-220.) Hussa denied Maria Perez's request for leave, stating he did not have anyone else that could do her job while she was gone and if she left, she

would lose her job.  (*Id.* 219.)  Plaintiffs do not explain how Hussa's denial of leave was related to Maria Perez's sexual harassment complaint to ABMK.  Based on those facts, a reasonable trier of fact could not find in favor of Maria Perez on her retaliation claim, and the Court grants defendants' motion for summary judgment on that claim.

In sum, because plaintiffs have not adduced evidence establishing the elements of their retaliation claims, the Court grants defendants' motion for summary judgment on those claims.

### C.     Sex Discrimination

Plaintiffs allege that defendants discriminated against them on the basis of sex "regarding terms, conditions, and privileges of employment," and, allege that defendants, through practice and policy, deprived plaintiffs of equal employment opportunities, including the opportunity to be promoted to supervisor, because of their gender.  (Am. Compl. ¶¶ 298-300, Docket No. 25.)

In sex discrimination actions, the Court applies the *McDonnell Douglas* burden-shifting test.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under the *McDonnell Douglas* framework, to establish a prima facie case of sex discrimination, a plaintiff must establish that she (1) is a member of a protected group; (2) was qualified for the job at issue; (3) suffered an adverse employment action; and (4) circumstances exist which create an inference of discrimination.  *Wheeler v. Aventis Pharms.*, 360 F.3d 853, 857 (8th Cir. 2004).  As to the third element, an adverse employment action is a "material employment disadvantage, such as a change in salary, benefits, or

responsibilities." *Tademe v. St. Cloud State Univ.*, 328 F.3d 982, 983 (8th Cir. 2003). "Employment actions which do not result in changes in pay, benefits, seniority, or responsibility are insufficient" to establish an adverse employment action for the purposes of a sex discrimination analysis. *Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 715 (8th Cir. 2000). A plaintiff can establish the fourth element by establishing that similarly situated employees of the opposite sex were treated differently. *See Wells v. SCI Mgmt. LP*, 469 F.3d 697, 701 (8th Cir. 2006). An inference of discrimination may also arise "where there is some evidence of a causal connection between a plaintiff's [protected characteristic] and the adverse employment action taken against the plaintiff." *Allen v. Interior Constr. Servs., Ltd.*, 214 F.3d 978, 982 (8th Cir. 2000).

Plaintiffs argue that ABMK took tangible employment action against each plaintiff in circumstances that giving rise to an inference of discrimination. To establish tangible employment action under *McDonnell Douglas*, plaintiffs rely on the same evidence they cite in support of their retaliation claims. Defendants argue that plaintiffs have not adduced any evidence that plaintiffs were treated differently than similarly situated males or demonstrated a causal connection between any adverse employment action and plaintiffs' gender. The Court addresses each plaintiff's sex discrimination claim below.

### 1. Francisca Sandoval

Plaintiffs argue that ABMK took adverse action against Sandoval by reducing her pay by 25%, denying her "promotion to full-time status and related employment benefits," constructively demoting her from her "utility position," and denying her family

and medical leave. (Pls.' Mem. in Opp'n to Mot. for Summ. J. at 66, Docket No. 182.) Plaintiffs have not pointed to evidence that Sandoval suffered any cognizable, tangible employment action because of her gender or that similarly situated males were treated differently. Sandoval testified that she sought full-time work at some time in 2003. (Sandoval Dep. Tr. 55-56.) Sandoval noted, however, that a female received full-time work over her request and over other male employees. (*Id.* 55-58.) Sandoval also testified that a male employee received full-time employment, but in those circumstances, Sandoval did not believe that ABMK unfairly gave the male the job. (Sandoval Dep. Tr. 55-58.) Moreover, Sandoval testified that in June 2005, she told Gonzales that she did not want to do utility work anymore. (Sandoval Dep. Tr. 72, 267.) ABMK transferred Sandoval to a cleaning position, and ABMK cut Sandoval's pay accordingly. (*Id.*) Sandoval also does not argue that the denial of her request for three months of maternity leave was related to her sex.

A reasonable trier or fact could not find in Sandoval's favor on her sex discrimination claim, and the Court accordingly grants defendants' motion for summary judgment on that claim.

### 2.     Ines Hernandez

Plaintiffs contend that ABMK took tangible employment action against Hernandez by disregarding her medical restrictions, denying her family-and-medical leave, and constructively discharging her. (Pls.' Mem. in Opp'n to Mot. for Summ. J. at 66-67, Docket No. 182.) Based on plaintiffs' citations to the record, Hernandez makes only one

allegation that could form the basis for a sexual discrimination claim. (*See id.*)

Hernandez testified that "based on the information [she] could see at the building . . . all

the supervisors were men and . . . the utility [jobs] were also men, so a woman cannot be

promoted to utilities or a supervisory position." (Hernandez Dep. Tr. 34.) Hernandez's

vague statement – without additional evidentiary support – does not establish

circumstances giving rise to an inference of discrimination against Hernandez based on

sex. To the extent Hernandez's testimony suggests that ABMK engaged in a pattern or

practice of sex discrimination, that "method of proving discrimination is not available to

individual plaintiffs." *See Sandoval I*, 552 F. Supp. 2d at 916.

In sum, plaintiffs do not point to evidence that ABMK took any adverse action

against Hernandez in circumstances giving rise to an inference of sex discrimination.

Accordingly, the Court grants defendants' motion for summary judgment on Hernandez's

sex discrimination claim.

### 3. Miriam Pacheco

Plaintiffs argue that ABMK denied Pacheco promotion to full-time status and

"constructively discharged" her. (Pls.' Mem. in Opp'n to Mot. for Summ. J. at 67,

Docket No. 182.) Because Pacheco testified she is still employed by ABMK, her

"constructive discharge" allegation is without merit. (*See* Pacheco Dep. Tr. 501, 513.)

Further, Pacheco has not established that she was denied full-time status because of her

gender. Pacheco testified that "one time, [she asked for] extra hours or more hours." (*Id.*

at 506.) Project manager Scott Martin told Pacheco that she could not work additional

hours because there was not enough work.  (*Id.*)  Pacheco testified that "a little bit after that," Martin hired an unidentified male with less seniority for a full-time job.  (*Id.* 506-07.)  When Pacheco asked Martin why he gave the male the full-time work, Martin responded that "it was because it was utility that the work was very hard, that utility work was very hard."  (*Id.* 507.)  Pacheco testified that she thought that the reason Martin gave the male extra hours could have been because she had previously complained about that type of work.  (*Id.* 507-08.)

A reasonable trier of fact could not find, based on Pacheco's vague testimony about an unidentified male getting full-time employment, that ABMK discriminated against Pacheco based on her sex.  The Court therefore grants defendants' motion for summary judgment on Pacheco's sex discrimination claim.

### 4.    Reyes

Plaintiffs argue that ABMK discriminated against Reyes based on her sex by denying her overtime work hours and giving her an "undesirable reassignment."  (Pls.' Mem. in Opp'n to Mot. for Summ. J. at 67, Docket No. 182.)  In support of those assertions, plaintiffs cite their supplemental answers to defendants' interrogatories.  Plaintiffs' answers to interrogatories assert that ABMK "has continued to deny . . . Reyes overtime evidently given to other employees with less seniority."  (*See* Cummins. Aff. Ex. 88, No. 7 at 15, Docket No. 183.)  Plaintiffs' unsupported answer to Interrogatory Number 7 does not raise an inference of discrimination, and plaintiffs do not argue that the denial of overtime hours to Reyes was based on sex.  Thus, plaintiffs have not

adduced adequate evidence showing that Reyes suffered adverse employment action or that she suffered an adverse employment action in circumstances that give rise to an inference of discrimination. Accordingly, the Court grants defendants' motion for summary judgment on Reyes' sex discrimination claim.

### 5. Gomez

Plaintiffs argue that ABMK took materially adverse action against Gomez based on sex by giving her an "undesirable reassignment," discharging her, and obstructing her ability to take leave. (Pls.' Mem. in Opp'n to Mot. for Summ. J. at 67, Docket No. 182.) Gomez has not established that she suffered materially adverse employment action in circumstances giving rise to an inference of discrimination. Gomez testified that as of the date of her deposition, she was still employed by ABMK. (Gomez Dep. Tr. 184-87.) Like her claim for retaliation, the record does not support Gomez's allegation that she was discharged. Gomez testified that while she was working at the airport, Lozano transferred Gomez from Concourse G to Concourse C, where Gomez testified she "had more duties." (Gomez Dep. Tr. 62.) Gomez testified that no one explained to her why she was transferred to Concourse C, but she thought she was transferred to "hurt" her. (*Id.* 71-72.) However, "a transfer involving only minor changes in working conditions and no reduction in pay or benefits does not constitute an adverse employment action." *Zhuang v. Datacard Corp.*, 414 F.3d 849, 854 (8th Cir. 2005) (alterations and internal quotation marks omitted). In addition, plaintiffs have not pointed to evidence that Gomez was transferred to a different work area because of her sex or in circumstances that could

give rise to an inference of discrimination.  Finally, Gomez testified that she was given time off when she requested it.  (Gomez Dep. Tr. 103-05.)

Viewing the facts in a light most favorable to Gomez, a reasonable trier of fact could not find that any cognizable, adverse employment action was the result of gender discrimination, and the Court grants defendants' motion for summary judgment on Gomez's sex discrimination claim.

### 6. Nidia Guerrero

Plaintiffs argue that ABMK discriminated against Guerrero based on her gender when they discharged her.  (Pls.' Mem. in Opp'n to Mot. for Summ. J. at 67, Docket No. 182.)  It is undisputed, however, the defendants terminated Guerrero's employment for legitimate, nondiscriminatory reasons: Guerrero failed to provide Leave of Absence paperwork to ABMK to excuse her absence from work for more than three days.  (Bonier Aff. ¶¶ 6-8, Docket No. 172; Guerrero Dep. Tr. 197-99.)  Because Guerrero has not established that her termination was pretext for discrimination, Guerrero cannot succeed on the merits of her sex discrimination claim.  The Court grants defendants' motion for summary judgment on that claim.

### 7. Lucila Marquez

Marquez argues that ABMK took tangible employment action against her by denying her "promotion to full-time status and related employment benefits," reducing her hours, and obstructing her ability to take family and medical leave.  (Pls.' Mem. in Opp'n to Mot. for Summ. J. at 67, Docket No. 182.)  Plaintiffs have not adduced any

evidence showing that Marquez was treated differently than similarly situated males or that there is a causal connection between ABMK's employment actions and Marquez's protected status. Marquez testified that ABMK changed her schedule and her co-workers' schedules, and she ended up working an hour less than other co-workers. (Marquez Dep. Tr. 300.) On further questioning, however, Marquez conceded that she was not sure if her other co-workers had also lost an hour of work on their schedules. (*Id.* at 300-02). Marquez claims she had trouble getting leave because her supervisor asked for a doctor's note for a doctor's appointment, but she ultimately obtained the leave. (*Id.* at 338-40.) Based on those facts, a reasonable fact-finder could not find in favor of Marquez on her sex discrimination claim, and the Court grants defendants' motion for summary judgment on that claim.

### 8. Maria Perez

Plaintiffs contend that ABMK took tangible employment action against Maria Perez by giving her an undesirable reassignment and obstructing her attempt to take leave. (Pls.' Mem. in Opp'n to Mot. for Summ. J. at 67, Docket No. 182.) Plaintiffs do not point to any evidence that Maria Perez was reassigned to new duties. Further, Maria Perez testified that she was denied leave to attend a funeral in Mexico because there was no one else that could do her job. (Perez Dep. Tr. 218-20.) Plaintiffs do not adduce evidence that Maria Perez's leave request was denied because of her sex or that similarly situated male employees were treated differently. Accordingly, the Court grants defendants' motion for summary judgment on Maria Perez's sex discrimination claim.

* * *

The Court has carefully and thoroughly reviewed the extensive record in this case, including the exhibits submitted in the parties' pre-remand motion for summary judgment, those portions of previous briefs that the parties expressly incorporated into their instant motions for summary judgment, the parties' briefs on their post-remand motions for summary judgment, and the attached exhibits. For the reasons stated above, the Court denies plaintiffs' motion for summary judgment on the issue of whether ABMI and ABMK are an integrated enterprise. The Court grants defendants' motion for summary judgment in its entirety, concluding that there are no genuine issues of material fact regarding the original plaintiffs' claims or Giron's and Laureano's hostile work environment claims.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Plaintiffs' Motion for Summary Judgment [Docket No. 221] is **DENIED**.

2.      Defendants' Motion for Summary Judgment [Docket No. 225] is **GRANTED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  December 21, 2010            _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                        JOHN R. TUNHEIM
                                                           United States District Judge